**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Greenlight Capital, Inc., DME Capital
Management, LP,

                                        Plaintiffs,

          -vs.-

James T. Fishback,

                                        Defendant.

No. __1:24-cv-4832_____

**COMPLAINT**

### COMPLAINT

Plaintiffs, Greenlight Capital, Inc. ("Greenlight") and DME Capital Management, LP ("DME") (collectively "Plaintiffs"), by and through their undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, for their complaint (the "Complaint") against Defendant James T. Fishback ("Defendant" or "Fishback") allege as follows:

### NATURE OF THE ACTION

1.       Fishback is a former Greenlight Research Analyst who left Greenlight on August 15, 2023.  Correctly deducing that he was about to be terminated for his poor performance and lack of accountability, Fishback resigned on July 31, 2023.  Ever since, he has been on a campaign to harass, intimidate and defame Greenlight and its co-founder, David Einhorn, by disparaging them, by falsely inflating his title, responsibilities and contributions to Greenlight, by claiming a track record that does not belong to him, by commencing complaints and litigation under false pretenses, and by seeking to interfere with Greenlight's relationships including with its customers in violation of Fishback's legal duties to Greenlight.

2.      In addition to seeking to harm Greenlight, Fishback purports to have formed a competing fund, Azoria Partners ("Azoria").  Indeed, Fishback lied to Greenlight even before he resigned, concealing the fact that he formed Azoria as early as July 4, 2023, almost a full month before he noticed his resignation.  Instead of following industry practice and the law, Fishback began a campaign to attract investors to Azoria by attempting to expropriate portions of Greenlight's track record that don't belong to him, by making false statements about his responsibilities at Greenlight, and by misappropriating and misusing Greenlight's Confidential Information (defined below).

3.      Fishback falsely represented himself to industry contacts and at industry events as Greenlight's "Head of Macro" and the person "running macro investing" at Greenlight and responsible for the "insane" performance of Greenlight's macro investment portfolio.  None of these things were true.  Fishback was hired as a Research Analyst, and was never promoted by Greenlight to "Head of Macro."  In fact, the title "Head of Macro" has never existed at Greenlight, and Mr. Einhorn alone, not Fishback, had the sole authority and discretion to manage and run Greenlight's macro investment portfolio, and Mr. Einhorn was responsible for its performance.  Fishback made these false statements to misleadingly inflate his perceived abilities and responsibilities and to take credit for Greenlight's track record, goodwill, and reputation.  Fishback apparently thought that this would provide him and Azoria with more credibility and help attract investors at Greenlight's expense.

4.      After noticing his resignation, during his final few days at Greenlight, Fishback forwarded Confidential Information from his Greenlight email address to his personal email addresses in violation of his Employment Agreement (defined below). This stolen information included Greenlight's then-current portfolio of investments and documents reflecting Greenlight's

macro investing track record, which constitute Greenlight's extremely sensitive and valuable proprietary information. This was just the tip of the iceberg, as a later investigation revealed that Fishback had sent Greenlight Confidential Information to his personal email accounts on dozens of occasions during his tenure at Greenlight.

5.     Since leaving Greenlight, Fishback has become even bolder in his wrongful conduct.

6.     First, Fishback has engaged in a publicity blitz including conferences, podcasts, social media posts and other written publications to publicly use the false "Head of Macro" title, to falsely state that he "ran macro investing" at Greenlight, and to falsely claim credit for the performance of Greenlight's macro investment portfolio. These statements are injurious to and malign Greenlight by falsely communicating to the world that Fishback, and not Mr. Einhorn, was responsible for Greenlight's macro investment portfolio and its performance, when in fact, the exact opposite is true.

7.     In fact, Fishback had absolutely no discretion whatsoever over what macro investments went into Greenlight's portfolio, how they were sized or risk managed, when profits were taken or when such positions were to be closed out. Fishback had no ability or responsibility to take or reduce risk.

8.     Fishback knowingly, recklessly, and maliciously made these false claims, while knowing full well that only Mr. Einhorn actually had such discretion.

9.     Second, in an attempt to intimidate Greenlight from correcting the public record, Fishback filed a frivolous lawsuit against Greenlight premised on the idea that it was somehow defamatory for Greenlight to tell the truth to people who inquired, that Fishback did not hold a

"Head of Macro" title.   He voluntarily dismissed his claims in favor of arbitration.   To date, Fishback has not commenced such arbitration, nor has he refiled these claims.

10.     Fishback also used false statements in his frivolous lawsuit as an improper opportunity to publicly misrepresent his role and performance at Greenlight by falsely claiming that he was "an outstanding performer at Greenlight," "excelled in his work," and "generated over $100 million in profits for Greenlight from the period of February 2021 to August 2023."

11.     None of this is true.   In fact, Fishback was such a poor performer at Greenlight that Greenlight had actually decided to terminate him for his lack of productivity and scheduled a meeting with him to do so, but he abruptly resigned when he deduced that he was about to be terminated.   And, since he had absolutely no authority or discretion whatsoever over Greenlight's macro investment portfolio, he was not responsible for generating any profits, let alone "over $100 million" of profits.

12.     Despite the fact that these statements are false, by making statements about Greenlight's profitability (albeit using incorrect numbers and falsely attributing the profitability to himself), Fishback also publicly disclosed Greenlight Confidential Information.

13.     Third, in furtherance of his attempt to harass and intimidate Greenlight, Fishback also simultaneously filed specious claims with the New York State Division of Human Rights against Greenlight alleging age discrimination (Fishback was in his late twenties during the relevant period) and religious discrimination based on his being Roman Catholic.   These claims were all complete fabrications, and Fishback voluntarily dismissed them as well.

14.     Fourth, Fishback continued his campaign to harass and intimidate Greenlight by threatening to attend and disrupt Greenlight's 2024 Annual Partner Dinner, which is attended by a

4

large number of Greenlight's investors, counterparties and service providers.  After being told that he would not be allowed to attend the event, Fishback threatened to stand outside the event and hand out letters to the attendees, including Greenlight's investors.  The letters that he threatened to hand out contained Greenlight Confidential Information and strategies, maliciously and disingenuously called into question Greenlight's macro investing abilities (falsely and maliciously claiming that no one at Greenlight, including Mr. Einhorn, had "experience in macro derivatives modeling, pricing or trading"), and prompted investors to ask a series of pointed questions to Mr. Einhorn at the event.  Fishback threatened to do this to embarrass and intimidate Greenlight and interfere with Greenlight's relationship with its investors.  After receiving multiple warnings from Greenlight and its counsel as to the wrongful nature of his threats, Fishback ultimately did not attend the event.  But he made no secret of his ongoing desire to harm Greenlight.

15.     Fifth, in May 2024, Fishback deceived the unwitting hosts of a podcast into extending an "invite" to Mr. Einhorn to debate Fishback on the merits of an investment in Tesla, and used Mr. Einhorn's rejection of this sham "invite" as a pretext to capture a wide audience and launch into a days-long social media and podcast tirade against Greenlight and Mr. Einhorn.

16.     In the media blitz that ensued, Fishback took the opportunity he created to continue spouting lies about his "Head of Macro" title, his role at Greenlight, and his responsibility for Greenlight's success, among the other wrongful acts enumerated below.  He also publicly disclosed additional Greenlight Confidential Information.  Fishback's apparent goal in doing this was to continue publicly perpetuating his false narrative about his performance, success, and responsibilities at Greenlight in order to lure investors to his purported hedge fund.  In particular, Fishback seemed to think that it would be especially beneficial to him if he could deceive potential

investors into believing that he alone holds the secret and ability to replicate Greenlight's historical macro investing success.

17.     Sixth, in his May 2024 social media offensive, Fishback wrongfully misused and disclosed Greenlight's Confidential Information in violation of his Employment Agreement.  After Fishback left Greenlight, Fishback refused to return or destroy the Confidential Information that he had stolen from Greenlight, despite Greenlight's repeated demands that he do so.  In May 2024, he publicly demonstrated that he still possessed and was willing to misuse Greenlight's Confidential Information, when he publicly discussed certain of Greenlight's macro investments and the purported performance of Greenlight's macro investment portfolio.

18.     Seventh, in an effort to cover up the truth and make himself look better to potential investors in Azoria, Fishback has repeatedly and publicly misrepresented multiple reasons for leaving Greenlight, including the false and defamatory statement that he left due to political disagreements with Mr. Einhorn.  Fishback apparently did so to hide the fact that he actually left Greenlight because he had been repeatedly warned about his poor performance, and rightly deduced that he was about to be terminated.  Even then, at the time he resigned, the only reason he gave was that he was leaving to focus on his work with a non-profit organization.

19.     Fishback concocted his phony story about political disagreements with Mr. Einhorn in May 2024, almost a full year after he resigned, when it became convenient for him to do so in an effort to attract more publicity by disparaging Mr. Einhorn to build his own following and to attract interest in Azoria.  His statements that he left because he was scrutinized for his political views are pure fiction.

20.     In fact, in his resignation email to Mr. Einhorn, Fishback actually said "I would love to continue working with you," and also pitched Mr. Einhorn to continue consulting for

Greenlight.  This is not something that someone who resigned due to political differences (or due to a hostile work environment due to age and religious discrimination) would say.  Fishback's false statements about political disagreements come at Greenlight's expense as they are injurious to Greenlight's reputation as both an employer and investment manager.

21.     Unfortunately for Greenlight, it did not learn until the final weeks and days of Fishback's employment that he was using wrongful means to promote himself and harm Greenlight in the process.  And at every juncture since Fishback's departure, Greenlight has exercised restraint, and used reasonable, measured responses in order to combat Fishback's wrongful tactics.

22.     But Fishback has shown no signs that he is going to abide by his legal and contractual duties to Greenlight, or end his campaign to falsely promote himself at Greenlight's expense.  On the contrary, Fishback's most recent conduct shows that he is increasingly desperate and willing to resort to wrongful tactics now more than ever.

23.     Mr. Fishback's flippant attitude towards his blatant violations of Greenlight's rights is perhaps best demonstrated in a short video Fishback posted on his X account on May 19, 2024 titled "Dear David Einhorn."  In the video, which has been viewed more that one million times, Fishback attempts to somehow portray himself as the victim, and Mr. Einhorn as a bully, and states: "I want to compete, I want to build a business, I want to create something . . . Let's compete.  Let me start Azoria.  Let me start my hedge fund . . . I don't know what I did, or you think I did."

24.     Fishback's feigned ignorance towards all of his wrongful conduct demonstrates exactly why Greenlight both needs to resort to legal avenues and deserves protection from this Court.

25.     Fishback's conduct has come at great expense to Greenlight.  After invoking Greenlight and Mr. Einhorn's name in his most recent social media scheme, Fishback's posts were

widely viewed, and major media outlets began reporting on the story.  Both Fishback's misuse of Confidential Information and misrepresentations about his purported responsibility for Greenlight's success have caused Greenlight irreparable harm.  By falsely conveying that he was responsible for the management and success of Greenlight's macro investment portfolio, he has both wrongfully misappropriated a valuable asset belonging to Greenlight for himself, and harmed Greenlight by attempting to undermine investor confidence in Greenlight's capabilities.

26.     The record is clear that Fishback considers Greenlight's Confidential Information, goodwill, performance, and reputation to be tools that he can use to both obtain credibility in the finance world, and generate media buzz in the world at large.  That poses two serious problems for Greenlight.

27.     The first problem is that Fishback has no legal right to do any of these things with Greenlight's Confidential Information, goodwill, performance or reputation, and in fact, Fishback's actions to date are directly harmful to Greenlight.

28.     The second problem is that Fishback is unlikely to cease his improper conduct in the absence of a court order.  Simply put, Fishback's behavior demonstrates that he is not concerned with whether his actions are lawful.  He employs dishonest tactics to attain his goals.  He has lost any benefit of the doubt that he is a good faith or rational actor.

## PARTIES

29.     Plaintiff Greenlight Capital, Inc., is a corporation formed under the laws of the state of Delaware and registered to do business in New York.

30.     Plaintiff DME Capital Management, LP, is a limited partnership formed under the laws of the state of Delaware and registered to do business in New York.

31.     Upon information and belief, Defendant is an individual and resident of the state of Florida, residing at 115 Southwest Pinckney Street, Madison, Florida 32340.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 in value, exclusive of interest and costs, and is between citizens of different states.

33.     For purposes of diversity jurisdiction, Greenlight and DME are citizens of the states of Delaware and New York.

34.     For purposes of diversity jurisdiction, Defendant is a citizen of the state of Florida.

35.     This Court has personal jurisdiction over Defendant since, among other things, on information and belief: (i) the Employment Agreement was executed by Greenlight in New York, Fishback executed and sent the Employment Agreement to Greenlight in New York to become an employee of Greenlight, the Employment Agreement contained a New York choice of law provision, and Fishback thereafter visited New York for purposes of the contractual relationship and his employment with Greenlight; (ii) a substantial portion of Fishback's misconduct described herein occurred in New York, or was directed at Plaintiffs in New York causing injury to Plaintiffs in New York state; and (iii) Fishback transacts business within the state.

36.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Greenlight & DME

37.     David Einhorn is the President of Greenlight, which he co-founded in 1996. Greenlight is a highly respected investment management firm, with billions of dollars in assets under management.  As a successful industry leader, Greenlight has invested substantial time, money, and resources into developing its own investment methodologies, investment portfolio,

reputation and goodwill with investors, and other highly commercially sensitive and confidential information that is critical to Greenlight's success.

38.     To protect this information, Greenlight has implemented several measures, including information access protocols regarding how employees may access sensitive company information and requiring all of its employees to agree to confidentiality obligations regarding certain company information.

39.     DME, like Greenlight, is owned and controlled by Mr. Einhorn.   After a restructuring on January 1, 2024, DME became the successor in interest of Greenlight's business.

## II.     Greenlight Hires Fishback

40.     On January 27, 2021, Greenlight sent a letter containing an offer of employment to Fishback (the "Offer Letter").  The Offer Letter stated that the offer of employment was contingent on Fishback signing the standard employment agreement that was enclosed with the Offer Letter (the "Employment Agreement").

41.     Fishback and Greenlight executed the Employment Agreement on February 8, 2021.  Section 5 of the Employment Agreement (the "Confidentiality Provision"),[1] contains multiple subparagraphs that imposed obligations on Fishback with respect to the use and handling of certain information (defined therein as "Confidential Information") that Fishback would have access to as a Greenlight employee.  The subparagraphs of the Confidentiality Provision in section 5 state:

> (i) To assist Employee in the performance of his duties, the Company agrees to provide to Employee special training and information regarding the Company's business methods and access to certain Confidential Information (as defined below) and materials belonging to the Company, its affiliates, and to third parties, including but not limited to investors and prospective investors of the Company who have

---

[1] Section 5 of the Employment Agreement is entitled "Confidential Information," but is referred to herein as the "Confidentiality Provision," to avoid confusion with the defined term "Confidential Information" that appears in Section 5 and that is also discussed herein.

furnished such information and materials to the Company under obligations of confidentiality.

(ii) Except as expressly permitted by the Company in writing, Employee agrees that he shall not (either during his employment by the Company or thereafter) disclose to any person not connected with the Company or use for his own benefit or for the benefit of any person other than the Company any Confidential Information either disclosed to or developed by the Employee during his employment by the Company.   For purposes of this agreement, "Confidential Information" shall include, but not be limited to, all investor lists, prospective investor lists, **investments (except where publicly disclosed)**, **investment methodologies**, methods of dealing, **investment track records**, investment recommendations, **investment performance**, **performance records of any individual investment position**, performance records of any Company fund, **performance records of Employee**, **information that supports the performance record of any Company fund or of Employee**, and other confidential business information related to the conduct of the Company's business and/or the business of any of the Company's affiliates.

(iii) In the event of termination of Employees employment with the Company, Employee agrees to deliver promptly to the Company all Confidential Information, equipment, documents, notes, reports, files, books, correspondence, lists, and other written or graphic reports and the like relating to the Company's or any affiliate's business which are or have been in his possession or under his control.

(iv) Nothing contained in this Agreement supersedes, conflicts with, or otherwise alters the Employee's rights or obligations under existing statute, law, rule, regulation or order relating to the reporting to applicable governmental authority of a violation of any law, rule, or regulation as required by law.

Employment Agreement § 5 (emphasis added).

42.     Thus, Fishback agreed, in recognition of the highly commercially sensitive and confidential nature of the information received in the course of his employment, that he would not disclose to any third party or use for his or others' benefit such Confidential Information and that he would return and not retain any Confidential Information following the termination of his employment.  Per the plain terms of the Confidentiality Provision, the Confidential Information subject to these obligations includes, among other things, information regarding current or

potential Greenlight investments, Greenlight's investment and fund performance, Greenlight's track record, and Greenlight's investment methodologies and recommendations.

**III.     Fishback Consistently Underperforms as an Employee at Greenlight**

43.     Throughout the course of Fishback's employment at Greenlight, Fishback failed to meet even minimal performance expectations.  Fishback consistently failed to devote appropriate time and effort to his Greenlight responsibilities and was notified repeatedly that his work product was unacceptably delayed, undeveloped, or otherwise incomplete.  Furthermore, he also showed a lack of accountability, and even dishonesty, about his performance issues and his outside personal ventures.

A.     Fishback's Performance Issues: 2021-2022

44.     As early as October 2021, Mr. Einhorn informed Fishback that he was on formal notice and that he was on "thin ice," due in part to errors and carelessness in his performance.  In Fishback's formal year-end performance assessment for 2021, Greenlight also communicated to him that his failure "to make himself more valuable to the firm" had "left himself with a smaller margin for error."[2]

45.     Fishback's substandard performance continued into 2022. When these performance issues were raised to Fishback, Greenlight came to understand that he would avoid accountability through dishonesty.  For instance, in the first quarter of 2022, Fishback made careless errors in his own work on multiple occasions, but attempted to blame others in order to avoid personal accountability.

---

[2] This statement refers to the fact that when he was hired, Fishback promised to do a sensitivity analysis of Greenlight's existing portfolio to a variety of macro variables, which he never did, and the fact that Greenlight had offered to train Fishback as a junior trader, which he abandoned less than six weeks into training.  His failure to do the sensitivity analysis, and his declining the opportunity to be a junior trader, were some of the reasons Fishback failed to make himself more valuable to the firm.

12

46.     For example, in January 2022, at Mr. Einhorn's direction, Greenlight executed a macro derivative transaction, which Fishback executed with a counterparty.  In accordance with Greenlight policy, Fishback sent an email with the details of the trade to Greenlight's operations staff informing them that the required initial margin for the transaction was $1.4 million.  In reality, however, the counterparty had requested $4.1 million of initial margin.

47.     When Greenlight's operations staff asked Fishback about the discrepancy, he did not have a ready answer.  As it turned out, the parties had changed the notional amount of the trade and Fishback had either neglected to recalculate, or perhaps to even reconsider, the impact of such change on the amount of the required initial margin.

48.     Greenlight's operations staff alerted senior management, including Mr. Einhorn, about the issue, as the operations staff was becoming concerned with the repeated unreliability of Fishback's work product.

49.     When Mr. Einhorn confronted Fishback about this particular issue, Fishback did not take ownership of his mistake, instead replying that it was "a bank error."  In fact, there was no bank error.  After the notional amount of the trade had changed, the counterparty had correctly recalculated the amount of the required initial margin of $4.1 million, and Fishback failed to do so.  The error was Fishback's by his failing to recalculate the required initial margin.

50.     Throughout 2022, Greenlight provided Fishback with clear notice that he was not meeting expectations.  For instance, on April 19, 2022, Mr. Einhorn expressed disappointment with the lack of substance in an assignment that Fishback had taken six days to complete and expressed to him that he thought Fishback's "work, as shown, could be replicated in about 30 minutes."

51.     In Fishback's formal year-end performance assessment for 2022, Greenlight also communicated to him that **"[w]hen projects are assigned by David to James, they often don't get evaluated in a timely manner and sometimes not at all**" (emphasis added).  The assessment continued that: "[t]o summarize: we aren't sure whether the lack of work is because (a) James disagrees with the topic, so he refuses to indulge David's request in a passive/aggressive way, (b) James isn't capable of investigating these types of questions, or (c) James isn't committing enough hours to his work at Greenlight."

B.   Potential Gift-Matching Incident

52.     Greenlight also became concerned with Fishback's preoccupation with his personal outside endeavors, and his ability to be forthcoming and honest with Greenlight, toward the end of 2022.

53.     For example, Greenlight has an annual gift-matching program in which it matches eligible contributions made by its employees to charitable organizations, up to $10,000.  On November 28, 2022, Fishback requested that Greenlight match a $10,000 donation he made to an organization that he created and ran called the Macrovoyant Foundation ("Macrovoyant").

54.     As part of the gift matching program, Greenlight has fairly standard requirements for this type of program that participating employees must provide proof of their own donation and wire information for the organization.  Greenlight asked Fishback to comply with these requirements for his matching gift request for Macrovoyant.  Greenlight became suspicious when Fishback was unable to provide proof of his own donation or other information verifying that Greenlight's donation would be received and handled legitimately by Macrovoyant.

55.     When Fishback made his initial request on November 28, the only "proof" that he provided for his donation was a picture of an uncashed personal check made out to "Macrovoyant

Foundation." He also requested that Greenlight provide the matching donation in the form of a check as opposed to a wire transfer, but did not explain why that was necessary.

56. Greenlight informed Fishback the next day that a picture of an uncashed check was not sufficient proof of his donation, and asked Fishback to provide a tax receipt for the donation. Approximately one month later, on December 27, 2022, Fishback provided an *unsigned* letter, not on letterhead, purporting to be a receipt from Macrovoyant. He again reiterated the need for a check, asking "[c]ould you kindly make the match in check form? The foundation is in the process of moving bank accounts so wire won't work." Greenlight informed Fishback that the unsigned letter was not sufficient proof of his donation.

57. Another month later, on January 27, 2023, Fishback sent Greenlight an email with: (i) a screenshot purporting to show a wire transfer, and (ii) a screenshot purporting to show a Bank of America account, with each screenshot showing a $10,000 transfer to "Macrovoyant Foundation" on November 29, 2022. However, there was no donor information in either screenshot and Fishback's name did not appear in either screenshot. Greenlight informed Fishback yet again that this was not a sufficient proof of payment.

58. On January 30, 2023, Greenlight followed up again via email to inquire about proof of his donation, and Fishback responded by saying that he was not authorized to share the organization's bank statements without approval from the Board, but sent another screenshot, purporting to be from the website Givebutter, which showed a donation in his name to "Macrovoyant Foundation Corporation" on January 30, 2023.

59. Greenlight ultimately decided not to accommodate Fishback's request given that he was unable to provide credible information to Greenlight about his donation in a timely manner,

why Greenlight's payment needed to be in check form, and his overall lack of transparency surrounding his requests since November 28.

60.     Fishback's insistence that Greenlight provide a check as opposed to a wire because the foundation was "moving bank accounts" did not make any sense, considering that an organization would typically open a new account before closing an old one.

61.     The request for a check on November 28 was ever more curious, because Fishback later purported to show Greenlight a wire from himself to Macrovoyant of $10,000 on November 29, *just one day after* he had requested the payment from Greenlight to Macrovoyant be in check form.

62.     Furthermore, his inability to provide any bona fide proof of payment—like a tax receipt—from Macrovoyant, the charity that he ran, raised questions as to the legitimacy of his own donation.

63.     Finally, it made no sense that Fishback hid behind the charity's Board, considering he was the founder of the charity.

64.     Overall, Greenlight found that Fishback's manner of requesting $10,000 from Greenlight for his own personal charity and his inability to provide required basic information raised questions as to whether Fishback was demonstrating appropriate personal integrity with Greenlight about the gift-match.

C.   Performance Issues Continue Into 2023

65.     Fishback's performance issues persisted into 2023 and were compounded because he was devoting increasing time and effort to his personal endeavors, like Macrovoyant Foundation (also known as Incubate Debate), which focused on high-school debate, at the expense of performing his job as a full-time Greenlight Research Analyst.

66.     For example, on April 13, 2023, Greenlight learned for the first time Fishback was managing five full-time employees at Incubate Debate.  Fishback had never disclosed this to Greenlight, in violation of its internal compliance and conflicts policies that require disclosure of such outside engagements.

67.     At approximately the same time, senior management at Greenlight communicated to Fishback that it was clear that his involvement with his personal endeavors, like Incubate Debate, was detrimental to his performance at Greenlight.

68.      Fishback acknowledged that Greenlight's criticisms were valid, and apologized and communicated that he would resolve the issue by hiring an executive director for Incubate Debate, so that he would not need to be involved in the organization's day-to-day activities.

69.     Despite his representations, Fishback remained preoccupied with his personal endeavors and his performance did not improve.  On May 29, 2023, Mr. Einhorn emailed Fishback and pointed out that Fishback had failed to provide a daily email summary of macro events that Mr. Einhorn had requested and stated that it appeared Fishback had ignored his direction.

70.     Mr. Fishback replied, apologizing and stating "David, you are not missing anything. This is my fault."

71.     Mr. Einhorn responded as follows:

I'm adding [Daniel Roitman], so that we don't have a game of telephone.  If the below is correct, then you can't tell him that you have taken what was said at your review to heart and made great progress.  **We genuinely doubt you are working as a full time employee.**  We don't have punch clocks and you work remotely.  So, the burden of proof is on you.   And, it looks like your side gig is cutting into Greenlight.  In fact, **it really doesn't appear to me that you are doing any meaningful amount of work for Greenlight.**  If I didn't like you, I'd fire you now. But, you are on very, very thin ice.  I don't intend to continue to have this argument with you. (emphasis added).

72.     On June 2, 2023, at a scheduled research meeting with Fishback, Mr. Einhorn expressed his continued dissatisfaction with Fishback's work.   Mr. Einhorn stated that organizational confidence in Fishback was extremely low and reminded Fishback that he "was on thin ice."

73.     Fishback acknowledged that he had let the firm down, needed to do a better job at prioritizing tasks that he had promised Greenlight that he would do, and apologized, again.

74.     Greenlight's patience with Fishback finally ran out in late July 2023.  On July 26, 2023, Fishback submitted a draft essay (the "Jelly Donut Assignment") to Mr. Einhorn that he had been assigned to write in February 2023.  After many delays, the draft essay was finally supposed to be delivered on July 24, 2023.  Despite it being two days beyond the most recent deadline, and despite Fishback have having had months to complete the Jelly Donut Assignment, the draft essay appeared to reflect only a few hours of effort.

75.     After receiving the Jelly Donut Assignment on July 26, and determining that it did not reflect a substantial amount of work, Greenlight reviewed its computer system and discovered that Fishback had almost no work files saved on Greenlight's network drive, and had engaged in very little activity on Greenlight's computer system.  This effectively confirmed that Fishback had not put any serious amount of work into the Jelly Donut Assignment, as he would have needed to have been active in the network drive during the process in order to do so.

76.     Moreover, since this review revealed that virtually none of Fishback's work had been saved on Greenlight's network drive, Fishback must either have been saving his Greenlight work files—which would have included a vast amount of Confidential Information—on his personal devices, in direct violation of Greenlight's policies and his Employment Agreement, or he did not do any meaningful work during his entire tenure at Greenlight.

18

77.     After this review, Greenlight finally decided to terminate Fishback for his lack of productivity, failure to perform his duties, and violations of company policies

78.     On Monday, July 31, 2023, Mr. Einhorn's assistant emailed Fishback at 10:48 a.m. to inform him that Mr. Einhorn wanted to schedule a Zoom call for noon that day.  The unstated purpose of that Zoom call was to terminate Fishback's employment.

79.     In response, at 10:56 a.m., Fishback requested that the Zoom call be rescheduled to 3:30 p.m. allegedly due to his travel schedule.  Then, a mere 27 minutes after delaying the Zoom call, Fishback tendered his resignation to Greenlight via email, and provided notice that his last day of employment would be on August 15, 2023.

80.     Greenlight understood at that time that Fishback likely deduced that the purpose of the Zoom call with Mr. Einhorn was to terminate him, so Fishback resigned first to avoid the embarrassment of termination.

81.     In Fishback's resignation email to Mr. Einhorn on July 31, 2023, Fishback stated that the reason he was leaving was to focus on his non-profit, Incubate Debate.  Fishback wrote that "**I would love to continue working with you.**  If you'd have me, I hope we could return to a part-time consulting arrangement, where I could share macro trade ideas with you and pursue my passion with Incubate Debate." (emphasis added).

82.     In a second email to Mr. Einhorn on August 6, 2023, Fishback reiterated those sentiments, stating: "[a]s I mentioned in my email on Monday, it is my **hope to return to my original role as an external consultant** and advise on existing and new macro positions…." (emphasis added).

83.     As further discussed herein, however, Fishback had other motives at that time that Greenlight has since discovered, but were not yet apparent to Greenlight at that time.

## IV.    Greenlight Discovers Fishback's Other Misconduct on the Eve of His Departure

84.    After Fishback resigned, Greenlight learned that before he left Greenlight, Fishback had taken concrete steps to form Azoria.  He had also secretly violated his duties to Greenlight.

85.    Specifically: (1) without Greenlight's knowledge or permission, and in order to build his credibility before launching Azoria, Fishback had participated (or registered to participate) in at least five industry events and used false credentials at four of these events to artificially inflate his importance at Greenlight; and (2) in violation of his Employment Agreement and Greenlight's compliance policies, Fishback surreptitiously sent Greenlight's Confidential Information to his personal email accounts in his final days at Greenlight, as he had also secretly done dozens of times before during his tenure at Greenlight.

86.    Fishback's plan to start a competing business built off the wrongful misappropriation of Greenlight's reputation and Confidential Information began to be revealed to Greenlight when Greenlight learned that Fishback had clandestinely signed up for the 2023 Citi Equities Conference which was being held in Miami Beach on September 12-14, 2023 (the "Citi Conference").

### A.    Fishback's Misrepresentations Regarding His Greenlight Title

87.    On August 1, 2023, Greenlight received an email with information about the Citi Conference.  The email showed that Fishback was scheduled to speak as Greenlight's "Head of Macro." This email was the first time Greenlight learned that Fishback was making misrepresentations about his work with Greenlight, and his title, to third parties.

88.    In fact, since Fishback did not request Greenlight's permission to speak at the Citi Conference, as he was required to do so by Greenlight policy, prior to receiving the August 1 email, Greenlight did not know that Fishback had even registered as a speaker for the Citi Conference, let alone used the fictitious "Head of Macro" title.

89.     In response, Greenlight performed a search of other Fishback engagements and learned that, unbeknown to Greenlight, Fishback had participated in at least four prior speaking engagements where he used a false title or credentials, and that he had used similar variations on the "Head of Macro" title at two of them.[3]  Fishback did not request or receive the required preapproval from Greenlight for any of these events, and in at least two instances, also used the Greenlight name and logo without permission.

90.     This fabricated job title "Head of Macro" has never existed at Greenlight, and Fishback's job title at the time of all of these engagements, as it had always been, was "Research Analyst."  More concerning to Greenlight is that Fishback chose the false title "Head of Macro" in order to convey to the public, and potential Azoria investors, that he had greater importance to Greenlight's operations than the title "Research Analyst" would imply, and to improperly suggest that he was responsible for the management and performance of Greenlight's macro investment portfolio.

B.  Fishback Created Azoria, a Competing Hedge Fund, While at Greenlight, and Lied to Greenlight About It

91.     When Greenlight confronted Fishback about his planned appearance at the Citi Conference, he was forced to reveal for the first time that he had started Azoria, the new business he had formed while still employed as a Research Analyst at Greenlight.

---

[3] Those other instances include (1) the University of Florida CAPS – Career and Academic Peer Mentors podcast released on February 9, 2022, where Fishback stated that he "helped run global macro investing at Greenlight;" (2) Columbia Alpha Partners "Breaking Into Hedge Funds with James Fishback & Greenlight Capital" event on October 11, 2022, where Fishback used the title "Head of Macroeconomic Research"; (3) the ALPFA at University of Florida's "Speaking on Asset Management, Inflation And the Fed" event on March 22, 2023, where Fishback used the title "Head of Global Macroeconomic Investing;" and (4) a Foundation for Individual Rights and Expression Conference on June 15, 2023 where Fishback stated that he "ran global macro at Greenlight Capital." Fishback also made an unauthorized presentation on March 10, 2022, in connection with Florida State University that was advertised as the "Greenlight Capital Speaker Series with James Fishback."  It is unclear what title he used at this event.

92.     After Greenlight received the email with the Citi Conference agenda, Greenlight requested Fishback to provide contact information for the Citi Conference, so that Greenlight could correct the agenda.  Fishback did not provide the requested contact information, but instead, on August 9, 2023, sent Greenlight's Chief Operating Officer a revised agenda for the Citi Conference which now listed Fishback as "Founder & CIO, Azoria Partners," which is the first time that Greenlight learned about the existence of Azoria.  In his August 9 email, Fishback said "[t]hey've updated it and removed my Greenlight affiliation, replacing it with the name of the consulting LLC I'm starting to service a few clients."  This was false.

93.     In fact, Azoria is not a "consulting LLC," but the hedge fund that Fishback currently purports to operate, is actively promoting on social media, and that Fishback has explicitly stated he intends to use to directly compete with Greenlight.  Fishback had conveniently failed to mention the existence of Azoria to Greenlight at any point in time before August 9, 2023, and it was curiously missing from his resignation email in which he stated he was leaving to focus on his non-profit, Incubate Debate.

94.     Indeed, Greenlight subsequently learned that the domain name for the Azoria Partners' website, which is still in use today, was registered on July 4, 2023, almost a full month before Fishback noticed his resignation from Greenlight.

95.     When Greenlight eventually discovered that Fishback formed Azoria as a competing hedge fund, Fishback's motivation for use of the fabricated "Head of Macro" title became much clearer.  By using the false title, Fishback was (and is) holding himself out to the public as responsible for Greenlight's macro investment successes and track record.  In turn, it appears that Fishback believed he could garner credibility and resources for his own competing ventures by doing so unbeknown to Greenlight.

C. <u>Fishback Transferred Greenlight's Confidential Information to Himself</u>

96.     Greenlight naturally became more suspicious of Fishback's motives following its discoveries above.  Greenlight discovered that on August 15, 2023, Fishback's final day at Greenlight, Fishback forwarded an "End of Day Package" that had been circulated internally at Greenlight on July 28, 2023, and which contained, among other things, a full list of the investments in Greenlight's portfolio, information pertaining to investment performance, and investment track records, to his personal non-Greenlight email address from his work email account.

97.     Such information undoubtedly constituted Confidential Information, as that term is defined in the Employment Agreement.  Because Fishback forwarded this information to himself surreptitiously, without authorization, and with no legitimate purpose related to his employment with Greenlight, this constituted a clear violation of the Confidentiality Provision in his Employment Agreement.

98.     Further investigation showed that this was not the only occasion on which Fishback had personally retained Confidential Information in violation of the Confidentiality Provision.  On August 11, 2023, Fishback also surreptitiously forwarded to his personal email account Confidential Information relating to the year-to-date profit and loss of certain Greenlight interest rate positions.

99.     While Greenlight is still attempting to ascertain the full extent of the Confidential Information that Fishback took, it seems that dozens of times during his tenure at Greenlight, Fishback surreptitiously emailed information from his Greenlight email account to one of his several personal email accounts, including information about specific Greenlight macro investments, and their performance.

100.    As discussed in further detail *infra*, however, Greenlight has learned through Fishback's recent public statements that he has made since leaving Greenlight that he still has possession of Confidential Information that he had stolen during his tenure at Greenlight.

D. Greenlight Warns Fishback Against Misconduct and Fishback Reveals His Scheme

101.    On August 15, 2023, immediately after Greenlight became aware that Fishback sent Confidential Information to his personal email account, Greenlight's Chief Operating Officer, Mr. Daniel Roitman, emailed Fishback notifying him that Greenlight detected his attempt to misappropriate Confidential Information and demanding that he delete the information.  Mr. Roitman also warned Fishback against using inaccurate titles.

102.    In response, Fishback replied "Deleted.  I thought I was the 'head of macro.'"

103.    Greenlight has serious reasons to doubt that Fishback ever deleted any of the Confidential Information he took from Greenlight.  As further discussed below, Greenlight's counsel has sent multiple letters to Fishback asking him to confirm the deletion of all Greenlight Confidential Information in his possession, which he has never replied to, and, just recently, on May 23, 2024, he publicly confirmed that he is still in possession of at least one of Greenlight's documents containing Confidential Information.

104.    Furthermore, Fishback knew full well that he had never held any other job title at Greenlight besides Research Analyst.  But in a disingenuous and transparent revelation of the scheme he had planned to carry out, he attached to his response a screenshot of an email he had also curiously forwarded from his work email to his personal email account that day.

105.    The screenshot was an email from Mr. Roitman to Ms. Heather Robinson, a Senior Manager of the GLG Group on May 11, 2023 (the "GLG Email").  The email thread began with Ms. Robinson contacting Mr. Roitman to promote a "Remote Roundtable" meeting her firm was hosting, and offering to "save [] a seat" for Greenlight.  In response, Mr. Roitman asked Ms.

24

Robinson to sign Fishback up for the meeting, which was relevant to Fishback's duties as a Research Analyst focused on macro positions, and introduced Fishback onto the email thread by informally remarking that he is "our head of macro."

106.    To be clear, Mr. Roitman was not stating that this was his formal title, as is obvious from the context and lack of a proper noun. The Remote Roundtable was a GLG "Signature Event" available only to senior executives (only Mr. Einhorn and Mr. Roitman were invited), and Mr. Roitman exaggerated his description of Fishback so that GLG would allow him to attend the event.

107.    Fishback knew that his title at Greenlight was "Research Analyst." But it was clear from Fishback's defiant response to Mr. Roitman's email that he intended to leverage an informal remark in a single stray email as "support" for a fictious formal title that he alone created.

108.    Fishback's emailed statement to Mr. Roitman on August 15 that he "thought" his title was "head of macro" was completely disingenuous, and in retrospect, just the beginning of the misrepresentations that Fishback intended to make to the public and potential investors. It is also quite telling that on August 15 Fishback stole two emails from Greenlight's system: the full portfolio of investments and the GLG Email.

109.    Fishback had no reasonable basis to believe that he was ever given the title or promoted to "Head of Macro." Contrary to Fishback's public statements, promotions are a big deal at Greenlight, and people are absolutely not "given new responsibilities pretty much on a whim" at Greenlight as he has since claimed publicly. His statement as such is outrageous and defamatory.

110.    If Fishback had been promoted, his change of title would have been widely communicated by Greenlight and documented in its records. There have been eighteen actual

25

promotions at Greenlight since 2011, and all eighteen were communicated to Greenlight's investors in its quarterly letters.

111.    Fishback's alleged "promotion" to "Head of Macro" was not communicated to investors in one of Greenlight's quarterly letters because the alleged "promotion" never actually occurred. Fishback's public claims that he was promoted are abject lies. Indeed, the only title that Greenlight ever included in its materials including organizational charts and firm brochures for Fishback was "Research Analyst."

112.    To be certain, Greenlight reviewed its own records, and found that the only time anyone at Greenlight (other than Fishback himself) used the term "head of macro," was the single stray comment in the GLG Email from Mr. Roitman to Ms. Robinson.

113.    Fishback's claim that he genuinely "thought" this was his official title is patently unreasonable and defies common sense and the facts.

114.    The record is clear. Fishback was never promoted to "Head of Macro" and the title "Head of Macro" has never existed at Greenlight.

115.    In fact, Fishback himself demonstrated that he knew that he never held the title "Head of Macro." When Greenlight reviewed its records, it identified that Fishback had used the fabricated "Head of Macro" title in his emails exactly four times. Three instances were when Fishback tried to set up a meeting with John Williams, the Governor of the Federal Reserve Bank of New York.[4] In an email on May 15, 2023 (which he re-forwarded to Mr. Williams again on June 7 and 24) to Mr. Williams, Fishback used an email signature block that read "Head of Macro, Greenlight Capital, Inc."

---

[4] The fourth email is when Fishback registered for the Citi Conference and provided a short bio with the title of "head of *global* macro."

116.     Quite tellingly, after sending this email on May 15, 2023, Fishback changed his email signature block back to his normal signature block that did not say "Head of Macro."  If Fishback genuinely thought he had the title "Head of Macro," why would he change his signature block to eliminate the title?  Importantly, no one from Greenlight was copied on any of the emails to Mr. Williams.

117.     Simply put, this behavior demonstrates Fishback's fraudulent intent.

## V.     Fishback's Continued Title Misrepresentations Shortly After Leaving Greenlight and Greenlight's Demand Letters

118.     Considered alongside Fishback's other actions during his employment with Greenlight, it is clear that by using made up titles that aggrandized his role at Greenlight, Fishback overstated his importance to Greenlight's success, in order to create publicity and build credibility for Azoria.

119.     This much was confirmed shortly after Fishback's employment with Greenlight terminated.  Specifically, on September 27, 2023, Mr. Roitman received the following email from a Mr. Jeffery Rehm, whose email signature indicates that he was the "Director of Investments" at Legacy Wealth Advisors, in Miami, Florida:

> I hope this finds you well. My firm is looking at James Fishback's new hedge fund (Azoria Partners) and I'm hoping to confirm some information with you.
>
> 1. Was James employed at Greenlight from February 2021 until his resignation in August 2023?
>
> 2. What were James' responsibilities as Greenlight's Head of Macro?
>
> 3. In aggregate over his employment, did James' investments contribute positively to Greenlight's returns?

120.     After receiving this inquiry, Mr. Roitman emailed Fishback on September 28, 2023 and wrote "I want you to correct the record or I will be forced to do so."  Fishback ultimately

replied "Do whatever you need to do."   Consequently, Mr. Roitman replied Mr. Rehm on September 29, with the following email:

> Sorry for the late reply but I was on a business trip.
>
> 1.  James was employed at Greenlight as a Research Analyst from February 2021 through August 2023.
>
> 2.  He was not Head of Macro. We do not have Heads at Greenlight as David Einhorn makes all portfolio management decisions. James responsibilities were to suggest macro trading ideas to David that could be standalone good risk-adjusted bets where we had a variant perception, or that could hedge areas of the portfolio where we wanted to minimize our exposure to macro factors.
>
> 3.  We generally do not comment on an individual analyst's ideas as David has trading discretion over the portfolio.

121.    Like other elements of Fishback's relationship with Greenlight, even this innocuous looking reference check is suspicious.  Mr. Rehm is apparently an employee of Legacy Wealth Advisors.  The Azoria website states that "Azoria is an investment manager founded and led by James T. Fishback and Asaf H. Abramovich."  Mr. Abramovich's LinkedIn profile and regulatory filings show that he worked for Legacy Wealth Advisors immediately before co-founding Azoria. A review of Fishback's communications on Greenlight servers also revealed that Fishback knew Mr. Rehm before leaving Greenlight.  After Mr. Roitman responded to Mr. Rehm, Mr. Rehm never followed-up on his inquiry.

122.    However, as discussed in further detail below, Mr. Rehm's email exchange with Mr. Roitman made its way to Fishback and wound up forming the sole basis for a frivolous defamation suit that Fishback filed against Greenlight.  Fishback claimed in his suit against Greenlight that Mr. Rehm would have invested $5 million in Azoria, but for Mr. Roitman's email, which allegedly cast doubt on Fishback's credibility.

123.    Putting together Fishback's ties to Mr. Rehm, Mr. Rehm's targeted questions towards the "Head of Macro" title, the lack of any follow-up from Mr. Rehm on the diligence for an alleged $5 million investment, the fact that Mr. Rehm and Mr. Roitman's email exchange made its way to Fishback (after he alleged that it made him out to be a liar to Mr. Rehm), and that Fishback seemed unconcerned that Mr. Roitman was going to tell Mr. Rehm (a supposedly important potential investor) that Fishback was not the Head of Macro, Greenlight has a reasonable basis to suspect that Fishback manufactured this "reference check," especially since he has recently shown that he is willing to deceive others into communicating with Greenlight to create pretext for his schemes, as discussed below in connection with the "Wall Street Skinny" podcast inquiry Greenlight received in May 2024.

124.    In any event, Fishback had not heeded Greenlight's demands about not using fake titles.  Indeed, a review of Fishback's X (formerly Twitter) account, his own personal website, fshbck.com, and the website and LinkedIn page for Azoria around the same time showed that Fishback was holding himself out as Greenlight's former "Head of Macro."

125.    As a result, on October 11, 2023, Greenlight sent Fishback a letter (the "First Demand Letter") that, *inter alia*, demanded that Fishback cease holding himself out as having held any title other the title he actually held at Greenlight, which was "Research Analyst."  Greenlight clearly communicated that Fishback's representations to the contrary that he was "Head of Macro" were false.  The letter demanded that Fishback return (or destroy, as applicable), Greenlight's Confidential Information in his possession or control.

126.    On October 19, 2023, Greenlight sent Fishback a second letter (the "Second Demand Letter") reiterating the demands made in the First Demand Letter, and documenting certain of Fishback's efforts which showed that he had received the First Demand Letter, but was

trying to obfuscate that fact in an attempt to deny that he had received notice.  The Second Demand Letter observed that within twenty-four hours of sending the First Demand Letter, the contact email address that was posted on the website and LinkedIn account for Azoria Partners had been changed from *james@azoriapartners.com* to *sunset@azoriapartners.com*.

127.     Fishback has never responded to either of these letters.  Instead, and as further detailed herein, he has consistently attempted to harass Greenlight by initiating frivolous litigation against Greenlight, continuing to publicly promote himself using false statements regarding his title and role with Greenlight, and misusing his knowledge of Greenlight's Confidential Information in order to remain in the public eye and benefit from Greenlight's notoriety and reputation, harming Greenlight in the process.

## VI.    Fishback Attempts to Silence Greenlight with Frivolous Litigation

128.     It has become apparent that Fishback considered misrepresenting his title and role with Greenlight and his alleged responsibility for Greenlight's macro investment performance to be a valuable tool for self-promotion.

129.     In an effort to legitimatize his misrepresentations, Fishback initiated frivolous litigation against Greenlight, in the hopes that it would give him leverage to use his fake title and to intimidate Greenlight from publicly objecting.

130.     Fishback filed a complaint against Greenlight on October 23, 2023, in New York State Supreme Court (the "Defamation Complaint").  The Defamation Complaint frivolously alleged that Greenlight defamed him by denying that he had held the "Head of Macro" title.

131.     In response, Greenlight moved for alternative forms of relief.  First, Greenlight invoked the arbitration provision in Fishback's Employment Agreement, so as to not waive the right to arbitration.  In the alternative, Greenlight moved to dismiss the complaint for failure to

adequately state claims for defamation, citing several fundamental legal issues with Fishback's claims.

132.    First, Greenlight pointed out that Fishback failed to identify when, how, or to whom Greenlight had made the alleged defamatory statements, as he was required to do under New York law.   Instead, Fishback vaguely alleged that Greenlight's Mr. Roitman had told "a partner and director of investments at a preeminent family office" at some unspecified point in time that he "was not Head of Macro."   Fishback notably failed to identify this person as Mr. Rehm, who worked at Legacy Wealth Advisors, the same firm that the co-founder of Azoria with Fishback worked at.

133.    Second, Greenlight explained that Fishback had a glaring issue with the falsity element of his defamation claims because his complaint contained no plausible allegations that he ever held a "Head of Macro" title.   That was because the only specific allegation Fishback could muster in support of his claims was the GLG Email.   As discussed above, Fishback could not have reasonably believed that he had the official title of "Head of Macro" based on this stray remark in a single email.   Moreover, Fishback knew that he did not have that title, because he had to hide his use of it from Greenlight, lest he be corrected.   Nevertheless, Fishback naively considered that he would be able to frame this off-hand remark in a single email as some sort of golden ticket to obtain a court's blessing on his use of a made-up and deceptive title.[5]

134.    Fishback's brief in response to Greenlight's motion revealed the frivolous nature of his claims.   First, Fishback capitulated to Greenlight's motion to compel him to pursue his claims in arbitration.

---

[5] Greenlight also made a number of other legal arguments that are not recounted here.

135.     Second, Fishback attempted to amend his complaint to fix the particularity issue by providing more "facts" about the allegedly defamatory statement.  As Greenlight had suspected, the sole basis for the statement was the email that Greenlight had received from Mr. Rehm at Legacy Wealth Advisors, with inquiries specifically targeted at Fishback's role as "Head of Macro."  As noted, this alleged potential investor worked at the same firm as Azoria's other co-founder.  With the benefit of hindsight and context for Fishback's actions, Greenlight highly doubts that this inquiry was even a legitimate attempt at diligence, and may have very well been completely pretextual to serve as the basis of Fishback's defamation suit.

136.     Third, Fishback did absolutely nothing to substantiate that he allegedly held a "Head of Macro" title beyond producing the GLG Email.  Fishback's inability to provide additional support for the title was particularly telling given that Fishback emailed documents to his personal email accounts on dozens of occasions, but the GLG Email was the only thing that he could point to as having reflected his alleged title.

137.     In any event, Fishback voluntarily dismissed his claims based on Greenlight's arguments that they were subject to arbitration.  Fishback has yet to assert these claims.[6]

138.     Fishback also filed a completely frivolous complaint with the New York State Division of Human Rights on October 24, 2023, the day after he filed his defamation complaint. Fishback claimed that Greenlight had discriminated against him based on his: (a) age (mid-to-late twenties); and (b) religion (Roman Catholicism).  The material facts and allegations in the complaint were complete fabrications, and while Greenlight will not recount them here, Greenlight

---

[6] For purposes of providing a complete picture of the ongoing litigation between the parties, Greenlight notes that it has, however, instituted a separate action against Fishback for recovery on the amounts due and owing to Greenlight pursuant to certain promissory notes that Fishback had executed in favor of Greenlight in exchange for loans made by Greenlight to Fishback during his employment.  The notes became due and payable, and after sending two un-responded to letters demanding repayment, Greenlight was forced to resort to legal action.  *See Greenlight Capital, Inc. v. Fishback*, No. 24-2299 (S.D.N.Y.) at ECF 1 ("Greenlight Notes Complaint").

notes that, like the Defamation Complaint, Fishback eventually withdrew this complaint in order to pursue it in arbitration, which he has to date failed to commence.

139.   Just as Fishback had done with the GLG Email for his "Head of Macro" claim, it appears that he thought he could re-write reality to create a basis for his frivolous discrimination claims by emailing a bible verse to the Greenlight employees on his last day at Greenlight.  It is unclear what Fishback thought he would be able to accomplish by doing this, but what is clear is that he was planning to use the legal system as a tool against Greenlight, with no real understanding of the concept that legal claims need to be based in fact, and litigants may not invent their own facts.

140.   Further, other reasons that Fishback has recently publicly given for resigning from Greenlight in May 2024, as described in more detail herein, flatly contradict his discrimination claims, which alleged that he had no choice but to leave due to the allegedly hostile work environment due to his age and religion. Of course, his public accounts for why he left are false, as well.  The true reason was that he deduced he was about to be terminated.

141.   Since withdrawing his frivolous litigation, Fishback continued harassing Greenlight through other avenues, including threatening to interfere with Greenlight events, misrepresenting his title and role at Greenlight to the general public at conferences and on other media platforms, and using Greenlight's Confidential Information to his advantage.

## VII.   Fishback Threatens to Disrupt Greenlight's 2024 Annual Partner Dinner

142.   On January 10, 2024, Fishback emailed Greenlight and threatened to attend Greenlight's 2024 Annual Partner Dinner.

143.   Many of Greenlight's investors, counterparties, service providers and employee family members attend Greenlight's Annual Partner Dinners.  Fishback's threats were obvious

attempts to intimidate and embarrass Greenlight, and interfere with Greenlight's relationships with its investors, counterparties and service providers.  When Greenlight notified Fishback that he was not permitted to attend, he insisted that he would still attempt to do so, or at a minimum, *stand outside the event* venue and attempt to communicate with attendees.

144.     Specifically, Fishback threatened to "hand a detailed letter to investors," that would prompt them to ask a series of "questions" of Mr. Einhorn during the Annual Partner Dinner.

145.     The content of the letter and the questions that Fishback threatened to provide the investors contained Greenlight Confidential Information that Fishback had obtained via his employment with Greenlight, which he agreed not to disclose in the Employment Agreement.  In particular, Fishback wrote in his January 10, 2024 email that he intended to ask the following question, among others:

> What is the status of Greenlight's macro book — which had its best year in 2022 and a strong year in 2023 — in light of James Fishback's (who was responsible for macro trades) departure in August 2023? Have these trades been exited or rolled over? Since no one at Greenlight has experience in macro derivatives modeling, pricing, or trading, who is currently overseeing the macro book?

146.     Fishback's statement that no one at Greenlight—including Mr. Einhorn—had any "experience in macro derivatives modeling, pricing or trading," is false.  And it was clear that Fishback intended to create the impression that Greenlight was not competent to make macro investments and to undermine Greenlight's investors' confidence in Greenlight's management, and Mr. Einhorn in particular.  More generally, it was clear that Fishback sought to sow discord between Greenlight and its investors, and attempted to make investors second-guess their investments with Greenlight.

147.     After Greenlight sent letters to Fishback through legal channels that detailed the wrongful nature of his threats, Fishback, ultimately, did not carry out his threat to distribute this

letter to Greenlight's investors. Nevertheless, such threats harassed Greenlight as it prepared for an important corporate event. Fishback's behavior reflected his continued intent to harm Greenlight through misrepresentations and misuse of Confidential Information. Greenlight took Fishback's threats seriously and was forced to hire additional security for its event.

## VIII.   Fishback Continues His Misrepresentations

148.    Since leaving Greenlight, and during all relevant time periods discussed above, Fishback has been extremely active in seeking out platforms where he could continue to make his misrepresentations about his role and work at Greenlight. For starters, Fishback has consistently continued to use the false "Head of Macro" title on his X account, and on the website and LinkedIn page for Azoria.

149.    Furthermore, in the first half of 2024, Greenlight discovered dozens of instances where Fishback had held himself out by false titles and roles at conferences, on podcasts and audio/video interviews, or in connection with other engagements that have led to the reproduction of his misrepresentations in other formats (like websites and articles). To illustrate, Fishback has made misrepresentations regarding his role and title at Greenlight in connection with the following engagements:

- Fishback represented that he "ran global macro" at Greenlight in connection with his appearance at a conference hosted by the Foundation for Individual Rights and Expression on June 15, 2023.
- Fishback represented that his role was "macro investing" at Greenlight in connection with his appearance on a Bloomberg TV interview on October 4, 2023.
- Fishback represented that his role was "Head of Global Macro" with Greenlight in connection with an article written by Brett Haensel and published by "With Intelligence" on October 31, 2023.
- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance on the January 10, 2024 episode of the podcast "Chat with Traders."
- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance on the January 14, 2024 episode of the podcast "Invested."

- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance at the Florida Investment Conference held by the University of Florida Warrington School of Business on February 9, 2024.
- Fishback represented that his role was "managing [the] investment fund" at Greenlight in connection with his appearance on the February 27, 2024 episode of the podcast "The Seth Leibsohn Show."
- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance on the March 7, 2024 episode of the podcast "Saint Louis In Tune."
- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance at conference hosted by the Greenwich Economic Forum on March 14, 2024.
- Fishback represented that his role was "Head of Macro" at Greenlight in connection with his appearance on the March 25, 2024 episode of the podcast "University of Florida: The Morning Gator."

150.    When Greenlight became aware of these engagements, it took steps to notify certain of the organizations about the misrepresentations Fishback had made in connection with their conferences, articles, podcasts, etc., including sending letters to certain of the institutions correcting the record.  In response, Fishback doubled-down on his negative publicity campaign.

## IX.    Fishback's May 2024 "Debate" Scheme & Social Media Meltdown

151.    For example, in mid-May 2024, Fishback hoodwinked the unwitting hosts of a podcast called the "Wall Street Skinny," that averages over 60,000 downloads per month, into extending an "invite" to Mr. Einhorn to debate Fishback on their podcast.  On May 15, 2024, Mr. Einhorn and Mr. Roitman received an email from Ms. Jennifer Saarbach, one of the co-hosts of the podcast, inviting Mr. Einhorn to have a "friendly debate" with Fishback on the podcast regarding the merits of investing in Tesla, among other things.

152.    Fishback, who was also copied on the email, responded and said: "This is an excellent idea. Looking forward to having a debate with you, David."  Then, before anyone at Greenlight could respond, Fishback, in an attempt to garner as much publicity for himself as he

could,[7] immediately took to X, and presented the invitation to the general public as organic and unsolicited.[8]  Of course, he made no mention of the fact that he himself had procured the "invite" by deceiving an innocent third party into proposing the podcast.

153.    Fishback had not been "invited" to do anything, given that Fishback was the one that approached Ms. Saarbach with the idea to have Mr. Einhorn on the podcast to debate Fishback, and not the other way around.  Fishback also deceived Ms. Saarbach because he knew full-well that given his repeated efforts to harass Greenlight, and repeated instructions to only communicate with Greenlight through counsel, Mr. Einhorn would not be interested in engaging in a public debate with Fishback.  But Fishback did not provide any of this relevant background to Ms. Saarbach, and deceived her into believing that Mr. Einhorn would be receptive to her "invitation," and that it would be "an amazing opportunity."[9]

154.    This sham "invite" was just the first step in Fishback's scheme.  Because Fishback knew that invoking the opportunity to debate Mr. Einhorn on a podcast would generate a lot of public interest, he used the sham "invite" as a pretext to discuss Mr. Einhorn and Greenlight on social media.  And since Fishback knew Mr. Einhorn had no interest in engaging with him in any sort of discussion, and would reject the sham "invite", it appears Fishback planned to chalk that up as a public-relations "win."

---

[7] Indeed, Fishback tagged Mr. Einhorn in his first post, as well as Elon Musk and two other prominent X accounts, which ultimately garnered more than eight hundred thousand views.

[8] Fishback's X post that day reads "I've been invited to debate Tesla with David Einhorn (my ex-boss), among other topics. I've been critical of Tesla shorts like @davidein because they fundamentally misunderestimate [sic] Tesla's core value driver: autonomy.  The path to truth runs through open debate. Let's do it!"

[9] In fact, in a May 16, 2024 email from Ms. Saarbach to Mr. Einhorn, she apologized to Mr. Einhorn for proposing a debate between Fishback and Mr. Einhorn.  In that email, Ms. Saarbach said "We were completely unaware of any litigation or animosity between you two — having just met James yesterday — and thought **his idea to bring you on for a debate** sounded like an amazing opportunity."  (emphasis added)

155.    Due to the social media interest Fishback had started around this debate, Mr. Einhorn was forced to publicly respond to Fishback with an X post of his own, which stated:

> Thank you for the offer. Normally, I am happy to debate and exchange views. However, in order for such a debate to be meaningful, the person on the other side needs to have some knowledge about the subject. In this case, I am not aware that you have ever spent any time analyzing Tesla or its fundamentals - or really any other equity position for that matter. Certainly not during the 2 years while you were a macro research analyst at Greenlight.
>
> In any event, even if I were to go against our policy of not publicly discussing shorts or even confirming we are short, such a debate is not possible in the face of the ongoing litigation between us.

156.    It appears that Fishback was unhappy with the fact that Mr. Einhorn's response derailed his deceptive scheme, as Fishback then launched into a days-long tirade on his X account, in which he continued to misrepresent his role with Greenlight, take credit for Greenlight's performance, and leverage his knowledge of Greenlight's Confidential Information in violation of his Employment Agreement.  Clearly, he wanted to remain in the public spotlight and generate press for himself and Azoria.  Relevant highlights from his social media junket include:

- On May 17 and May 18, Fishback falsely continued to insist in X posts that he held a "Head of Macro" title and was not a Research Analyst.  The May 17 post also appears to be an early instance of Fishback demanding the release of his "track record" (which is defined as Confidential Information under his Employment Agreement).

- On May 19 and May 20, Fishback continued to demand the release of his track record in multiple posts:

  - In one video post titled, "Dear David Einhorn" on May 19, Fishback complained that he has not been allowed to compete because he "can't have [his] title, . . . can't describe [his] responsibilities, . . . can't describe [his] contributions, [and Greenlight is] not gonna validate even the smallest, smallest, most mini[s]cule aspect of [his] employment to any investor."

  - This was the same video in which Fishback stated:  "I want to compete, I want to build a business, I want to create something . . . Let's compete.  Let me start Azoria.  Let me start my hedge fund . . . I don't know what I did, or you think I did."

- o In another post, from May 19 Fishback posted a poll that asked viewers whether they thought Mr. Einhorn should publicly release Fishback's trading track record from Greenlight.  The responses were 74.9% "Yes" and 25.1% "No."

- o In a third post from May 19, Fishback stated: "This isn't a dispute about title. It's about who is responsible for Greenlight's insane macro returns. Let's clear this up right now, @DavidEin. Publicly release my track record so prospective investors in my hedge fund can see my tangible contributions."

- o On May 20, Fishback reiterated his sentiments from the day before, stating: "This isn't really about a title. It's about my track record."

157.    On May 23, 2024, Fishback appeared on an episode of the "Forward Guidance Podcast," which was published in video format, and which Fishback reposted on his X account. In this episode, he repeated and expanded on many of the same misrepresentations that he had made in his own posts, and he provided an even more in-depth discussion of Greenlight's Confidential Information.  Relevant statements from Fishback on that podcast appearance include:

- Fishback stated ad nauseum that he was the "Head of Macro."  Interestingly, the host, Mr. Jack Farley asked him "[w]ho told you you were promoted, and how did that happen?" But Fishback neither explained who told him he was promoted, or how it happened.

- Mr. Farley pressed Fishback about documentation for his alleged title, stating "I've been promoted before, you've been promoted before. They typically have a letter that says this is your new title."  Fishback admitted that there was never any letter, but lied to the host, stating that "if I had my company email right here with all of the emails, all the examples I was referred to as the head of macro, that would be, I'd have access to it and I could share that."

- Fishback doubled-down on this sentiment.  Mr. Farley asked Fishback "What are the instances where Greenlight employees referenced to you as the head of macro? I'm aware of one instance where that happened in an email. But how common was that?  What evidence do you have in terms of written records?"  Fishback replied "Well, if I don't have my access to my company email, if I did, **we could produce them up the wazoo, right?** This was not even in dispute.  It's like saying, how often do people call you James? How often do people call you Fishback? I was the Head of Macro. They called me the Head of Macro."  When asked "Are there any other written records where other Greenlight people, i.e., not you, refer to you as that?" Fishback replied "Not that I have access to, **but discovery is going to be fun, Jack. Discovery is going to be a lot of fun.**" (emphasis added).  Fishback's statements were false, since as described above, there is not a single other email that refers to Fishback as the Head of Macro (except for the four emails he himself sent).

- Perhaps sensing his own lack of credibility, Fishback deflected from the questions above, and in the same breath, misappropriated Greenlight's successes for himself, stating: "I think the bigger thing here, Jack, is everyone wants to get caught up on a title. And to be fair, that's exactly how this started.  But the bigger question here is who is responsible for Greenlight's insane macro performance? The title is part of that, but the crux of this debate, of this dispute is, **is David responsible or am I responsible for what Greenlight did in macro over those three years?**" (emphasis added).  The import of this question is clear.  Fishback is wrongfully trying to take credit for Greenlight's success in managing its macro investment portfolio.

- Fishback went on to once again falsely state that he had "generat[ed] $100 million of profits" at Greenlight.

- Fishback also acknowledged that he could not discuss Confidential Information about his work at Greenlight when it suited him to deflect difficult questions, but then proceeded to do so anyway when opportunities in the conversation arose where he felt it would help his cause to misappropriate Greenlight's successes and track records.

  o Fishback publicly disclosed that Greenlight invested in "interest rate futures tied to the path of the Fed in 2022" and "inflation swaps" as examples of Greenlight investments.

  o When asked about the types of trades he made, Fishback acknowledged his confidentiality obligations, but then immediately began discussing trades stating: "Well, let me just speak in general terms. I don't want to reference anything I did at Greenlight. But when I think exotic derivatives, I would say second-gen FX exotic options, second-gen interest rate exotic options, all OTC.  I would think variance swaps. I would think volatility swaps on FX vol, variance on equity index vol, and the sort."  It appears that Fishback considered there was a loophole to his Confidentiality Provision if he simply pretended to speak in the hypothetical sense.

  o In addition to disclosing Confidential Information, he again seized on the opportunity to misappropriate Greenlight's successes, stating: "[I]t's pretty clear that only one person would have been in a position to run that type of complicated macro book," referring to himself, and "[i]f I wasn't running the macro book, Jack, who on earth was?"  The correct answer is clear:  Mr. Einhorn.

  o Fishback also revealed that he was not simply disclosing Greenlight information that he was able to recall from memory, but that he actually still possessed Greenlight's Confidential Information.  He stated: "So, I'm actually staring, I can't show you of course, **but I'm staring right now at my internal trading ledger** that goes through all of my trades by instrument and the profit and loss on those trades." (emphasis added).  Later in that same podcast, he stated again "[n]o, because **I am staring right now again, right here at the internal performance sheet** that breaks down all of my trades with a little nice number at the end of it there."  (emphasis added).  This "internal trading ledger" or "internal performance

sheet" is Greenlight Confidential Information that he took from Greenlight in violation of his confidentiality obligations and has retained in spite of receiving two letters from Greenlight demanding that he delete it.  His acknowledgments that he also could not show the interviewer its contents, but could discuss them verbally demonstrate that Fishback thinks his confidentiality obligations are subject to whatever loopholes he thinks are clever and benefit him in the moment.

158.   These text and video posts contained dozens of statements in which Fishback misrepresented his role with Greenlight, wrongfully took credit for Greenlight's macro investment performance, and misused his knowledge of Greenlight's Confidential Information in violation of his Employment Agreement.  These statements defamed Greenlight, misappropriated its success and reputation, and interfered with Greenlight's relationships with its investors.

## X.   Fishback's Claims About "Running" Macro at Greenlight and Generating $100 Million of Profits for Greenlight Are False

159.   In his May 2024 social media blitz, Fishback continued to repeat the misrepresentations regarding the "Head of Macro" title that he had been making since even before he left Greenlight.  But he went even further with new misrepresentations to back up his fake title, claiming that he "ran" macro trading, and that he was responsible for $100 million in macro trading profits, which he called "insane."

160.   These statements are false because they inaccurately inflate Fishback's role in Greenlight's macro investing success at the expense of others at Greenlight who were really responsible for Greenlight's success, namely, Mr. Einhorn.

161.   Fishback's statements create the false impression that he had discretionary authority to make investment decisions at Greenlight, which he never had, ever.  By the same token, these statements are harmful to Greenlight because they create the impression that Greenlight's ability to make successful macro investments is now non-existent or seriously impaired because Fishback is no longer at the firm.

41

162.    The truth is that Mr. Einhorn, and only Mr. Einhorn, had the discretion and authority to determine what macro investments went into Greenlight's portfolio, how they were sized or risk managed, when profits were taken or when such positions were to be closed out.  Fishback had absolutely no discretion over any of these things.

163.    It is true that because Fishback claimed that he had relationships with various trading desks on Wall Street, Fishback was responsible, on a non-discretionary basis, to execute some macro trades for Greenlight that Mr. Einhorn directed.  Fishback never had the discretion to execute any trades on his own.

164.    Therefore, Fishback's statements that he "ran macro" investing at Greenlight are absolutely false.  Mr. Einhorn was in charge of macro investing at Greenlight during the entirety of Fishback's tenure, as he was prior to Fishback's employment, and as he continues to be to this day.

165.    In addition, because Fishback had no discretion over Greenlight's macro investment portfolio, his claims that he "generated $100 million of profits" for Greenlight, and that he generated "insane" profits for Greenlight are also false.  Any performance or track record with respect to Greenlight's macro investment portfolio belongs to the person who had the discretion over the portfolio and makes the decisions, Mr. Einhorn.  Fishback actually generated nothing.

166.    In his public misrepresentations and disclosure of Confidential Information on the Forward Guidance Podcast, Fishback said "So, I'm actually staring, I can't show you, of course, but I'm staring right now at my internal trading ledger that goes through all of my trades by instrument and the profit or loss on those trades. And right at the top, it says Fishback Performance."  It appears Fishback may be referencing a document that Greenlight prepares as

part of the formal annual performance review process.  This document is not intended to properly reflect the profits "generated" by or attributed to such research analyst.

167.    While Greenlight tracks the positions research analysts follow, Mr. Einhorn has the sole decision-making responsibility.  For that reason, sometimes an idea will be tracked to a research analyst's profit and loss statement despite the analyst even *opposing* the position.

168.    This actually happened with Fishback.  For instance, when Fishback joined Greenlight, Greenlight had an existing position in "inflation swaps."  Fishback was assigned to review Greenlight's existing macro portfolio.  At the time, he believed the market consensus view that was voiced by the Chair of the Federal Reserve that inflation would be "transitory."  As a result, Fishback advocated selling Greenlight's inflation swaps.

169.    Mr. Einhorn was unpersuaded, disagreed with Fishback, and kept the inflation swaps.  In fact, over time Greenlight bought additional inflation swaps. So, Fishback's analyst tracking profit and loss statement at Greenlight included the gains on the inflation swaps even though Fishback was against maintaining the position.  His analyst tracking statement also would not take into account how much Greenlight would have foregone, had Mr. Einhorn listened to Fishback's misguided recommendation and sold the inflation swaps.

170.    It is quite dishonest of Fishback to attempt to claim that he was responsible for Greenlight's "insane" macro returns which included substantial profits on inflation swaps simply because those positions are included on the list of investments that were assigned to him, especially when he was opposed to certain of those positions.

171.    It appears that with respect to Fishback's statements regarding profits he claims to have "generated," he is attempting to take credit for some trades that he was against putting in the portfolio, and for other investment ideas that were generated by Mr. Einhorn and were assigned to

Fishback to be researched and monitored.  And again, all of the investments he is attempting to take credit for, like every other Greenlight macro investment, are ones that he never exercised any discretionary authority over when it came to making actual investment decisions.

172.    In reality, profits and losses are only realized and measurable based on the discretion exercised by the person with final decision-making authority, which is what makes Fishback's public statements so misleading.  In fact, Fishback had no "track record" at Greenlight.

## XI.    **Fishback's False Claims About the Work Environment at Greenlight**

173.    In the period since Fishback resigned, on various occasions, Fishback has also given multiple reasons, some of which are untrue and defamatory, as to why he resigned from Greenlight.  The purpose of all of these different reasons was to hide the truth: that Fishback was about to be terminated for his poor performance, and hastily resigned to avoid termination.

174.    In his resignation email to Mr. Einhorn, the only reason for resigning stated by Fishback was that he was leaving Greenlight to focus on his non-profit, Incubate Debate. Fishback's July 31, 2023 resignation email makes no mention of leaving Greenlight (1) due to a hostile and discriminatory work environment, (2) due to his lack of belief in Greenlight's mission/vision, (3) due to Mr. Einhorn's politics and the direction Greenlight was taking, or (4) to start a competing hedge fund, all of which he would later state as reasons for resigning.

175.    Fishback's false statements about the work environment at Greenlight are harmful to Greenlight's reputation, ability to attract employees, and have harmed Greenlight's relationship with its investors in the process.  Specifically, Fishback made public statements in May 2024 that Greenlight was a politically charged environment, and that he was treated negatively due to his political views.  These statements are absolutely false.

176.    On May 19, 2024, in response to posts about why he left Greenlight, Fishback posted to X stating that "I don't stick around if I don't believe in the mission/vision."

177.    Then, in connection with comments Fishback gave to MarketWatch in connection with its May 20, 2024 article entitled "Greenlight Capital's clash with a former employee has captivated the hedge-fund world," Fishback stated, for the first time ever, that he left Greenlight due to political reasons.  Specifically, the MarketWatch article, which purported to contain statements from Fishback, reported that:  "Fishback—who has previously been pictured with Donald Trump and appeared on podcasts with ex-Republican contender Vivek Ramaswamy—said he left Greenlight following disagreements with Einhorn over politics and the direction the hedge fund was taking."  Fishback re-posted the Marketwatch article on his X account on May 20, 2024.

178.    Fishback's statements about leaving Greenlight for political reasons were false.

179.    In the May 23, 2024 episode of the Forward Guidance Podcast discussed above, Fishback elaborated on these falsehoods, stating that his going on Fox News in June of 2023 "was not well received at Greenlight," which he clarified was due to political reasons.[10]

180.    These statements are also completely false.

181.    Fishback's statements that political disagreements were his reason for leaving are clearly contradicted by the circumstances of his departure.  For one, Greenlight believes that Fishback resigned from Greenlight because he deduced that he was about to be terminated.  Even the reasons Fishback gave for leaving Greenlight—first, to run Incubate Debate, and second, to

---

[10] Fishback explained in the full exchange:

Fishback:  "…certainly ruffled some feathers when I went on Fox News and Newsmax and talked about a young lady from Broward County where I grew up, who was told at a high school debate tournament that she was not allowed to bring up President Trump in a speech about President Biden's foreign policy. Certainly, that was not well received at Greenlight."

Interviewer:  "And how did you know that? Did you - you heard it from people? Oh, so-and-so isn't pleased or it was just a vibe you got."

Fishback:  "Oh, I was told I was told directly."

Interviewer:  "You were told directly. And do you think that those political differences contributed to your departure?"

Fishback:  "I think that they certainly didn't help."

run Azoria—undermine his claims that he had left for political reasons, or disagreed with Greenlight's "mission."

182.    Indeed, in Fishback's resignation email to Mr. Einhorn on July 31, 2023, Fishback wrote "I would love to continue working with you. If you'd have me, I hope we could return to a part-time consulting arrangement, where I could share macro trade ideas with you and pursue my passion with Incubate Debate."

183.    In a second email to Mr. Einhorn on August 6, 2023, Fishback again wrote "As I mentioned in my email on Monday, it is my hope to return to my original role as an external consultant and advise on existing and new macro positions…."

184.    These are not things that Fishback would have communicated to Mr. Einhorn if he was leaving Greenlight due to political scrutiny or disagreement with its mission or values or due to a hostile and discriminatory work environment.

185.    Furthermore, it is clear that Fishback is attempting to use politics as a scapegoat for his failure to meet expectations and perform his duties as a Greenlight employee adequately.  For instance, Fishback's statements that his appearance on Fox News in 2023 was "not well-received" at Greenlight for political reasons is clearly contradicted by his communications with Greenlight.

186.    When Greenlight learned that Fishback was pursuing television appearances, Mr. Einhorn explicitly told Fishback on June 2, 2023 that it "doesn't bother me that you are on Fox TV," but notified Fishback that he thought Fishback's devotion of time to personal endeavors—whatever they might have been—were negatively affecting his performance at Greenlight.

187.    Indeed, the issue with Fishback appearing on Fox News had nothing to do with what he intended to say (which Greenlight frankly knew nothing about), but the fact that it would

take away from the already little time he was devoting to his Greenlight work. The email correspondence on this issue is clear: On June 26, 2023, Fishback emailed Mr. Roitman and said:

> "I have stepped off for 45 mins to do an interview with Bret Baier
> (Fox News) on high school debate. I'll be live at 10:45AM"

Mr. Roitman's response email said:

> "Well - it's a workday. You ought to be working.
> This school debate thing has become a full second job.
> We should discuss later this week."

188.  There is absolutely no mention of politics, Fishback's political views or anything political whatsoever in this email exchange or any other exchanges with Greenlight.

189.  As a successful investment firm, Greenlight's focus is on making decisions that make economic sense for investors, and political preferences or ideologies that do not bear on the merits of investment decisions are not a part of Greenlight's decision-making process. Likewise, diversity of thought and opinion are welcomed at Greenlight, and individuals with views spanning the political spectrum are equally inclined and encouraged to succeed at Greenlight.

190.  In fact, Greenlight prefers that politics be kept out of its work entirely, so as not to disrupt its business. But in this instance, it was Fishback that injected his own outside activities into the workplace, which he now uses as a convenient scapegoat for his other shortcomings as an employee.

191.  For these reasons, Fishback's misrepresentations about politicization are extremely harmful to Greenlight. They create the false impression that employees are scrutinized based on their political beliefs, and harm Greenlight's ability to recruit and hire investment professionals.

192.  In turn, these statements also suggest to investors that Greenlight allows its investment decisions to be clouded by politics, to the detriment of its investors' confidence in Greenlight. To be sure, Fishback said as much in his appearance on the Forward Guidance podcast,

stating: "[a]gain, this is not about differences in political opinion. This is about, to the extent that it matters, to what extent are you letting those political differences influence your investing process…."

193.    Fishback's motives in attempting to denigrate Greenlight to potential future employees could not be clearer.  For instance, on May 20, 2024, Fishback posted to X: "If you want get paid what you're worth, don't work at Greenlight."  And on June 2, 2024, Fishback quite childishly changed the bio of his X account to read: "Past:  Head of Macro at Greenlight (sucks)" and "Past:  Head of Macro at Greenlight (ew)," as shown below.

 

194.    Overall, Fishback seems to have accomplished his goal of generating the publicity he sought.  Fishback's posts themselves were widely viewed, with some receiving more than one million views.  Major media outlets covered the "dispute" that Fishback pretextually procured, including the *New York Times*, *Business Insider*, *Yahoo Finance*, *Bloomberg* and *Morningstar*, and as a result, his wrongful statements have been published to millions more.

195.    Because these publications have been made without full and accurate information, they have lent an air of legitimacy to Fishback's "position" in the dispute, when in reality, Fishback's position is built around prevarications, misappropriation of Greenlight's track record,

disclosures of Greenlight Confidential Information, and other threats to impose harm on Greenlight.

196.    The harm of these statements to Greenlight is apparent.  Greenlight has already received inquiries regarding Fishback's claims from investors, business partners, peers in the investment community, and the press related to Fishback's inflated and fictitious role in Greenlight's performance.  And because Fishback has been relentless and unabashed in his campaign to publicly use Greenlight Confidential Information and make misrepresentations about Greenlight's business and his responsibilities at Greenlight, Fishback's unlawful statements have damaged, and pose a continued risk of damaging, Greenlight's reputation and goodwill with numerous parties that are vital to Greenlight's success, including Greenlight's current and future investors, business partners, potential employees, and the financial community at large.

197.    Given the wide press coverage that Fishback has generated, and the adage that "bad news travels fast," there is no feasible way for Greenlight to identify the parties to whom Fishback's statements have been published, such that Greenlight can correct the record and assess the extent of damage done due to the disclosure of its Confidential Information, and the other injurious falsehoods that have been spread by Fishback.

198.    Furthermore, Fishback's recent public statements confirm that he is both still in physical possession of Greenlight's Confidential Information, and willing to disclose Confidential Information in his possession and knowledge, absent injunctive relief.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Employment Agreement)

199.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

200.    Pursuant to the Employment Agreement, Fishback has an undisputed obligation not to use or disclose Greenlight's Confidential Information without authorization pursuant to his Employment Agreement. He likewise had and continues to have an undisputed contractual obligation to return and not keep Greenlight's valuable Confidential Information after he decided to leave Greenlight.

201.    Fishback violated these provisions of the Employment Agreement by accessing and downloading various Confidential Information to his personal devices during the course of his employment, as demonstrated by his failure to use Greenlight's proper information storage locations, and his forwarding of Confidential Information from his Greenlight email address to his personal email address during his last two weeks at Greenlight, after he tendered his resignation.

202.    Contrary to his representation to Greenlight that he deleted certain of the Confidential Information he took from Greenlight (which he failed to confirm in response to letters from Greenlight's counsel), Fishback has continued to violate these provisions of the Employment Agreement by discussing Greenlight's Confidential Information with third parties on public platforms, and confirming via public statements that he is still in possession of Greenlight's Confidential Information.  Specifically, Fishback has recently made multiple statements regarding Greenlight's investment positions, strategies, profits, and track record in written and audiovisual posts to his X account that have all constituted a misuse of Confidential Information.

203.    As a direct consequence of these egregious breaches, Greenlight has, at the very least, not received the benefit of the bargain associated with the Employment Agreement with Fishback, and will suffer an even greater harm if Fishback is not enjoined from continuing to possess, use, and disclose Greenlight's Confidential Information, further breaching the agreement.

204.    Greenlight performed its own contractual obligations under the Employment Agreement.

205.    In the event of a breach or threatened breach of the Employment Agreement, Greenlight is entitled to an injunction restricting Fishback from committing or continuing the breach or threatened breach under the Employment Agreement.

206.    As a direct and proximate cause of the Fishback's breach of contract, Greenlight has suffered, and continues to suffer, substantial damages, including, without limitation, the loss of economic advantage, and denial of its bargained for exchange, and, accordingly, Greenlight is entitled to damages in an amount to be determined at trial.

207.    Greenlight will continue to be directly and proximately damaged if Fishback is not immediately and permanently enjoined from further breaching the Employment Agreement and prohibited from further accessing, using, and disclosing Greenlight's Confidential Information.

208.    Greenlight has no adequate remedy at law and is suffering irreparable injury and damages as a result of Fishback's actions.

209.    Fishback agreed in the Employment Agreement that a violation of the Confidentiality Provision would cause irreparable injury to Greenlight, and that Greenlight was entitled to seek injunctive relief in order to enforce the Confidentiality Provision. *See* Employment Agreement § 11 (stating that that "money damages may not be an adequate remedy for any breach or threatened breach of" the Confidentiality Provision, and that Greenlight "may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violations of such provisions.")

## SECOND CAUSE OF ACTION

### (Unfair Competition)

210.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

211.    Both before and after leaving Greenlight, Fishback has falsely exaggerated his role at Greenlight and falsely claimed credit for the management and performance of Greenlight's macro investment portfolio.  Fishback did so to obtain a commercial benefit for himself and the hedge fund that he created while at Greenlight, Azoria Partners, rather than building his own business by investing the time and capital necessary to do so.

212.    Fishback has undertaken these misrepresentations in bad faith and with full knowledge of the falsity of his statements and the wrongfulness of his actions.

213.    By virtue of the foregoing, Fishback has engaged in unfair competition and continues to compete unfairly with Plaintiffs, seeking to reap what he has not sown.

214.    The acts of unfair competition include Fishback's public and repeated false claims that he was promoted to "Head of Macro" at Greenlight, was responsible for managing macro investing at Greenlight, and was responsible for Greenlight's macro investing profits.

215.    Fishback lied about his responsibility for managing Greenlight's investments, and took credit for performance data that belongs to Greenlight, in connection with his marketing of Azoria Partners and himself.

216.    In making these false claims, Fishback has misappropriated Plaintiffs' track record, goodwill, and reputation.  The successful performance of Plaintiffs' trades, including the macro investment portfolio which Fishback claims to have managed on his own, were the result of Mr. Einhorn and Plaintiffs' labor, skill and resources.

217. Fishback's representations about his role are intended to mislead, and have misled, investors into thinking that Fishback is responsible for the successful performance of Plaintiffs' macro investment portfolio.

218. In addition, Fishback has taken and used for his own devices the Confidential Information of Greenlight, including information relating to the year-to-date profit and loss of certain Greenlight interest rate positions and an "internal trading ledger." Fishback has used this information to solicit investments from the investing public, including present or potential investors of Plaintiffs. Fishback has also used this Confidential Information as part of his campaign to disparage Greenlight and its investment practices, including by discussing his "internal trading ledger" on the May 23, 2024 Forward Guidance Podcast, in which he impugned Plaintiffs' and Einhorn's abilities to engage in successful macro investing.

219. Plaintiffs exercised due diligence in attempting to discover the claims against Fishback asserted herein, including the instant claim.

220. By virtue of the foregoing, Fishback has caused and will continue to cause Plaintiffs to suffer substantial money damages, as well as injury that cannot be calculated, and irreparable harm to its business, reputation, and goodwill.

221. Plaintiffs are entitled to recover their damages suffered as a proximate result of Fishback's unfair competition, as alleged herein, in an amount to be proven at trial.

222. Fishback's unfair competition has been willful, wanton and malicious.

223. As a result of Fishback's willful, wanton, and malicious conduct, Plaintiffs are entitled to recover punitive damages against Fishback in an amount to be determined at trial.

224.     In addition, as alleged herein, Fishback's common law violations have caused and will continue to cause Plaintiffs irreparable harm that is not adequately remedied at law and that requires permanent injunctive relief.

## THIRD CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Advantage)

225.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

226.     Plaintiffs have existing business relationships with their investors and prospective investors in that there was a reasonable probability of future economic benefit from Plaintiffs' relationship with their actual and prospective investors.

227.     Fishback knew of Plaintiffs' existing business relationships with their actual and prospective investors and intentionally interfered with them by presenting them with false and misleading information, as alleged herein.

228.     As alleged herein, Fishback used dishonest, unfair, and improper means to interfere with Plaintiffs' relationships with its actual and prospective investors by inflating his perceived importance and accomplishments at Greenlight to the investing public, in marketing himself and his new fund, in an attempt to undermine Mr. Einhorn and Plaintiffs' perceived macro investing capabilities and interfere with Plaintiffs' relationship with its investors.

229.     Specifically, Fishback has made demonstrably false statements (including on X (formerly "Twitter") and in public appearances) about his employment credentials and responsibilities—particularly that he was "Head of Macro," "ran macro" investing at Greenlight, and that no one else at Greenlight has the ability to run macro trading—which misappropriate Plaintiffs' track record.

230.     Fishback made these false statements knowing that they were accessible to Plaintiffs' investors.

231.     These statements by Fishback were knowingly false.

232.     As alleged herein, Fishback has perpetrated a campaign of misrepresentations about Plaintiffs' business and misappropriation of Plaintiffs' Confidential Information which has damaged and risks continuing to damage Plaintiffs' reputation and goodwill with numerous parties that are vital to Plaintiffs' success, including their actual and prospective investors, business partners, potential employment prospects, and the financial community at large.

233.     Plaintiffs exercised due diligence in attempting to discover the claims against Fishback asserted herein, including the instant claim.

234.     By virtue of the foregoing, Fishback has caused and will continue to cause Plaintiffs to suffer substantial money damages, as well as injury that cannot be calculated, and irreparable harm to its business, reputation, and goodwill.

235.     Plaintiffs are entitled to recover their damages suffered as a proximate result of Fishback's tortious interference with its actual and prospective investors, as alleged herein, in an amount to be proven at trial.

236.     Fishback's tortious interference with Plaintiffs' relationships with their actual and prospective investors has been willful, wanton and malicious.

237.     As a result of Fishback's willful, wanton, and malicious conduct, Plaintiffs are entitled to recover punitive damages against Fishback in an amount to be determined at trial.

238.     In addition, as alleged herein, Fishback's common law violations have caused and will continue to cause Plaintiffs irreparable harm that is not adequately remedied at law and that requires permanent injunctive relief.

## FOURTH CAUSE OF ACTION

### (Defamation and Defamation Per Se)

239.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

240.    Fishback committed defamation by making public statements on dozens of occasions detailed herein that he was the "Head of Macro," that he was responsible for managing Plaintiffs' macro trading operations, that he was responsible for Plaintiffs' macro trading profits, returns, and performance, and that no one else at Greenlight has the ability to run macro trading.

241.    Fishback also committed defamation by making public statements that he was subject to scrutiny and criticism for his political views at Greenlight.

242.    These statements were knowingly false and made with malice.

243.    As a result of the false statements made by Fishback, Plaintiffs have been forced to expend time, money, and other resources in order to ascertain the harmful extent of Fishback's actions, and pursue actions to correct his false statements.

244.    In addition, Plaintiffs' current investors could refrain from investing additional amounts with Plaintiffs as a result of these false statements, and Fishback's false statements have deterred new investors from making investments with Plaintiffs.  Fishback's statements have also caused damage to Plaintiffs by impairing the Plaintiffs' ability to recruit potential employees.

245.    Fishback's statements have also impugned Plaintiffs' reputation in their profession, business, and/or trade, and are therefore defamatory per se.

246.    As a direct and foreseeable result of the defamation by Fishback, Plaintiffs are entitled to an award of all monetary damages that they have incurred and are continuing to incur in their business as result of such conduct, as well as disgorgement of any ill-gotten gains received by Fishback resulting from these statements.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests judgment as follows:

(a)     Entry of a permanent injunction ordering Fishback to refrain from breaching the terms of his Employment Agreement, and specifically enjoining: (i) Fishback from retaining any Confidential Information in any form (including computer files, removable media "thumb drives," CDs, electronic files on removal media or in any other electronic form, and hard copy documents) and instead returning all copies of such documents, materials, computer files and other data to Greenlight, and destroying any such Confidential Information that would remain in Fishback's possession even following return (i.e., computer files); and (ii) Fishback from disclosing or otherwise using Greenlight's Confidential Information;

(b)     Entry of a permanent injunction ordering Fishback to refrain from making misrepresentations that are tortious and violative of Plaintiffs' common law rights under New York law, including that: (i) Fishback was Greenlight's Head of Macro; (ii) Fishback was responsible for managing or running Greenlight's macro trading activity; and (iii) that Fishback was responsible for Greenlight's macro trading success;

(c)     Granting judgment in Plaintiffs' favor on its claims and awarding Plaintiffs an amount of monetary damages to be determined at trial, including but not limited to damages in an amount sufficient to compensate Plaintiffs for Fishback's breach of contract and damages for the business lost by Plaintiffs as a result of Fishback's unfair competition and other tortious misconduct; and

(d)     In the alternative, awarding Plaintiffs nominal damages;

(e)     Awarding Plaintiffs punitive and/or liquidated damages;

(f)     Awarding Plaintiffs nominal damages;

(g)     Awarding Plaintiffs the reasonable costs and disbursements of this action;

(h)      Awarding Plaintiffs pre-judgment interest on the judgment amount;

(i)      Awarding Plaintiffs any further relief as the Court may deem just and proper.


New York, New York
Dated:  June 25, 2024

                              AKIN GUMP STRAUSS HAUER & FELD LLP

                    By:     _/s/ Stephen M. Baldini_____
                            Stephen M. Baldini
                            Akin Gump Strauss Hauer & Feld LLP
                            One Bryant Park
                            New York, NY 10036
                            Tel:  212-872-1000
                            Fax:  212-872-1002
                            sbaldini@akingump.com

                            *Counsel for Plaintiffs Greenlight Capital,
                            Inc. and DME Capital Management, LP*