**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Greenlight Capital, Inc., DME Capital
Management, LP,

                          Plaintiffs,

        -vs.-

James T. Fishback,

                          Defendant.

No. 1:24-cv-04832-PAE

**FIRST AMENDED COMPLAINT**

---

## COMPLAINT

Plaintiffs, Greenlight Capital, Inc. ("Greenlight" or the "Company") and DME Capital Management, LP ("DME") (collectively "Plaintiffs"), by and through their undersigned counsel, Akin Gump Strauss Hauer & Feld LLP, for their complaint (the "First Amended Complaint") against Defendant James T. Fishback ("Defendant" or "Fishback") allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Fishback, a former Greenlight employee, due to his theft of sensitive proprietary information from Greenlight in violation of his Employment Agreement (as defined herein).

2.      This is Plaintiffs' first amended complaint in this action.  In addition to a claim for breach of Fishback's Employment Agreement due to Fishback's theft of Confidential Information (as defined herein), Plaintiffs' original complaint contained other claims against Fishback for unfair competition, tortious interference, defamation, and defamation *per se*.  These claims related to Fishback's misrepresentations about his title, role, and responsibility for the macro investment

portfolio performance at Greenlight and his harmful statements about Greenlight and Mr. Einhorn. Plaintiffs still intend to assert those claims against Fishback.  However, Plaintiffs intend to assert those claims in arbitration, and have thus excluded them from this First Amended Complaint.

3.    Fishback was a Research Analyst at Greenlight.  He resigned from the Company in July 2023.  In his final weeks as a Greenlight employee, Greenlight discovered that Fishback had sent Greenlight's proprietary information to his personal accounts.  This stolen information included Greenlight's then-current portfolio of investments and documents reflecting Greenlight's macro investing track record, which constitute Greenlight's extremely sensitive and valuable proprietary information.  This was just the tip of the iceberg, as a later investigation revealed that Fishback had sent Greenlight's Confidential Information to his personal email accounts on dozens of occasions during his tenure at Greenlight.

4.    More importantly for purposes of this action, this proprietary information was defined as Confidential Information under the terms of Fishback's Employment Agreement, and Fishback's handling of that Confidential Information during and after his employment was a clear violation of his Employment Agreement, which provides for injunctive relief in the event of such a breach.

5.    Fishback's motives for stealing this proprietary information could not be clearer. Around the time that Greenlight detected Fishback's theft of Confidential Information, it also learned that he secretly formed a competing hedge fund, Azoria Partners ("Azoria") while still at Greenlight, and had started misrepresenting his role with Greenlight to investment industry contacts.  Among other misrepresentations, he told third parties that he was Greenlight's "Head of Macro"—a fictitious title that did not exist at the Company.  He did so to misappropriate

Greenlight's successes to himself, which he could in turn use to build credibility for the new hedge fund that he was planning to launch.

6.     Fishback's theft of Greenlight's Confidential Information was just one of the wrongful means used by Fishback to support his nascent fund—and the exact type of conduct against which the terms of the Employment Agreement were designed to protect.  Greenlight instructed Fishback to delete the Confidential Information when it detected his theft and Fishback misrepresented to Greenlight that he had done so.  And since leaving Greenlight, Fishback has continued to retain and misuse Greenlight's Confidential Information in violation of the Employment Agreement and demonstrated that he is willing to violate that agreement in order to obtain commercial advantages for himself and Azoria.

7.     First, Fishback filed a frivolous lawsuit against Greenlight alleging that it was somehow defamatory for Greenlight to truthfully respond to inquiries about Fishback by stating that he did not hold a "Head of Macro" title at Greenlight.   Fishback used false statements in his frivolous lawsuit as an improper opportunity to publicly misrepresent his role and performance at Greenlight by falsely claiming that he was "an outstanding performer at Greenlight," "excelled in his work," and "generated over $100 million in profits for Greenlight from the period of February 2021 to August 2023."  Despite the fact that these statements are false, by making statements about Greenlight's profitability (albeit using incorrect numbers and falsely attributing the profitability to himself), Fishback publicly disclosed Greenlight Confidential Information.  Fishback voluntarily dismissed his claims in favor of arbitration.  To date, he has not commenced an arbitration, nor has he refiled these claims.

8.     Second, Fishback threatened to attend and disrupt Greenlight's 2024 Annual Partner Dinner, which is attended by a large number of Greenlight's investors, counterparties and

service providers.  Fishback threatened to hand out letters to investors containing Greenlight's Confidential Information and strategies, which maliciously and falsely called into question Greenlight's macro investing abilities.  Fishback misused Greenlight's Confidential Information to make these threats, which were intended to embarrass and intimidate Greenlight and interfere with Greenlight's relationship with its investors.  After receiving multiple warnings from Greenlight and its counsel as to the wrongful nature of his threats, Fishback ultimately did not attend the event.  But he made no secret of his ongoing desire to harm Greenlight.

9.      Third, in May 2024, Fishback deceived the hosts of a podcast into extending an "invite" to Greenlight's President, David Einhorn, to debate Fishback on the merits of an investment in Tesla.  He used Mr. Einhorn's rejection of this sham "invite" to capture a wide audience for a days-long social media tirade against Greenlight and Mr. Einhorn.  Importantly, Fishback knew that Greenlight had made investments in Tesla and misused his knowledge of this Confidential Information to draw this attention.

10.     In the media blitz that ensued, Fishback took the opportunity he created to publicly discuss certain of Greenlight's macro investments and the purported performance of Greenlight's macro investment portfolio.   In doing so, he wrongfully disclosed and admitted to his continued possession of Greenlight's Confidential Information.  He also continued to misrepresent his role at Greenlight and his responsibility for Greenlight's success in conjunction with these statements.

11.     Unfortunately for Greenlight, it did not learn until the final weeks and days of Fishback's employment that he was using wrongful means to promote himself and harming Greenlight in the process.  And at every juncture since Fishback's departure, Greenlight has exercised restraint and used reasonable, measured responses in order to combat Fishback's wrongful tactics.

12.    But Fishback has shown no signs that he is going to abide by his legal and contractual duties to Greenlight or end his campaign to misuse Greenlight's Confidential Information and falsely promote himself at Greenlight's expense.  On the contrary, Fishback's more recent conduct shows that he is increasingly desperate and willing to resort to wrongful tactics now more than ever.

13.    Mr. Fishback's flippant attitude towards his blatant violations of Greenlight's rights is perhaps best demonstrated in a short video Fishback posted on his X (formerly "Twitter") account on May 19, 2024 titled "Dear David Einhorn."  In the video, which has been viewed more than one million times, Fishback attempts to somehow portray himself as the victim, and Mr. Einhorn as a bully, and states:  "I want to compete, I want to build a business, I want to create something . . . Let's compete.  Let me start Azoria.  Let me start my hedge fund . . . I don't know what I did, or you think I did."

14.    Fishback's feigned ignorance towards all of his wrongful conduct demonstrates exactly why Greenlight both needs to resort to legal avenues and deserves protection from this Court.

15.    Fishback's conduct has come at great expense to Greenlight.  After invoking Greenlight and Mr. Einhorn's name in his most recent social media scheme, Fishback's posts were widely viewed, and major media outlets began reporting on the story.  Fishback's misuse of Confidential Information has caused Greenlight irreparable harm.

16.    It is clear that Fishback considers Greenlight's Confidential Information to be a tool that he can use to both obtain credibility in the investment community, and generate media buzz in the world at large.  That poses two serious problems for Greenlight.

17.     The first problem is that Fishback's continued use of Greenlight's Confidential Information is violative of the Employment Agreement and directly harmful to Greenlight.

18.     The second problem is that Fishback is unlikely to cease his improper conduct in the absence of a court order. Simply put, Fishback's behavior demonstrates that he is not concerned with whether his actions are lawful. He employs dishonest tactics to attain his goals. He has lost any benefit of the doubt that he is a good faith or rational actor.

## PARTIES

19.     Plaintiff Greenlight Capital, Inc., is a corporation formed under the laws of the state of Delaware and registered to do business in New York.

20.     Plaintiff DME Capital Management, LP, is a limited partnership formed under the laws of the state of Delaware and registered to do business in New York.

21.     Upon information and belief, Defendant is an individual and resident of the state of Florida, residing at 115 Southwest Pinckney Street, Madison, Florida 32340.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 in value, exclusive of interest and costs, and is between citizens of different states.

23.     For purposes of diversity jurisdiction, Greenlight and DME are citizens of the states of Delaware and New York.

24.     For purposes of diversity jurisdiction, Defendant is a citizen of the state of Florida.

25.     This Court has personal jurisdiction over Defendant since, among other things, on information and belief: (i) the Employment Agreement was executed by Greenlight in New York, Fishback executed and sent the Employment Agreement to Greenlight in New York to become an employee of Greenlight, the Employment Agreement contained a New York choice of law

provision, and Fishback thereafter visited New York for purposes of the contractual relationship and his employment with Greenlight; (ii) a substantial portion of Fishback's misconduct described herein occurred in New York, or was directed at Plaintiffs in New York causing injury to Plaintiffs in New York state; and (iii) Fishback transacts business within the state.

26.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### I.    Greenlight & DME

27.    David Einhorn is the President of Greenlight, which he co-founded in 1996. Greenlight is a highly respected investment management firm, with billions of dollars in assets under management.  As a successful industry leader, Greenlight has invested substantial time, money, and resources into developing its own investment methodologies, investment portfolio, reputation and goodwill with investors, and other highly commercially sensitive and confidential information that is critical to Greenlight's success.

28.    To protect this information, Greenlight has implemented several measures, including information access protocols regarding how employees may access sensitive Company information and requiring all of its employees to agree to confidentiality obligations regarding certain Company information.

29.    DME, like Greenlight, is owned and controlled by Mr. Einhorn.  After a restructuring on January 1, 2024, DME became the successor in interest of Greenlight's business.

### II.    Greenlight Hires Fishback

30.    On January 27, 2021, Greenlight sent a letter containing an offer of employment to Fishback (the "Offer Letter").  The Offer Letter stated that the offer of employment was contingent on Fishback signing the standard employment agreement that was enclosed with the Offer Letter

(the "Employment Agreement").

31.    Fishback and Greenlight executed the Employment Agreement on February 8, 2021.  Section 5 of the Employment Agreement (the "Confidentiality Provision"),[1] contains multiple subparagraphs that imposed obligations on Fishback with respect to the use and handling of certain information (defined therein as "Confidential Information") that Fishback would have access to as a Greenlight employee.  The subparagraphs of the Confidentiality Provision in section 5 state:

> (i) To assist Employee in the performance of his duties, the Company agrees to provide to Employee special training and information regarding the Company's business methods and access to certain Confidential Information (as defined below) and materials belonging to the Company, its affiliates, and to third parties, including but not limited to investors and prospective investors of the Company who have furnished such information and materials to the Company under obligations of confidentiality.

> (ii) Except as expressly permitted by the Company in writing, Employee agrees that he shall not (either during his employment by the Company or thereafter) disclose to any person not connected with the Company or use for his own benefit or for the benefit of any person other than the Company any Confidential Information either disclosed to or developed by the Employee during his employment by the Company.  For purposes of this agreement, "Confidential Information" shall include, but not be limited to, all investor lists, prospective investor lists, **investments (except where publicly disclosed)**, **investment methodologies**, methods of dealing, **investment track records**, investment recommendations, **investment performance**, **performance records of any individual investment position**, performance records of any Company fund, **performance records of Employee**, **information that supports the performance record of any Company fund or of Employee**, and other confidential business information related to the conduct of the Company's business and/or the business of any of the Company's affiliates.

> (iii) In the event of termination of Employees employment with the Company, Employee agrees to deliver promptly to the Company all Confidential Information, equipment, documents, notes, reports, files, books, correspondence, lists, and other written or graphic reports and the like relating to the Company's or any affiliate's business which are or have been in his possession or under his control.

---

[1] Section 5 of the Employment Agreement is entitled "Confidential Information," but is referred to herein as the "Confidentiality Provision," to avoid confusion with the defined term "Confidential Information" that appears in Section 5 and that is also discussed herein.

(iv) Nothing contained in this Agreement supersedes, conflicts with, or otherwise alters the Employee's rights or obligations under existing statute, law, rule, regulation or order relating to the reporting to applicable governmental authority of a violation of any law, rule, or regulation as required by law.

Employment Agreement § 5 (emphasis added).

32.     Thus, Fishback agreed, in recognition of the highly commercially sensitive and confidential nature of the information received in the course of his employment, that he would not disclose to any third party or use for his or others' benefit such Confidential Information and that he would return and not retain any Confidential Information following the termination of his employment.  Per the plain terms of the Confidentiality Provision, the Confidential Information subject to these obligations includes, among other things, information regarding current or potential Greenlight investments, Greenlight's investment and fund performance, Greenlight's track record, and Greenlight's investment methodologies and recommendations.

### III.    Fishback's Tenure with Greenlight

33.     Throughout the course of Fishback's employment at Greenlight, Fishback failed to meet even minimal performance expectations.  Fishback consistently failed to devote appropriate time and effort to his Greenlight responsibilities and was notified repeatedly that his work product was unacceptably delayed, undeveloped, or otherwise incomplete.  Furthermore, he also showed a lack of accountability, and even dishonesty, about his performance issues and his outside personal ventures.  These issues were a precursor of his conduct in misusing Greenlight's Confidential Information.

#### A.  Fishback's Performance Issues: 2021-2022

34.     As early as October 2021, Mr. Einhorn informed Fishback that he was on formal notice and that he was on "thin ice," due in part to errors and carelessness in his performance.  In Fishback's formal year-end performance assessment for 2021, Greenlight also communicated to

him that his failure "to make himself more valuable to the firm" had "left himself with a smaller margin for error."

35.     Fishback's substandard performance continued into 2022.    When these performance issues were raised to Fishback, Greenlight came to understand that he would avoid accountability through dishonesty.    For instance, in the first quarter of 2022, Fishback made careless errors in his own work on multiple occasions, but attempted to blame others in order to avoid personal accountability.

36.     For example, in January 2022, at Mr. Einhorn's direction, Greenlight executed a macro derivative transaction, which Fishback executed with a counterparty.    In accordance with Greenlight policy, Fishback sent an email with the details of the trade to Greenlight's operations staff informing them that the required initial margin for the transaction was $1.4 million.    In reality, however, the counterparty had requested $4.1 million of initial margin.

37.     When Greenlight's operations staff asked Fishback about the discrepancy, he did not have a ready answer.    As it turned out, the parties had changed the notional amount of the trade and Fishback had either neglected to recalculate, or perhaps to even reconsider, the impact of such change on the amount of the required initial margin.

38.     Greenlight's operations staff alerted senior management, including Mr. Einhorn, about the issue, as the operations staff was becoming concerned with the repeated unreliability of Fishback's work product.

39.     When Mr. Einhorn confronted Fishback about this particular issue, Fishback did not take ownership of his mistake, instead replying that it was "a bank error."    In fact, there was no bank error.    After the notional amount of the trade had changed, the counterparty had correctly

recalculated the amount of the required initial margin of $4.1 million, and Fishback failed to do so.  The error was Fishback's by his failing to recalculate the required initial margin.

40.    Throughout 2022, Greenlight provided Fishback with clear notice that he was not meeting expectations.  For instance, on April 19, 2022, Mr. Einhorn expressed disappointment with the lack of substance in an assignment that Fishback had taken six days to complete and expressed to him that he thought Fishback's "work, as shown, could be replicated in about 30 minutes."

41.    In Fishback's formal year-end performance assessment for 2022, Greenlight also communicated to him that "[w]hen projects are assigned by David to James, they often don't get evaluated in a timely manner and sometimes not at all".  The assessment continued that: "[t]o summarize: we aren't sure whether the lack of work is because (a) James disagrees with the topic, so he refuses to indulge David's request in a passive/aggressive way, (b) James isn't capable of investigating these types of questions, or (c) James isn't committing enough hours to his work at Greenlight."  Fishback confirmed in recent posts to his X account that Greenlight was correct in its assessment.[2]

B.  Potential Gift-Matching Incident

42.    Greenlight also became concerned with Fishback's preoccupation with his personal outside endeavors, and his ability to be forthcoming and honest with Greenlight, toward the end of 2022.

---

[2] On June 26, 2024, Fishback posted: "I dragged my feet on David's 'macro research projects' because they were laughably stupid. I'm a macro trader. I refuse to be a yes-man who is forced to substantiate conspiracies and delusions."

The same day, Fishback also posted: "I sometimes worked only 2 hours a day when markets were slow.  I would read instead of staring at my Bloomberg like some monkey.  When things got interesting (e.g. SVB crisis), I was up at 3AM trading SOFR futures and USDJPY one-touches.  I'm not punching a clock for anyone, especially not David Einhorn."

43.     For example, Greenlight has an annual gift-matching program in which it matches eligible contributions made by its employees to charitable organizations, up to $10,000.  In late 2022, Fishback requested that Greenlight match a $10,000 donation he made to an organization that he created and ran called the Macrovoyant Foundation ("Macrovoyant").  However, despite multiple requests from Greenlight over a period of two months, Fishback could not provide any bona fide evidence that he had actually made the donation to Macrovoyant, as required by Greenlight's donation matching program.  Even more suspiciously, Fishback repeatedly insisted that the matching donation be made by check, and not wire transfer, which is standard for these matching donations.  Ultimately, Greenlight did not match this "donation".

44.     Overall, Greenlight found that Fishback's manner of requesting $10,000 from Greenlight for his own personal charity and his inability to provide required basic information raised questions as to whether Fishback was demonstrating appropriate personal integrity with Greenlight about the gift-match.

C.  Performance Issues Continue Into 2023

45.     Fishback's performance issues persisted into 2023 and were compounded because he was apparently devoting increasing time and effort to his personal endeavors, like Macrovoyant Foundation (also known as Incubate Debate), which focused on high-school debate, at the expense of performing his job as a full-time Greenlight Research Analyst.

46.     For example, on April 13, 2023, Greenlight learned for the first time Fishback was managing five full-time employees at Incubate Debate.  Fishback had never disclosed this to Greenlight, in violation of its internal compliance and conflicts policies that require disclosure of such outside engagements.

47.     At approximately the same time, senior management at Greenlight communicated to Fishback that it was clear that his involvement with his personal endeavors, like Incubate Debate, was detrimental to his performance at Greenlight.

48.     Fishback acknowledged that Greenlight's criticisms were valid, and apologized and communicated that he had resolved the issue by hiring an executive director for Incubate Debate that would be starting soon, so that he would not need to be involved in the organization's day-to-day activities.

49.     Despite his representations, Fishback remained preoccupied with his personal endeavors and his performance did not improve.  On May 29, 2023, Mr. Einhorn emailed Fishback and pointed out that Fishback had failed to provide a daily email summary of macro events that Mr. Einhorn had requested and stated that it appeared Fishback had ignored his direction.

50.     Mr. Fishback replied, apologizing and stating "David, you are not missing anything. This is my fault."

51.     Mr. Einhorn responded as follows:

I'm adding [Daniel Roitman], so that we don't have a game of telephone.  If the below is correct, then you can't tell him that you have taken what was said at your review to heart and made great progress.  **We genuinely doubt you are working as a full time employee.** We don't have punch clocks and you work remotely.  So, the burden of proof is on you.   And, it looks like your side gig is cutting into Greenlight.  In fact, **it really doesn't appear to me that you are doing any meaningful amount of work for Greenlight.** If I didn't like you, I'd fire you now.  But, you are on very, very thin ice.  I don't intend to continue to have this argument with you. (emphasis added).

52.     On June 2, 2023, at a scheduled research meeting with Fishback, Mr. Einhorn expressed his continued dissatisfaction with Fishback's work.   Mr. Einhorn stated that organizational confidence in Fishback was extremely low and reminded Fishback that he "was on thin ice."

53. Fishback acknowledged that he had let the firm down, needed to do a better job at prioritizing tasks that he had promised Greenlight that he would do, and apologized, again.

## IV. Greenlight Discovers Fishback's Improper Handling of Confidential Information & Fishback Resigns from Greenlight

54. Unfortunately, and unbeknownst to Greenlight, Fishback's performance issues were intertwined with the manner in which he mishandled Confidential Information in connection with his responsibilities. Greenlight first discovered Fishback's mishandling of Confidential Information in late July 2023, when Fishback submitted an incomplete work assignment, prompting Greenlight to evaluate Fishback's work process.

55. In February 2023, Mr. Einhorn tasked Fishback with drafting an essay (the "Jelly Donut Assignment"). After many delays, the draft essay was finally supposed to be delivered on July 24, 2023. Fishback submitted it two days later on July 26, 2023. Despite the assignment being two days beyond the most recent deadline, and Fishback having had months to complete the Jelly Donut Assignment before that, the draft essay appeared to reflect only a few hours of effort, at best.[3]

56. After determining that the Jelly Donut Assignment did not reflect a commensurate amount of effort for the time Fishback took to complete it, Greenlight reviewed its computer system and discovered that Fishback had almost no work files saved on Greenlight's network drive, and had engaged in very little activity on Greenlight's computer system.

---

[3] Fishback himself confirmed his failure to follow Mr. Einhorn's instructions in a post to his X account on June 26, 2024, wherein he wrote, "I am a macro trader not some washed-up billionaire's ghost writer," above a screenshot of the Jelly Donut Assignment allegations in Greenlight's original complaint. And as discussed herein, this was the same day that he posted: "I dragged my feet on David's 'macro research projects' because they were laughably stupid. I'm a macro trader. I refuse to be a yes-man who is forced to substantiate conspiracies and delusions."

57.    Upon information and belief, Fishback must either have been saving his Greenlight work files—which would have included a vast amount of Confidential Information—on his personal devices, in direct violation of Greenlight's policies and his Employment Agreement, or he did not do any meaningful work during his entire tenure at Greenlight.

58.    Prior to his submission of the Jelly Donut Assignment, Fishback had shown a repeated lack of attention to other assignments as well, and had been warned multiple times that he needed to improve the quality of his work.  Despite recognizing his shortcomings and promising that he would improve his performance, Fishback's work on the Jelly Donut Assignment demonstrated that Fishback was not seriously committed to improving the quality of his work product.  As such, Greenlight decided to terminate Fishback for his pattern of neglecting assignments and responsibilities, of which the Jelly Donut Assignment was just the latest example.

59.    On Monday, July 31, 2023, Mr. Einhorn's assistant emailed Fishback at 10:48 a.m. to inform him that Mr. Einhorn wanted to schedule a Zoom call for noon that day.  The unstated purpose of that Zoom call was to terminate Fishback's employment.

60.    In response, at 10:56 a.m., Fishback requested that the Zoom call be rescheduled to 3:30 p.m. allegedly due to his travel schedule.  Then, a mere 27 minutes after delaying the Zoom call, Fishback tendered his resignation to Greenlight via email, and provided notice that his last day of employment would be on August 15, 2023.

61.    Given Fishback's awareness of Greenlight's dissatisfaction with his performance and the context of the requested Zoom meeting with Mr. Einhorn, Fishback likely deduced that the purpose of the Zoom call was to terminate him and he resigned first to avoid the embarrassment of termination, and having to disclose such termination to potential investors in his new fund.

62.     In Fishback's resignation email to Mr. Einhorn on July 31, 2023, Fishback stated that the reason he was leaving was to focus on his non-profit, Incubate Debate.  Fishback wrote that "I would love to continue working with you.  If you'd have me, I hope we could return to a part-time consulting arrangement, where I could share macro trade ideas with you and pursue my passion with Incubate Debate."

63.     As further discussed herein, however, Fishback's lack of attention to his work and the inevitable termination of his employment was something that Fishback had already been planning for, as he had secretly formed his own hedge fund even prior to Greenlight's attempt to terminate him, and he estimated that he could use Greenlight's reputation and Confidential Information to jumpstart his new venture when that time finally came.

## V.      Greenlight Discovers Fishback's Other Misconduct on the Eve of His Departure

64.     In his final weeks at the Company, Greenlight learned that Fishback had taken concrete steps to form Azoria in July 2023, and had been misrepresenting his role at Greenlight to promote himself to the investment community and counterparties.

65.     Greenlight also discovered that Fishback surreptitiously sent additional Confidential Information to his personal email accounts on the eve of his departure, in addition to the dozens of instances of mishandling Confidential Information that Greenlight had discovered as a result of the Jelly Donut Assignment.

### A.   Fishback Created Azoria, His Own Fund, While at Greenlight, and Concealed it from Greenlight

66.     Fishback's plan to start his own business built off the wrongful misappropriation of Greenlight's reputation and Confidential Information was revealed to Greenlight when Greenlight learned that Fishback had clandestinely signed up for the 2023 Citi Equities Conference, which was being held in Miami Beach on September 12-14, 2023 (the "Citi Conference").

67.     On August 1, 2023, Greenlight received an email with information about the Citi Conference.  The email showed that Fishback was scheduled to speak as Greenlight's "Head of Macro."  There were two problems with this email.

68.     First, Fishback had signed up using a false title.  The job title "Head of Macro" has never existed at Greenlight, and Fishback's job title at the time of this engagement, as it had always been, was "Research Analyst."  More concerning to Greenlight is that Fishback chose the false title "Head of Macro" in order to convey to the public, and potential Azoria investors, that he had greater importance to Greenlight's operations than the title "Research Analyst" would imply, and to improperly suggest that he was responsible for the management and performance of Greenlight's macro investment portfolio.  A subsequent investigation by Greenlight showed that Fishback had also attempted to use the false "Head of Macro" title and similar variations at other public speaking engagements in the past and without permission.

69.     Second, Fishback did not request Greenlight's permission to speak at the Citi Conference, as he was required to do so by Greenlight policy.  Thus, Greenlight did not know that Fishback had even registered as a speaker for the Citi Conference prior to receiving the August 1 email.

70.     When Greenlight confronted Fishback about his planned appearance at the Citi Conference, Fishback was forced to reveal for the first time that he had started Azoria, the new business he had formed while still employed as a Research Analyst at Greenlight.

71.     After Greenlight received the email with the Citi Conference agenda, Greenlight requested Fishback to provide contact information for the Citi Conference, so that Greenlight could contact the Citi Conference organizers to inform them that Fishback was not authorized to speak on Greenlight's behalf and that Fishback never held a "Head of Macro" title.  Fishback did not

provide the requested contact information.  Instead, on August 9, 2023, Fishback sent Greenlight's Chief Operating Officer, Daniel Roitman, a revised agenda for the Citi Conference which now listed Fishback as "Founder & CIO, Azoria Partners," which is the first time that Greenlight learned about the existence of Azoria.  In his August 9 email, Fishback said "[t]hey've updated it and removed my Greenlight affiliation, replacing it with the name of the consulting LLC I'm starting to service a few clients."  This was also false in retrospect.

72.    In fact, Azoria is not a "consulting LLC," but the hedge fund that Fishback currently purports to operate, is actively promoting on social media, and that Fishback has explicitly stated he intends to use to directly compete with Greenlight.  Fishback had conveniently failed to mention the existence of Azoria to Greenlight at any point in time before August 9, 2023, and it was curiously missing from his resignation email in which he stated he was leaving to focus on his non-profit, Incubate Debate.

73.    Indeed, Greenlight subsequently learned that the domain name for the Azoria Partners' website, which is still in use today, was registered on July 4, 2023, almost a full month before Fishback noticed his resignation from Greenlight.

B.    Fishback Transferred Greenlight's Confidential Information to Himself

74.    Greenlight naturally became more suspicious of Fishback's motives following its discoveries above.  Greenlight discovered that on August 15, 2023, Fishback's final day at Greenlight, Fishback forwarded an "End of Day Package" that had been circulated internally at Greenlight on July 28, 2023, and which contained, among other things, a full list of the investments in Greenlight's portfolio, information pertaining to investment performance, and investment track records, to his personal, non-Greenlight email address from his Greenlight email account.

75.    Such information undoubtedly constituted Confidential Information, as that term is defined in the Employment Agreement.  Because Fishback forwarded this information to himself

surreptitiously, without authorization, and with no legitimate purpose related to his employment with Greenlight, this constituted a clear violation of the Confidentiality Provision in his Employment Agreement.

76.     Further investigation showed that this was not the only occasion on which Fishback had personally retained Confidential Information in violation of the Employment Agreement in his last two weeks at the Company.  On August 11, 2023, Fishback also surreptitiously forwarded to his personal email account Confidential Information relating to the year-to-date profit and loss of certain Greenlight interest rate positions.

77.     While Greenlight is still attempting to ascertain the full extent of the Confidential Information that Fishback took, it seems that dozens of times during his tenure at Greenlight, Fishback surreptitiously emailed information from his Greenlight email account to one of his several personal email accounts, including information about specific Greenlight macro investments, and their performance.

78.     As discussed in further detail *infra*, however, while Fishback represented to Greenlight that he had in fact deleted the portfolio of Greenlight investments that he had stolen, Greenlight has learned through Fishback's recent public statements that he has made since leaving Greenlight that he still has possession of Confidential Information that he stole during his tenure at Greenlight.

C.    Greenlight Warns Fishback Against Misconduct and Fishback Reveals His Scheme

79.     On August 15, 2023, immediately after Greenlight became aware that Fishback sent Confidential Information to his personal email account, Mr. Roitman emailed Fishback notifying him that Greenlight detected his attempt to misappropriate Confidential Information and demanding that he delete the information.  Mr. Roitman also warned Fishback against using inaccurate titles.

80.     In response, Fishback replied "Deleted.  I thought I was the 'head of macro.'"
Despite never having received a promotion from Research Analyst and that a "Head of Macro"
title had never existed at Greenlight, Fishback attached an image from a single email where from
Mr. Roitman to Ms. Heather Robinson, a Senior Manager of the GLG Group on May 11, 2023 (the
"GLG Email").  The email thread began with Ms. Robinson contacting Mr. Roitman to promote a
"Remote Roundtable" meeting her firm was hosting, and offering to "save [] a seat" for Greenlight.
In response, Mr. Roitman asked Ms. Robinson to sign Fishback up for the meeting, which was
relevant to Fishback's duties as a Research Analyst focused on macro positions, and introduced
Fishback onto the email thread by informally remarking that he is "our head of macro."

81.     To be clear, Mr. Roitman was not stating that this was his formal title, as is obvious
from the context and lack of a proper noun. The Remote Roundtable was a GLG "Signature Event"
available only to senior executives (only Mr. Einhorn and Mr. Roitman were invited), and Mr.
Roitman overstated his description of Fishback so that GLG would allow him to attend the event.
To be certain, Greenlight reviewed its own records, and found that the only time anyone at
Greenlight (other than Fishback himself) used the term "head of macro," was the single stray
comment in the GLG Email from Mr. Roitman to Ms. Robinson.

82.     Notably, Fishback forwarded the GLG Email to himself on his final day at
Greenlight, when he also stole Greenlight's portfolio of investments.  It is clear that Fishback was
planning to use the GLG email as a basis to misrepresent his title in conjunction with his theft of
Greenlight's Confidential Information as a way to kickstart Azoria.

83.     Greenlight believes that Fishback did not actually delete any of the information that
he stole from Greenlight, given the context of his wrongful and deceptive conduct around the time
of his departure and his bad practices while an employee.  As discussed in further detail below,

Greenlight's counsel has sent multiple letters to Fishback asking him to confirm the deletion of all Greenlight Confidential Information in his possession, and he has never replied to those letters. And as recently as May 23, 2024, he publicly confirmed that he is still in possession of Greenlight's documents containing Confidential Information, and that he is also willing to publicly disclose his own personal knowledge of Greenlight's Confidential Information.

## VI.    Greenlight's Demand Letters

84.    On October 11, 2023, Greenlight sent Fishback a letter (the "First Demand Letter") that, *inter alia*, demanded that Fishback return (or destroy, as applicable), Greenlight's Confidential Information in his possession or control and cease holding himself out as having held any title other the title he actually held at Greenlight, which was "Research Analyst."  In addition to overnight courier, Greenlight sent the letter via email address to the email address that Fishback had most recently used to communicate with Greenlight, *tommyfishback@gmail.com*, as well as the email address that was posted on the website and LinkedIn account for Azoria, *james@azoriapartners.com*.

85.    On October 19, 2023, Greenlight sent Fishback a second letter (the "Second Demand Letter") reiterating the demands made in the First Demand Letter, and documenting certain of Fishback's efforts which showed that he had received the First Demand Letter, but was trying to obfuscate that fact in an attempt to deny that he had received notice.  The Second Demand Letter observed that within twenty-four hours of sending the First Demand Letter, the contact email address that was posted on the website and LinkedIn account for Azoria Partners had been changed from *james@azoriapartners.com* to *sunset@azoriapartners.com*.

86.    Fishback has never responded to either of these letters.

## VII.    Fishback Includes Confidential Information in a Frivolous Complaint

87.     After receiving the First and Second Demand Letters from Greenlight, Fishback filed a complaint against Greenlight on October 23, 2023, in New York State Supreme Court (the "Defamation Complaint").    The Defamation Complaint frivolously alleged that Greenlight defamed him by denying that he had held the "Head of Macro" title.

88.     Fishback voluntarily dismissed his claims in favor of arbitration.    To date, he has not commenced an arbitration, nor has he refiled these claims.    For its part, Greenlight now intends to commence arbitration to assert the claims for unfair competition, tortious interference, defamation, and defamation *per se* against Fishback that were contained in Greenlight's original complaint in this action.

89.     More pertinent for present purposes is the fact that Fishback also used the Defamation Complaint in order to disclose Confidential Information regarding Greenlight's performance history.    In the Defamation Complaint, Fishback stated that he had "generated over $100 million in profits for Greenlight from the period of February 2021 to August 2023."    Setting aside that Fishback falsely attributed any of Greenlight's profits to himself, the disclosure of Greenlight's performance history, like profits over a certain time period, is a disclosure of Confidential Information and a violation of the Employment Agreement.

90.     Fishback used the Defamation Complaint as a platform to continue falsely inflating his title and role, for which Greenlight will pursue claims in a separate forum.    But his disclosure of Greenlight's Confidential information to further those goals was also an independent violation of the Employment Agreement.

## VIII.    Fishback Threatens to Disrupt Greenlight's 2024 Annual Partner Dinner

91.     On January 10, 2024, Fishback emailed Greenlight and threatened to attend Greenlight's 2024 Annual Partner Dinner.

92.    Many of Greenlight's investors, counterparties, service providers and employees' family members attend Greenlight's Annual Partner Dinners.  Fishback's threats were obvious attempts to intimidate and embarrass Greenlight, and interfere with Greenlight's relationships with its investors, counterparties and service providers.  When Greenlight notified Fishback that he was not permitted to attend, he insisted that he would still attempt to do so, or at a minimum, stand outside the event venue and attempt to communicate with attendees.

93.    Specifically, Fishback threatened to "hand a detailed letter to investors," that would prompt them to ask a series of "questions" of Mr. Einhorn during the Annual Partner Dinner.  The content of the letter and the questions that Fishback threatened to provide the investors contained Greenlight Confidential Information that Fishback had obtained via his employment with Greenlight, which he agreed not to disclose in the Employment Agreement.  In particular, Fishback wrote in his January 10, 2024 email that he intended to ask the following questions, among others:

> What is the status of Greenlight's macro book — which had its best year in 2022 and a strong year in 2023 — in light of James Fishback's (who was responsible for macro trades) departure in August 2023? Have these trades been exited or rolled over? Since no one at Greenlight has experience in macro derivatives modeling, pricing, or trading, who is currently overseeing the macro book?

94.    Fishback's statement that no one at Greenlight—including Mr. Einhorn—had any "experience in macro derivatives modeling, pricing or trading," is false.

95.    After Greenlight sent letters to Fishback through legal channels that detailed the wrongful nature of his threats, Fishback, ultimately, did not carry out his threat to distribute this letter to Greenlight's investors.  Nevertheless, such threats harassed Greenlight as it prepared for an important corporate event.  Fishback's behavior reflected his continued intent to harm Greenlight through misrepresentations and misuse of Confidential Information. Greenlight took Fishback's threats seriously and was forced to hire additional security for its event.

**IX.**     <u>**Fishback's May 2024 "Debate" Scheme & Social Media Meltdown**</u>

96.     Since leaving Greenlight, and during all relevant time periods discussed above, Fishback has been extremely active in seeking out platforms where he could continue to misuse Greenlight's Confidential Information.  For example, in mid-May 2024, Fishback hoodwinked the unwitting hosts of a podcast called the "Wall Street Skinny," that averages over 60,000 downloads per month, into extending an "invite" to Mr. Einhorn to debate Fishback on their podcast.  On May 15, 2024, Mr. Einhorn and Mr. Roitman received an email from Ms. Jennifer Saarbach, one of the co-hosts of the podcast, inviting Mr. Einhorn to have a "friendly debate" with Fishback on the podcast regarding the merits of investing in Tesla, among other things.

97.     Fishback, who was also copied on the email, responded and said: "This is an excellent idea. Looking forward to having a debate with you, David."  Then, before anyone at Greenlight could respond, Fishback, in an attempt to garner as much publicity for himself as he could,[4] immediately took to X, and presented the invitation to the general public as organic and unsolicited.[5]  Of course, he made no mention of the fact that he himself had procured the "invite" by deceiving an innocent third party into proposing the podcast.

98.     Fishback had not been "invited" to do anything, given that Fishback was the one that approached Ms. Saarbach with the idea to have Mr. Einhorn on the podcast to debate Fishback, and not the other way around.  Fishback also deceived Ms. Saarbach because he knew full-well that given his repeated efforts to harass Greenlight, and repeated instructions to only communicate

[4] Indeed, Fishback tagged Mr. Einhorn in his first post, as well as Elon Musk and two other prominent X accounts, which ultimately garnered more than eight hundred thousand views.

[5] Fishback's X post that day reads "I've been invited to debate Tesla with David Einhorn (my ex-boss), among other topics. I've been critical of Tesla shorts like @davidein because they fundamentally misunderstimate [sic] Tesla's core value driver: autonomy.  The path to truth runs through open debate. Let's do it!"

with Greenlight through counsel, Mr. Einhorn would not be interested in engaging in a public debate with Fishback.  But Fishback did not provide any of this relevant background to Ms. Saarbach and deceived her into believing that Mr. Einhorn would be receptive to her "invitation," and that it would be "an amazing opportunity."[6]

99.    This sham "invite" was just the first step in Fishback's scheme.  Because Fishback knew that invoking the opportunity to debate Mr. Einhorn on a podcast would generate a lot of public interest, he used the sham "invite" as a pretext to discuss Mr. Einhorn and Greenlight on social media.  In doing so, he remarked on Greenlight's investment positions in Tesla, which constitute Confidential Information, as a potential topic for the sham debate.  And since Fishback knew Mr. Einhorn had no interest in engaging with him in any sort of discussion, and would reject the sham "invite", it appears Fishback also planned to use his statements laden with violations of his Confidential Information as a public-relations "win."

100.    Due to the social media interest Fishback had started around this debate, Mr. Einhorn was forced to publicly respond to Fishback with an X post of his own, which stated:

> Thank you for the offer. Normally, I am happy to debate and exchange views. However, in order for such a debate to be meaningful, the person on the other side needs to have some knowledge about the subject. In this case, I am not aware that you have ever spent any time analyzing Tesla or its fundamentals - or really any other equity position for that matter. Certainly not during the 2 years while you were a macro research analyst at Greenlight.
>
> In any event, even if I were to go against our policy of not publicly discussing shorts or even confirming we are short, such a debate is not possible in the face of the ongoing litigation between us.

---

[6] In fact, in a May 16, 2024 email from Ms. Saarbach to Mr. Einhorn, she apologized to Mr. Einhorn for proposing a debate between Fishback and Mr. Einhorn.  In that email, Ms. Saarbach said "We were completely unaware of any litigation or animosity between you two — having just met James yesterday — and thought **his idea to bring you on for a debate** sounded like an amazing opportunity."  (emphasis added)

101.    It appears that Fishback was unhappy with the fact that Mr. Einhorn's response derailed his deceptive scheme, as Fishback then launched into a days-long tirade on his X account, in which he continued to leverage his knowledge of Greenlight's Confidential Information in violation of his Employment Agreement.  His clear goal in doing so was to remain in the public spotlight and generate press for himself and Azoria.  Relevant highlights from his social media junket include:

- On May 17, Fishback demanded the release of his "track record" (which is defined as Confidential Information under his Employment Agreement).

- On May 19 and May 20, Fishback continued to demand the release of his track record in multiple posts:

  - In one video post titled, "Dear David Einhorn" on May 19, Fishback complained that he has not been allowed to compete because he "can't have [his] title, . . . can't describe [his] responsibilities, . . . can't describe [his] contributions, [and Greenlight is] not gonna validate even the smallest, smallest, most mini[s]cule aspect of [his] employment to any investor."

  - This was the same video in which Fishback stated:  "I want to compete, I want to build a business, I want to create something . . . Let's compete.  Let me start Azoria.  Let me start my hedge fund . . . I don't know what I did, or you think I did."

  - In another post, from May 19 Fishback posted a poll that asked viewers whether they thought Mr. Einhorn should publicly release Fishback's trading track record from Greenlight.  The responses were 74.9% "Yes" and 25.1% "No."

  - In a third post from May 19, Fishback stated: "This isn't a dispute about title. It's about who is responsible for Greenlight's insane macro returns. Let's clear this up right now, @DavidEin. Publicly release my track record so prospective investors in my hedge fund can see my tangible contributions."

  - On May 20, Fishback reiterated his sentiments from the day before, stating: "This isn't really about a title. It's about my track record."

102.    On May 23, 2024, Fishback appeared on an episode of the "Forward Guidance Podcast," which was published in video format, and which Fishback reposted on his X account.

In this episode, he provided an even more in-depth discussion of Greenlight's Confidential Information.  Relevant statements from Fishback on that podcast appearance include:

- Fishback went on to once again falsely state that he had "generat[ed] $100 million of profits" at Greenlight.

- Fishback also acknowledged that he could not discuss Confidential Information about his work at Greenlight when it suited him to deflect difficult questions, but then proceeded to do so anyway when opportunities in the conversation arose where he felt it would help his cause to misappropriate Greenlight's successes and track records.

  - Fishback publicly disclosed that Greenlight invested in "interest rate futures tied to the path of the Fed in 2022" and "inflation swaps" as examples of Greenlight investments.

  - When asked about the types of trades he made, Fishback acknowledged his confidentiality obligations, but then immediately began discussing trades stating: "Well, let me just speak in general terms. I don't want to reference anything I did at Greenlight. But when I think exotic derivatives, I would say second-gen FX exotic options, second-gen interest rate exotic options, all OTC.  I would think variance swaps. I would think volatility swaps on FX vol, variance on equity index vol, and the sort."  It appears that Fishback considered there was a loophole to his Confidentiality Provision if he simply pretended to speak in the hypothetical sense.

  - In addition to disclosing Confidential Information, he again seized on the opportunity to misappropriate Greenlight's successes, stating: "[I]t's pretty clear that only one person would have been in a position to run that type of complicated macro book," referring to himself, and "[i]f I wasn't running the macro book, Jack, who on earth was?"  The correct answer is clear:  Mr. Einhorn.

  - Fishback also revealed that he was not simply disclosing Greenlight information that he was able to recall from memory, but that he actually still possessed documents containing Greenlight's Confidential Information.  He stated: "So, I'm actually staring, I can't show you of course, **but I'm staring right now at my internal trading ledger** that goes through all of my trades by instrument and the profit and loss on those trades."  (emphasis added).  Later in that same podcast, he stated again "[n]o, because **I am staring right now again, right here at the internal performance sheet** that breaks down all of my trades with a little nice number at the end of it there."  (emphasis added).  This "internal trading ledger" or "internal performance sheet" is Greenlight Confidential Information that Fishback took from Greenlight in violation of his confidentiality obligations and has retained in spite of receiving two letters from Greenlight demanding that he delete it.  His acknowledgments that he also could not show the interviewer its contents, but could discuss them verbally demonstrate that Fishback thinks his

confidentiality obligations are subject to whatever loopholes he thinks are clever and benefit him in the moment.

103.    These text and video posts contained dozens of statements in which Fishback misused his knowledge of Greenlight's Confidential Information in violation of his Employment Agreement.

104.    Fishback disclosed Greenlight's Confidential Information, like its positions and performance history, in order to create the impression that he was responsible for Greenlight's macro trading successes.  For instance, his statements that he was responsible for $100 million in macro trading profits, which he called "insane," are disclosures of Greenlight performance (albeit inaccurate and falsely attributed to Fishback).  His statements disclosing Confidential Information about Greenlight's investments are also targeted at demonstrating to the public that he has knowledge about what drove Greenlight's success, in order to create the impression that he is capable of recreating that success with his own fund.

105.    These statements are false because they inaccurately inflate Fishback's role in Greenlight's macro investing success at the expense of others at Greenlight who were really responsible for Greenlight's success, namely, Mr. Einhorn.  Fishback's statements create the false impression that he had discretionary authority to make investment decisions at Greenlight, which he never had, ever.  By the same token, these statements are harmful to Greenlight because they create the impression that Greenlight's ability to make successful macro investments is now seriously impaired because Fishback is no longer at the firm.

106.    Fishback's posts themselves were widely viewed, with some receiving more than one million views.  Major media outlets covered Fishback's departure from Greenlight in light of the surrounding "dispute" he pretextually procured, including the *New York Times*, *Business*

*Insider*, *Yahoo Finance*, *Bloomberg* and *Morningstar*, and as a result, his wrongful statements have been published to millions more.

107.    Because these publications have been made without full and accurate information, they have lent an air of legitimacy to Fishback's "position" in the dispute, when in reality, Fishback's position is built around prevarications, misappropriation of Greenlight's track record, disclosures of Greenlight Confidential Information, and other threats to impose harm on Greenlight.

108.    The harm of these statements to Greenlight is apparent.  Because Fishback has been relentless and unabashed in his campaign to publicly use Greenlight Confidential Information, Fishback's unlawful statements have damaged, and pose a continued risk of damaging, Greenlight's commercial success, as well as its reputation and goodwill with numerous parties that are vital to Greenlight's success, including Greenlight's current and future investors, business partners, potential employees, and the financial community at large.

109.    Given the wide press coverage that Fishback has generated, and the adage that "bad news travels fast," there is no feasible way for Greenlight to identify the parties to whom Fishback's statements have been published, such that Greenlight can completely assess the extent of damage done due to the disclosure of its Confidential Information.

110.    Furthermore, Fishback's recent public statements confirm that he is still in physical possession of documents containing Greenlight's Confidential Information, and that he is willing to disclose Confidential Information from those documents as well as other Confidential Information that he has knowledge of independent of any documents, absent injunctive relief.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Employment Agreement)

111.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

112.    Pursuant to the Employment Agreement, Fishback has an undisputed obligation not to use or disclose Greenlight's Confidential Information without authorization pursuant to his Employment Agreement. He likewise had and continues to have an undisputed contractual obligation to return and not keep Greenlight's valuable Confidential Information after he decided to leave Greenlight.

113.    Fishback violated these provisions of the Employment Agreement by forwarding Confidential Information from his Greenlight email address to his personal email addresses during his employment.

114.    Contrary to his representation to Greenlight that he deleted certain of the Confidential Information he took from Greenlight (which he failed to confirm in response to letters from Greenlight's counsel), Fishback has continued to violate these provisions of the Employment Agreement by discussing Greenlight's Confidential Information with third parties on public platforms, and confirming via public statements that he is still in possession of Greenlight's Confidential Information.  Specifically, Fishback has recently made multiple statements regarding Greenlight's investment positions, strategies, profits, and track record in written and audiovisual posts to his X account that have all constituted a misuse of Confidential Information.

115.    As a direct consequence of these breaches, Greenlight has, at the very least, not received the benefit of the bargain associated with the Employment Agreement with Fishback, and will suffer an even greater harm if Fishback is not enjoined from continuing to possess, use, and disclose Greenlight's Confidential Information, further breaching the agreement.

116.    Greenlight performed its own contractual obligations under the Employment Agreement.

117.    In the event of a breach or threatened breach of the Employment Agreement, Greenlight is entitled to an injunction restricting Fishback from committing or continuing the breach or threatened breach under the Employment Agreement.

118.    As a direct and proximate cause of the Fishback's breach of contract, Greenlight has suffered, and continues to suffer, substantial damages, including, without limitation, the loss of economic advantage, and denial of its bargained for exchange, and, accordingly, Greenlight is entitled to damages in an amount to be determined at trial.

119.    Greenlight will continue to be directly and proximately damaged if Fishback is not immediately and permanently enjoined from further breaching the Employment Agreement and prohibited from further accessing, using, and disclosing Greenlight's Confidential Information.

120.    Greenlight has no adequate remedy at law and is suffering irreparable injury and damages as a result of Fishback's actions.

121.    Fishback agreed in the Employment Agreement that a violation of the Confidentiality Provision would cause irreparable injury to Greenlight, and that Greenlight was entitled to seek injunctive relief in order to enforce the Confidentiality Provision. *See* Employment Agreement § 11 (stating that that "money damages may not be an adequate remedy for any breach or threatened breach of" the Confidentiality Provision, and that Greenlight "may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violations of such provisions.").

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests judgment as follows:

31

(a)    Entry of a permanent injunction ordering Fishback to refrain from breaching the terms of his Employment Agreement, and specifically enjoining: (i) Fishback from retaining any Confidential Information in any form (including computer files, removable media "thumb drives," CDs, electronic files on removal media or in any other electronic form, and hard copy documents) and instead returning all copies of such documents, materials, computer files and other data to Greenlight, and destroying any such Confidential Information that would remain in Fishback's possession even following return (i.e., computer files); and (ii) Fishback from disclosing or otherwise using Greenlight's Confidential Information;

(b)    Granting judgment in Plaintiffs' favor on its claims and awarding Plaintiffs an amount of monetary damages to be determined at trial, including but not limited to damages in an amount sufficient to compensate Plaintiffs for Fishback's breach of contract; and

(c)    Awarding Plaintiffs punitive and/or liquidated damages;

(d)    Awarding Plaintiffs the reasonable costs and disbursements of this action;

(e)    Awarding Plaintiffs pre-judgment interest on the judgment amount;

(f)    Awarding Plaintiffs any further relief as the Court may deem just and proper.

New York, New York
Dated:  September 23, 2024

AKIN GUMP STRAUSS HAUER & FELD LLP

By:    */s/ Stephen M. Baldini*
Stephen M. Baldini
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel:  212-872-1000
Fax:  212-872-1002
sbaldini@akingump.com

*Counsel for Plaintiffs Greenlight Capital,
Inc. and DME Capital Management, LP*

33