1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

GREENLIGHT CAPITAL, INC.,

              Plaintiffs,

          v.                     24 Civ. 4832 (PAE)

JAMES T. FISHBACK,

                            Conference

             Defendant.

------------------------------x

                          New York, N.Y.
                          January 28, 2025
                          3:30 p.m.

Before:

              HON. PAUL A. ENGELMAYER,

                          District Judge

                  APPEARANCES

AKIN GUMP STRAUSS HAUER & FELD LLP (NYC)
     Attorneys for Plaintiffs
BY:  STEPHEN M. BALDINI
     DANIEL SLEMMER

ABRAMS, FENSTERMAN, EISMAN, FORMATO, FERRARA & WOLF, LLP
     Attorneys for Defendant
BY:  JUSTIN T. KELTON

P1sFgreC

(Case called; appearances noted)

THE COURT:  Good afternoon.  All right.

I think this ought to be a relatively short and straightforward conference; at least, at this stage of the game, I'm not perceiving any obvious areas of difference.  Let me make sure that we have some common vocabulary as to what discovery, in particular, is going to look like.

You've indicated four months for fact discovery.  That's consistent with my default case management plan.  It seems entirely more than reasonable, given are the rather finite scale of the case.

Let me ask you, from the perspective of Greenlight, in terms of discovery, are you seeking it from more than Mr. Fishback, personally?  Is there some operation behind him?

I'm trying to get a sense of how many electronic custodians and what the universe of discovery likely looks like.

Just, kindly, speak into the mic, if you can.

Thank you.

MR. BALDINI:  Sure.  Thanks, your Honor.

I suspect, yes, that we probably will need from other custodians, non-parties, obviously.

THE COURT:  Non-parties or employees of his or --

MR. BALDINI:  Employees of his wouldn't be parties.  His entity is not a party, *et cetera*.

P1sFgreC

THE COURT: Right. Right.

MR. BALDINI: So, yeah. I think you correctly described at least how we're viewing the discovery as probably finite, but that doesn't necessarily mean not intrusive.

THE COURT: So the entity isn't a party because there's no contractual obligation a new entity has. But if he opens up a new entity, he's accountable for that.

MR. BALDINI: Correct.

THE COURT: And the types of material you would be looking to that would prove up the breach that you allege would be what?

MR. BALDINI: Sure. The easy one is, there's obviously requests that we'll make for hard copies of documents. There's indications in the complaint of him reviewing hard documents that he mentioned on social media that he was talking about. And then electronics as well, and not just electronic communications, you know, emails, texts, *et cetera*, but, I think this may well be a case where we have to get a little bit into some of the forensics of deletion and custodians and the like, in order to make sure that we're comfortable that we have found all of the confidential information that was in his possession.

THE COURT: Just be concrete about the scenario or scenarios that you primarily have in mind in terms of misuse of your confidential information.

What do you think happened here?

MR. BALDINI: A couple of things. We believe and allege that during the course of his employment, the defendant was downloading information onto his personal computers, devices, and the like. We believe and have alleged that he also has hard copies of certain information with him as well.

And then, you know, there's amorphous allegations -- and I say amorphous not because they're made up, but there's allegations about things that his employment contract prohibited from doing, but that, you know, are -- in his head, that he is saying and advertising to the public at large that would be prohibited by the terms of his employment.

THE COURT: Such as --

MR. BALDINI: Track record. I did this -- track record.

THE COURT: I see.

MR. BALDINI: Track record.

THE COURT: Where he's describing his track record at Greenlight.

MR. BALDINI: Correct.

THE COURT: Inaccurately or accurately.

MR. BALDINI: Regardless, track record is one of the prohibited areas of confidentiality within the terms of the agreement.

THE COURT: Does that literally mean anything?

P1sFgreC

In other words, if he said: Look, I had such-and-such number of percent in dollars in assets under management, at that generic level, is that really prohibited, or is it more things that tend to reveal strategy?

MR. BALDINI: I think it's more the latter, but I think we'll be arguing over the scope of that over the course of the case. I think we'll be arguing this category of things is within the scope of that, and I think Mr. Kelton, of course, will arguing that certain things are not, if that makes sense.

THE COURT: No, it makes sense.

So you mentioned the possibility of things being copied from proprietary files of Greenlight. To the extent that the mode of copying was electronic, would Greenlight's records, by their nature, tend to reflect the fact of a copy being made or emailed or transferred or whatever the mechanism was?

MR. BALDINI: Yeah, not necessarily, so far as we could tell.

We have been through some of the forensics with our client, and I don't want to get into the confidences at this point or anything like that, but we don't have confidence at this point that we can, straight-line, say, this is what was taken; this is what was not.

And you'll have to excuse me, because that technical aspect is a little beyond me.

P1sFgreC

THE COURT:  Understood.

Let me just reduce it to my own world, here.  If I emailed something to a law clerk of mine, one would look at my sent folder, and similarly, I expect the same would be true for other devices beyond my desk top upstairs.

Obviously, you've got a different electronic environment here, but is it really the case that one can't reliably reconstruct the transmitting out of files or things of that nature?

MR. BALDINI:  I think what we would say, it's the case that we can have some confidence over some things that were definitively sent.

THE COURT:  Right.

MR. BALDINI:  But what we don't know is the full universe of anything else.

THE COURT:  Yeah; I respect that.

But, in other words, can you tell who the immediate-step recipient was?

MR. BALDINI:  I'm sorry if I'm being vague.

THE COURT:  No.

MR. BALDINI:  For example, if you look at our complaint, there is a specific allegation about a specific document being emailed to him from another of his email addresses.

THE COURT:  Right.

MR. BALDINI: We do have a record of that.

THE COURT: And the implication, therefore, is that something mischievous, improper happened with it after it went to his personal email, if that's the right way to put it.

MR. BALDINI: Correct.

THE COURT: And he could, in theory, defend on the grounds of: I was taking it to work at home but not to use for personal benefit.

And then the litigation would do what? How would you get to the bottom of that?

MR. BALDINI: So, there's a couple of things. Primarily, we're seeking permanent injunctive relief. We're seeking an order that these are the terms; you can't use it; you have to return everything to us.

So, to your question, I don't think, fundamentally, that would change anything about the litigation.

THE COURT: It wouldn't change anything, perhaps, about it injunctively.

If your view of the facts is right, whatever his purpose was in removing it from your work environment and putting it on a personal one of his, it's got to be returned. But as it would relate to, for example, the damages claim, something more would need to happen; right?

MR. BALDINI: Yes and no.

I mean, I think if you go through the complaint, some

things have already happened. And candidly, whether it's due to the parties' relationships -- Mr. Kelton's or whatever -- things have sort of frozen since the litigation started. We haven't seen any things happen where we need to come rushing into you and say, your Honor, we need to upgrade this to preliminary injunction.

THE COURT: That was actually on my list of questions, but --

MR. BALDINI: Yes. Yeah, and so we think, given the state of play today, that it's better to litigate this out as a permanent injunction case and have the matter proceed accordingly, assuming that doesn't change.

But, (A), the complaint says some bad things have happened prior to the filing of the complaint such as, you know, representing things to the market while trying to build your competing firm using information that you're not entitled to use.

And then the purpose of the injunction and the go-forward is, there is the possibility of additional bad things happening, to the extent this information is not returned to us or an injunction is not issued, preventing further information from being disclosed.

THE COURT: So to the point about a preliminary injunction, when I resolved the motion to strike, I was left with the impression that this case had a degree of

house-on-fire urgency because you felt that your clients' interests were being harmed by the absence of court intervention here.

I think what you're saying to me is, at least right now, you're not looking at a preliminary injunction because you're not seeing overt evidence of your intellectual property being misused, even if you believe that it is possessed and hasn't been returned; correct?

MR. BALDINI: Correct.

THE COURT: All right. Look, nonetheless, I think what I have to say is this. I'm happy to approve the case management plan you've all given me, and I understand that four months is not a short am amount of time. But more than in most cases. I have to mean business when I say, this is a hard stop. If there's a matter of personal crisis or exigency, I'm always going to be open to accommodating lawyers as human beings but if it's simply a matter of: This case is a lot of work, I think, given the nature of the controversy, I need to be firm at that the end date for fact discovery is a firm one.

Beyond that, although I hope that there won't be a need to separate out an earlier phase of preliminary injunctive relief from permanent -- I'm delighted with what you told me, that there doesn't appear to be ongoing harm that is visible to you -- if there is, I expect to move with dispatch, and we'll put in place, promptly, a schedule to litigate that.

P1sFgreC

MR. BALDINI: Understood on all counts, your Honor.

THE COURT: Okay. May I ask you this question.

The next conference date that I expect to set in the case would ordinarily be set as month after the close of fact discovery. And under my individual rules, the purpose of that next conference is predominantly as a pre-motion conference in anticipation of summary judgment practice.

And more than nine times out of ten, I set the next conference date keyed to the end of fact discovery on the premise that whatever value expert discovery might have with respect to damages, more than nine times out of ten, it has no bearing on liability, and therefore, the time for me to check in with counsel is key to the end of fact discovery. And I use that as a time to set a deadline for joint stipulated facts that I ask to be agreed upon prior to the initiation of summary judgment briefing.

There are narrow sets of issue areas where expertise bears on liability: antitrust, market definitions, some Lanham Act cases, the occasional patent case. I can't tell, from the portrait here, whether expert discovery is really going to be germane to any element of liability or just to extent of damages.

What's your view?

MR. BALDINI: I would say, not to liability, except to the extent that there is some expert testimony needed around

discovery spoliation, stuff like that.

THE COURT: All right. Well, look as to --

MR. BALDINI: But not --

THE COURT: As to that, that's not really summary judgment. That goes to adverse inferences and things like that.

Here's why I ask, which is, your contention is that Mr. Fishback misappropriated intellectual property from you. It sounds like, from your perspective, you've already got enough of that. That from your perspective, whether you win or lose, you've got enough to clear the summary judgment bar on that, such that whether there's more or less of it as might be proven by expertise -- some computer geek who goes through all this stuff -- it's not going to affect the summary judgment analysis.

MR. BALDINI: Agreed.

THE COURT: And therefore, from your perspective -- I'll hear from your adversary in a moment -- I can schedule our next conference keyed to the end of fact discovery.

MR. BALDINI: Yes. Yes, your Honor.

THE COURT: I suppose the other point that could be made is, I could also say to you, to the extent that you're going to have that computer expert, just have that work done by the end of the fact discovery deadline so that if anybody thinks it's germane to potential summary judgment motion as to

liability, that's in the can by the end date of fact discovery.

MR. BALDINI:  Agreed, your Honor; yes.

THE COURT:  I note -- and again I'll get to defense counsel in a moment -- together you've agreed not to answer the question of whether this is to be a jury trial.  And I think I understand, in effect, what you're both saying is, you're both reserving your right to seek a jury trial, subject to the right later on to argue that in some fashion it's been foregone.

I understand, strategically, why you might want to choose later on to not seek a jury trial, but I don't -- to the extent the issue is whether there's a right to one, I don't get it.

MR. BALDINI:  From our perspective, the issue is the equitable relief to the extent that it is -- should there be an injunction here, trial, then that is not a matter where a jury is typically impaneled.

THE COURT:  Right.  But there will be a damages component, too, and so it wouldn't be the first time in which a case proceeded on two tracks, and the Court would receive such additional evidence as might be germane to equitable relief to top up whatever the jury got as to damages.

But, I thought I understand you to be saying there is uncertainty as to whether there's any place for a jury trial, and given that there's a damages claim, I didn't understand that, unless somebody waived it in agreement.

MR. BALDINI: No, your Honor.

I think it was more around the complexities of whether the equitable relief versus the damages claim, but I think you're making a fair point.

THE COURT: I mean, but that's, ultimately, a discretionary call, I mean, why his lawyers might conclude that it adds cost and aggravation and uncertainty to have a jury doing damages, particularly if a judge is already going to be engaging on what may be the more important piece for you, equitably. You might just say it's a lot cleaner to deal with this as a judge trial. But I was going at it -- I misunderstood this to be a debate about what is legally available to us to what is strategically sound.

MR. BALDINI: Yeah. And just to clarify your question, there's no jury trial waiver in the employment agreement.

THE COURT: So you both have a right to a jury trial with respect to the damages piece of the puzzle. The question is whether either of you insists on it.

MR. BALDINI: Fair, your Honor.

THE COURT: I just want to make sure, before I move to your adversary, that's correct.

MR. BALDINI: That's correct.

THE COURT: All right. So let me turn to you, Mr. Kelton. Let's start where we left off and the jury charge

piece.

Did my dialogue with Mr. Baldini about get it right?

MR. KELTON: Yes.

I just wanted to add that on behalf of Mr. Fishback, we did include a jury demand in the answer, and Mr. Fishback does intend to pursue a jury trial to the extent that he has the right to do so. We will, of course discuss it going forward, but for now, he is asserting his right to a jury trial.

THE COURT: Okay. And look, I have no reason that he doesn't have one, given that there's a damages claim here.

I would urge you, later on, as we get closer to the end date for fact discovery and when I'm apt to engage with you again, to have a thoughtful discussion about that. I don't put a thumb on the scale in one way or the other, but just as a veteran of seeing problems like this, it's a cost magnifier and an uncertainty magnifier to introduce a jury into the mix, particularly if you've got a judge dealing with an equitable piece of the bud puzzle and particularly, if at the end of the day, you mutually conclude that the action here is with the injunctive part and that the damages are only but so much.

I have no idea if that's the case, but given your adversary's representation that there isn't overt evidence of -- my words here -- ongoing mischief, it might be the case that the case really turns on equitable things.

MR. KELTON:  Sure.

THE COURT:  Anyway, I'm just putting it out there.  I hope you'll keep the line of communication open.  I take it, by the way, notwithstanding the evident tension between the parties, counsel are working together well.

MR. KELTON:  I think so.  We were just chatting before, nice colloquy in this relationship.

MR. BALDINI:  Agreed.

THE COURT:  Good.  Let's keep that going.

This isn't personal between you.  And heaven knows, the best part of my job is when I have lawyers working together and we're all moving together towards a common end.

So with that, let's get back to discovery.  What does the discovery that you'll be seeking from your adversary predominantly look like?

MR. KELTON:  Predominantly, it's going to be:  Show us the proof.  You have a very long complaint with a lot of allegations.  You know, Mr. Fishback does not believe that he did most, if not all, of the things that are alleged or at least not in the fashion that they're being alleged.

But, Greenlight, if you think he did, you're going to put it into your burden of proof, so, document requests, interrogatories, depositions targeted to -- show me all the documents that you think show that you were actually damaged by any of this.  Show me every time you think Mr. Fishback

actually disclosed something that wasn't publicly known or is confidential.

THE COURT:  So as I understand it, there is a range of allegations here, but the heart of it is the use by Mr. Fishback.  But I suppose it's also a violation, just the taking of the confidential information, even if, from where it sits right now, Greenlight can't purport to know the use, if any, that was made; right?

MR. KELTON:  Yeah.  I think it's important to note here, Judge, that Mr. Fishback worked almost entirely remotely on his personal computer.  So when we talk about taking, it's not as if somebody, you know, put something up their shirt and walked out of the office.

THE COURT:  Right.

MR. KELTON:  These are files that Greenlight knew and authorized to be on Mr. Fishback's personal computer.  I understand that they think he exceeded the scope of the authorization.

THE COURT:  Sorry.  May I ask you, just as to that -- I mean, look, I'm working for the ultimate bureaucracy where there are rules about that sort of thing.

Were there any purported rules in place about the use of a personal as opposed to a -- my words here -- Greenlight computer or server?

MR. KELTON:  I don't think so, other than what's in

the employment agreement. Counsel may tell me that there are. I don't have a copy of Greenlight' policies.

THE COURT: Can I just get a quick answer to that, because it may help the discussion.

MR. BALDINI: Yes, your Honor.

The rules aren't around use of your personal devices. The rules are around what you can sign into that's a firm-mandated sign in. I forget the name of the system.

But, for example, if I were a Greenlight employee. I would have a keycard, and I can go on my computer and sign into this Greenlight website and do my work from there, but I can't take stuff out of that website, even though I'm using my own computer.

THE COURT: Okay. So in other words, you can work on your personal computer on something like a VPN -- that's what we call it here; I don't think I've given away a state secret -- but as you understand it, if he were to take something from the VPN -- in my case here, a chambers file, a draft of a decision -- and copied it on to the personal computer, that's where he's crossed a line.

MR. BALDINI: Correct.

THE COURT: Look, I'm not holding you to it, Mr. Kelton, but any reason to think that that's an incorrect statement?

MR. KELTON: No, but I think it's probably incomplete

in the sense that Mr. Fishback, before he was an employee, he did consulting work for Greenlight. I understand he worked on his personal laptop when he did consulting work also. I don't know when he actually got an employee log-in and employee credentials. I think -- and again --

THE COURT: You think, as a consultant, he wasn't subject to the sort of limitation that Mr. Baldini described earlier from his employee phase.

MR. KELTON: I think that's possible, but the other piece of it is, some of the issues that are addressed in the client -- like, for example, the drafting of an essay -- may have taken place outside remote connection, just on a Word document on the screen.

THE COURT: Right.

MR. KELTON: So to the extent that that Word document remained on his computer, I would make a distinction or an argument that that's not taking something.

THE COURT: Right.

MR. KELTON: But this is the discovery that we're planning to pursue.

THE COURT: I mean, at the end of the day, you both need to be looking at both halves of the exchange here, right, in the sense that to establish, at least, anything meaningful in terms of liability, the use is going to matter. And so at the end of the day, I totally understand the questions you

P1sFgreC

would be directing towards Mr. Baldini's client, towards Greenlight, but his inability to answer the question of what use your client has made is going to reflect his lack of access, where we stand now, to what's going on internal to Mr. Fishback world.

MR. KELTON: I suspect that he'll serve me with discovery asking about the use, but I think that Mr. Fishback would say or will say that he really isn't using confidential information. The thing about the track record is, he views it as his resume. And as your Honor sort of pointed out or asked about, does that mean that he can, literally, never discuss any aspect of his employment again, any of his achievements, if he's reaching out to new investors or new employers. We don't think that that's a fair reading of the employment reading or a reasonable reading.

THE COURT: Forgive my asking this, but we have an individual party on your side of the house. And I've seen this play before, where there are problems getting a faithful production of documents, or worse, where there is spoliation.

The client is not an organization. Not to say organizations are above doing that stuff, but it tends to be, candidly, a higher level of risk where you have a solo actor.

As a lawyer for this person, what are you doing to make sure that there's going to be a faithful and complete production in response to the valid discovery demands of the

plaintiff?

MR. KELTON: Sure, Judge.

We always have very candid discussions about obligations to produce and maintain and preserve evidence, and we've done that here.

I will say that when we're talking about spoliation -- and counsel raised it -- now this is a case where Greenlight reached out to Mr. Fishback and instructed him, asked him and demanded that he delete certain information. And he did, but I would not view that as spoliation, because it was at the request and instruction of Greenlight.

THE COURT: I mean, obviously, all the facts differ here. And, you know, if the only person with a legal interest in its preservation has also told you to destroy it, that's got implications. On the other hand, the timing matters and whatnot.

MR. KELTON: Sure.

THE COURT: Where I'm going is, without knowing the logistics here, this leaps out to me as a case where I would expect counsel to take a more hands-on role than in the average case. Because I would love not to be litigating a spoliation motion, to the extent that spoliation hasn't already happened, or even if it's not spoliation, I would be wary, given what I've read, of the concern of your client making a self-interested judgment about what is responsive.

P1sFgreC

If there were a general counsel in the mix who had a bar ticket to worry about, that tends to have a natural control. That's not the situation here, and so I have to look to you as his lawyer, whether it means you're looking over his shoulder and going there and looking at the stuff that's not being produced, but I'm putting it out there. I will be a lot more happy to know that you had your hands all over the outgoing discovery process.

MR. KELTON: Understood, Judge.

And I frequently deal with these issues in the first instance by negotiating search terms and things like that with opposing counsel, and I hope we can do something like that here so that everybody has a degree of looking at the process.

THE COURT: But he's been instructed, in no uncertain terms, about his preservation obligations.

MR. KELTON: It's in our retainer agreement; Yes, Judge.

THE COURT: As to the subject I took up with Mr. Baldini, do you agree that I can set the pre-motion conference in anticipation of summary judgment practice?

Can it be keyed to the end of fact discovery?

MR. KELTON: Yes.

THE COURT: Okay. So look, given that, we've got fact discovery ending May 23. How about Wednesday, June 11, at 3 p.m.? That's a little bit under -- one moment.

P1sFgreC

Yeah. Well, one moment.

(The Court conferred with deputy clerk)

THE COURT: Counsel, how about June the 18th, at 3 p.m.?

MR. KELTON: Is it okay if I just check my phone?

THE COURT: Yeah. Go ahead.

I'm amazed we didn't take it from you.

MR. BALDINI: It's neither my wife's nor my kid's birthday, so I'll say, okay.

THE COURT: Okay. Good. I checked with them first.

MR. BALDINI: Appreciate it.

MR. KELTON: That looks good to me.

Thank you, judge.

THE COURT: So we'll put that down, then.

Here's the takeaway, which is, if you look at my individual rules, two weeks after the close of fact discovery, if anybody intends to move, in whole or in part, for summary judgment, you are to write me a three page, single-spaced letter previewing the motion. The other side has a week to respond in a comparable length.

These are not the motions. They are not the oppositions. They are just previews, but they're informative to me and my law clerk. We'll talk about the case in between, and when we meet with you on the 18th, I'll have a pile of questions for you about what's happened so far and what the

summary judgment motions look like. There's likely to be some discussion of settlement.

Coming out of the conference, though, I will be setting a deadline for joint stipulated facts to make sure that as much either facts or document authentications, as can be done by agreement, can be submitted. And then keyed off the deadline for those joint stipulated facts, or JSF, will be a motion schedule. And depending whether you're both moving or one of you is moving, I'll set up a rational sequence that, hopefully, pretty efficiently gets the issues litigated keyed to what you're each moving on.

But, please, do treat the May 23 deadline as a hard one.

Okay. I gather, from your letter, that there's no promise, at this point, to a resolution. Let me ask you just whether there's any value in my referring this to the magistrate judge with a notation that, essentially, it's for the parties to collectively take that resource off the shelf so that the magistrate judge won't be badgering you to come in for a settlement conference, but it means as soon as you think there's a prospect of settling this but you need a third-party, you've got a place to go.

MR. BALDINI: Your, Honor, this is not the only dispute we've had among the parties, and we've attempted, in the past, to resolve things on more global basis.

P1sFgreC

THE COURT:  A little closer.

MR. BALDINI:  Sorry.

THE COURT:  No worries.

MR. BALDINI:  And at this point, from our clients' perspective, there's not a lot of utility in that.

We'll obviously --

THE COURT:  The global basis, meaning you have got an arbitration.  Has that been initiated yet?

MR. BALDINI:  It has been initiated.

And just as we were coming over here today, an arbitrator was appointed, so it's at the very beginning of the process, but an arbitrator has just been appointed.

THE COURT:  What's the likely life cycle of that arbitration, in your experience?

MR. BALDINI:  I would say 12 months.

THE COURT:  How does it get coordinated to make sure that overlapping discovery is done in a coordinated way so we're not creating needless costs centers, which is a sort of complicated way of saying, if you have the same custodian, how do we make sure that their stuff gets searched once?

MR. BALDINI:  I promise I'm going to answer your question, but I just wanted to tell you one other thing.

THE COURT:  Yeah.

MR. BALDINI:  There's a third case, a dispute among the parties for foreclosure on a promissory note.  That case

has a motion for summary judgment that's *sub judice*.

There's no ongoing --

THE COURT:  State court?

MR. BALDINI:  No; federal.

THE COURT:  Why is it not in this case?

MR. BALDINI:  It wasn't marked as a related case. It's really a discrete issue.  It's separate.  It's just a pure collection case, and it preexisted this case by some --

THE COURT:  Who is it assigned to?

MR. BALDINI:  It was originally -- it just got reassigned to Judge Swain.

THE COURT:  From someone else?

MR. BALDINI:  Broderick.

THE COURT:  Well, whatever.  Be that as it may, okay.

So, basically, there are three different litigations. I mean, it makes the legal industry look horrible, that two people have three fights, sort of.

MR. BALDINI:  Sort of.

But I did say I was going to answer your question, and so I will.

The discovery in the note case is complete, and I think, for the most part, discrete.  What I will tell you is, to the extent that there's crossover between this matter and the arbitration, we'll work with Mr. Kelton to see that we don't take the same discovery on the same issues multiple

P1sFgreC

times.

THE COURT:  I mean, look, what I would say is, I want the discovery in my case done within the four months.

MR. BALDINI:  Yup.

THE COURT:  To the extent there are common custodians or common electronic things being searched, let us say, in strong terms, particularly -- I gather we have the same lawyers?

MR. BALDINI:  Yes.

THE COURT:  Excellent.

Then please think on a forward-looking basis on what the needs, say, in the arbitration are going to be so that the discovery demands are formulated to pickup both matters.  I'm just trying to spare everybody money, and since I'm the first one you're talking to and you've just learned the arbitrator's name today, I would welcome your being able to report to the arbitrator that the judge directed that you -- barring the truly unexpected -- get outgoing electronic discovery -- hopefully, depo discovery too -- but get it done once so that there's no duplication.

Look, I'll leave you to do that, but I certainly don't want my discovery slipping longer because of the arbitration, and then what follows is, I don't want your clients paying extra money just because of the existence of an arbitration where, by the time the arbitrator meets with you, he or she

P1sFgreC

might be inclined to set a discovery deadline later on.

MR. BALDINI: Understood, your Honor.

And what I can't promise is that there isn't discrete issues that have nothing to do with this that need separate attention, but we will work it out with Mr. Kelton and have been able to do so, thus far, in various disputes that I mentioned.

THE COURT: Okay.

MR. BALDINI: Again, reiterate we understand, your May 23 means May 23.

THE COURT: Without holding you to it, which of the cases is more economically more important, the arbitration or the litigation?

What's the center of gravity?

MR. BALDINI: I'm going to try to answer your question. The note litigation is, is math.

THE COURT: Is --

MR. BALDINI: It's math. There's a promissory note. There's a promissory note for a set amount. There's a fee-shifting provision, so it's note amount plus attorneys' fees equals damages.

THE COURT: What's the amount of the note?

MR. BALDINI: 250-ish.

This case you have in front of you, so you see that the arbitration --

P1sFgreC

THE COURT: But the case here in front of me, I can't tell the value of it because it, presumably, has to a lot to do with the unknown of what's become of your confidential information and what use has been made of it.

MR. BALDINI: Correct.

The arbitration has not only a claim by Greenlight, but also a claim by Mr. Fishback, counterclaims going back and forth, centered around a number of different actions. But, really, if I have to reduce it to a nugget, it's defamation-type claims. And the alleged damages are greater than those alleged here or -- well, no.

Not here, because here, it's as you said, the unknown.

THE COURT: The injunctive claims have monitory value.

MR. BALDINI: That's right.

But certainly greater than the value of the note case, but they are defamation-type claims, and both sides are going to be fighting about how they were damaged by the other side's conduct.

THE COURT: But in other words, it's not as if, as between this and the arbitration, one is clearly the 800-pound gorilla. Both of them are consequential in getting this thing resolved, if you can.

MR. BALDINI: I would say that's fair for you to say.

I don't know if Justin would agree with me, but --

THE COURT: And as it relates to a settlement, I have

a clear vibe that we're not ready et yet.

The question is, I can do this another way and simply say, please deep speaking and know that the moment I get a joint letter from you asking me to do it, I'd refer it in a nanosecond to the magistrate judge or the mediation project of our court, if you wanted.

Obviously, you're at liberty to chose, as commercial litigators often do, a third-party settler whom you pay for the privilege of consulting.  I'll leave it to your good judgment.

What I'll tell you is that our magistrate judges, historically, have been superb.  I don't happen to note, but my law clerk will check who our MJ is in this case, but they have been a whiz as settling stuff of this scale and this complexity, so I'd encourage you to take advantage of that resource.

MR. BALDINI:  Appreciate that, your Honor.

THE COURT:  Your view?

MR. KELTON:  Just on that point, I guess I would make a unilateral request.

Mr. Fishback is very interested in a referral to, especially, a magistrate.  We have tried before to resolve the parties' disputes.  They are complex.  But Mr. Fishback wants to resolve these cases, and I think that dealing with them individually, although this is not usually the case.

In a case like this, dealing with them individually

P1sFgreC

may actually lead to resolutions more efficiently. Because the issues in this case, you know, it's, as far as I can tell, there's not a lot of money on the line, and he's not using the confidential information, and even if there were to be an injunction --

THE COURT: The problem is, your adversary may trust you but doesn't know for sure that that's correct.

MR. KELTON: I understand.

But I think that a magistrate or other neutral looking at this might be able to move the parties closer together.

THE COURT: Judge Gorenstein, our former chief, is the assigned magistrate judge. He and I have overlapped for the entirety of the time I've been on the bench. I can't begin to count the number of cases that he has successfully settled, including in the commercial space. He is a serious no-nonsense person who gets stuff done.

You tell me, Mr. Baldini. I'm hearing Mr. Kelton say that he would be willing for me to refer this to Judge Gorenstein here and now. It doesn't require you to settle, but it at least gets that process going.

Any reason not to do that?

MR. BALDINI: I'm loathe to waste Judge Gorenstein's time. In fairness to what Mr. Kelton said, there's never been an attempt to settle any of these matters on an individual basis; everything's been done globally.

P1sFgreC

THE COURT: Let me do this.

You've got clients. I'm encouraging you to have this discussion and to discuss, candidly, whether there's a productive purpose now to getting before the MJ, even if it's a matter of just hiving off one-third of the puzzle or two-thirds of the puzzle, or if the promissory note maybe came with it or whatever. But I'm not going to issue an order that, effectively, forces a horse to water that's not going to drink. But, please, have that discussion soon, and know that within 24 hours of a joint letter, I'll make the referral and on request, get on the email or the phone to Judge Gorenstein with the proviso that this is urgent; please try to prioritize it.

MR. BALDINI: Thank you, you Honor.

THE COURT: All right. With that, helpful, interesting discussion and interesting case.

Is there any other way I can be useful?

MR. BALDINI: Not from our perspective, your Honor.

MR. KELTON: No, Judge. Not from mine, either.

THE COURT: Interesting case.

Look, I appreciate the evident collegiality between the two of you. Just hear my voice, that matters to me, but it also will spare everybody a lot of blood and treasure here.

With that, I wish you Happy New Year. Be well.

Thank you.

(Adjourned)