**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Greenlight Capital, Inc., DME Capital Management, LP, | Case No. 1:24-cv-04832-PAE |
| Plaintiffs, | |
| v. | |
| James T. Fishback, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS GREENLIGHT CAPITAL, INC. AND DME CAPITAL MANAGEMENT, LP'S MOTION FOR ATTORNEYS' FEES**

AKIN GUMP STRAUSS HAUER & FELD LLP

Stephen M. Baldini
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Telephone: 212-872-1000
Fax: 212-872-1002
sbaldini@akingump.com

*Counsel for Plaintiffs Greenlight Capital, Inc. and DME Capital Management, LP*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.............................................................3

    A.    The Employment Agreement & Initial Breach of the Confidentiality Provision ............3

    B.    The Instant Action ...............................................................................................5

ARGUMENT ...........................................................................................................................7

    I.    Plaintiffs are Contractually Entitled to an Award of Attorneys' Fees and Costs ................7

    II.    Plaintiffs' Request for Fees is Reasonable and Appropriate .................................................8

        A.    The Hourly Rates Charged and Paid by Plaintiffs are Reasonable..................................8

            1.    Akin Charged Below its Customary Rate, and Plaintiffs Have Paid the Fees Billed at Those Rates ....................................................................................................................9

            2.    The Requested Rates are Consistent with Rates Awarded in the Southern District of New York...................................................................................................................10

            3.    Counsel's Experience Warrants the Requested Rates...................................................11

            4.    The Nature of Akin and Plaintiffs' Relationship Warranted Akin's Retention in this Matter .........................................................................................................................12

            5.    The Results Obtained Warrant the Requested Rates ...................................................14

            6.    This Was a Complex Case ...........................................................................................14

        B.    The Hours Expended were Necessary and Appropriate for this Litigation...................15

            1.    Akin Performed Tasks Requiring Significant Effort .................................................15

            2.    Akin's Efforts were Necessitated by Fishback's Own Wrongdoing and Litigation Conduct.......................................................................................................................17

                a.    Fishback's Conduct Drove Discovery .................................................................17

                b.    Fishback Never Had Any Colorable Defenses .......................................................19

                c.    Fishback's Intent Was to Make This Case Difficult...........................................21

            3.    Akin Worked Efficiently................................................................................................24

C.    Plaintiffs are Entitled to Costs and Legal Assistant Fees ..............................................25

CONCLUSION....................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*An v. Despins*,
  2024 WL 1157281 (S.D.N.Y. March 18, 2024) .......................................................................11

*Anderson v. YARP Rest., Inc.*,
  1997 WL 47785 (S.D.N.Y. Feb. 6, 1997).................................................................................9

*Andrews v. City of New York*,
  118 F. Supp. 3d 630 (S.D.N.Y. Aug. 3, 2015)........................................................................10

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008)..................................................................................8, 9, 10, 12, 14

*ATX Debt Fund 1, LLC v. Paul*,
  2024 WL 2093387 (S.D.N.Y. May 9, 2024) ..........................................................................11

*Bergerson v. New York State Off. of Mental Health*,
  652 F.3d 277 (2d Cir. 2011)....................................................................................................10

*Blum v. Stenson*,
  465 U.S. 886 (1984)................................................................................................................10

*In re Celsius Network LLC*,
  No. 22-10964 (Bankr. S.D.N.Y.), ECF Nos. 4273 and 7776 .................................................11

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986)................................................................................................................17

*Elevation Health, LLC v. Sun Grp. Partners, LLC*,
  2025 WL 763983 (S.D.N.Y. Jan. 31, 2025), *adopted as modified*, 2025 WL
  586681 (S.D.N.Y. Feb. 24, 2025).............................................................................................7

*Greenlight Cap., Inc. v. Fishback*,
  2025 WL 965597 (S.D.N.Y. Mar. 31, 2025) ..........................................................................24

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..................................................................................................................8

*Imbeault v. Rick's Cabaret Int'l Inc.*,
  2009 WL 2482134 (S.D.N.Y. Aug. 13, 2009)..........................................................................8

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
  2015 WL 4154112 (S.D.N.Y. July 10, 2015)...........................................................................7

iii

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ..............................................................................8, 9, 12, 14

*Kassim v. City of Schenectady*,
    415 F.3d 246 (2d Cir. 2005)...............................................................................................17

*Korpak, Ltd. v. Williams Lea Inc.*,
    2022 WL 375543 (S.D.N.Y. Feb. 7, 2022)..........................................................................20

*Lilly v. City of New York*,
    934 F.3d 222 (2d Cir. 2019).................................................................................................14

*Metro Found. Contractors, Inc. v. Arch Ins. Co.*,
    551 F. App'x 607 (2d Cir. 2014).............................................................................................7

*Millea v. Metro-N. R.R. Co.*,
    658 F.3d 154 (2d Cir. 2011)....................................................................................................8

*Montefiore Med. Ctr. v. Local 272 Welfare Fund*,
    2019 WL 4565099 (S.D.N.Y. Sept. 19, 2019)........................................................................8

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008)....................................................................................................7

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015).................................................................................................20

*Phyto Tech Corp. v. Givaudan SA*,
    2023 WL 1437714 (S.D.N.Y. Jan. 31, 2023) .......................................................................12

*Reiter v. Metro. Transp. Auth. of New York*,
    2004 WL 2072369 (S.D.N.Y. Sept. 10, 2004).....................................................................10

*Robles v. City of New York*,
    2021 WL 1034773 (S.D.N.Y. Feb. 26, 2021).......................................................................14

*Ruiz v. Maidenbaum & Assocs. P.L.L.C.*,
    2013 WL 3957742 (S.D.N.Y. Aug. 1, 2013)...........................................................................8

*In re SVB Fin. Grp.*,
    No. 23-10367 (Bankr. S.D.N.Y.), ECF Nos. 1363 and 1513 ................................................11

*U.S. Football League v. Nat'l Football League*,
    887 F.2d 408 (2d Cir. 1989).................................................................................................25

*VFS Fin., Inc. v. Falcon Fifty LLC*,
    17 F. Supp. 3d 372 (S.D.N.Y. 2014)....................................................................................20

**Statutes and Rules**

Fed. R. Civ. P. 65(d)(1)......................................................................................................................21

Fed. R. Civ. P. 68................................................................................................................20, 21

Plaintiffs Greenlight Capital, Inc. ("Greenlight") and DME Capital Management, LP ("DME") (collectively, "Plaintiffs"), by and through their undersigned counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), seek attorneys' fees and costs pursuant to Section 11 of the employment agreement by and between Greenlight and Defendant James T. Fishback ("Fishback"), dated February 8, 2021 (the "Employment Agreement").  Plaintiffs seek an award of attorneys' fees in the amount of $1,747,626.75 and costs in the amount of $120,176.51, as supported by the Declaration of Stephen M. Baldini (the "Baldini Decl.") and exhibits thereto.

## INTRODUCTION

Plaintiffs seek their attorneys' fees and costs here after prevailing in this case through a Court-approved admission by Fishback that he breached the Employment Agreement by violating its Confidentiality Provision[1] on more than sixty occasions, embodied in the Injunction Order that enjoins Fishback from committing any further violations.

Plaintiffs' efforts to achieve this victory have been measured and reasonable since day one. When Fishback resigned from Greenlight in 2023, Greenlight discovered a handful of Fishback's attempts to misappropriate its Confidential Information.  Greenlight initially de-escalated the situation with a warning, and took Fishback at his word when he represented that he (a) had deleted the information he stole, and (b) would honor his confidentiality obligations.  As Plaintiffs proved out and Fishback acknowledged here, those representations were false, and Plaintiffs were eventually forced to commence this case in June 2024, after Fishback began publicly discussing and confirming that he was in physical possession of Greenlight's Confidential Information.

These statements were made in conjunction with Fishback's broader campaign to harass Greenlight and promote his new business, Azoria.  A key tool in Fishback's harassment campaign

---

[1] Any capitalized but otherwise undefined terms in the Introduction section have the meaning ascribed to them in subsequent sections of this memorandum.

has been abusive litigation. Discovery in this case turned up damning evidence of Fishback's plot to manufacture false pretenses to sue Greenlight for millions of dollars before Greenlight ever commenced this suit. Fishback's goal was to preemptively obtain leverage over Greenlight and avoid consequences for his wrongful conduct, including his breaches of the Confidentiality Provision.

Simply put, Plaintiffs were forced to bring this case against an adversary who intended to use litigation as a tool to coerce Greenlight into foregoing its claims against him and pay him ransom money. Fishback has never had any valid legal or factual defenses to Plaintiffs' claim here. And every single one of the Confidentiality Provision violations that he ultimately admitted to in the Injunction Order were not just based on his own personal actions, of which he was obviously aware, but a calculated course of conduct. His liability was always an inevitability, and he knew that. Fishback also knew that the Employment Agreement entitled Plaintiffs to attorneys' fees for bringing an action to enforce the Confidentiality Provision.

Nevertheless, Fishback forced Plaintiffs to litigate this case to uncover the full extent of his wrongdoing and vindicate their rights. Furthermore, much of Greenlight's time in this case was spent resolving Fishback's discovery issues and disposing of his meritless motions and improper filings. Indeed, it is certainly no coincidence that Fishback capitulated here only after discovery revealed that his parallel claims against Plaintiffs were fraudulent, in addition to his widespread Confidentiality Provision violations.

Fishback made a strategic choice to put Plaintiffs through the paces of litigation in this case knowing full well that he was in the wrong. Plaintiffs met the challenge and not only prevailed on their claim, but did so efficiently, and should be awarded all fees and costs incurred that were necessary to bring about that result.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs brought this action against Fishback for breach of the Employment Agreement. On September 24, 2025, this Court so-ordered the parties' stipulated order establishing Fishback's liability and setting out the terms of a permanent injunction (the "Injunction Order"). *See* ECF No. 70. Plaintiffs now bring the instant motion to recover attorneys' fees and costs under the Employment Agreement, Injunction Order, and the Court's order dated September 24, 2025. *See* ECF No. 71. A brief recitation of the underlying facts of this case is provided below.

**A.      The Employment Agreement & Initial Breach of the Confidentiality Provision**

On February 8, 2021, Fishback executed the Employment Agreement with Greenlight. *See* Baldini Decl., Ex. 1. Section 5 of the Employment Agreement (the "Confidentiality Provision") contains multiple subparagraphs that imposed obligations on Fishback with respect to the use and handling of certain information (defined therein as "Confidential Information") that Fishback would have access to as a Greenlight employee. *Id.* § 5. The Confidentiality Provision provided that Fishback "shall not (either during his employment by the Company or thereafter) disclose to any person not connected with the Company or use for his own benefit or for the benefit of any person other than the Company any Confidential Information…" *Id.* § 5(ii). Pursuant to the Confidentiality Provision, "Confidential Information" included, *inter alia*, "investment methodologies, methods of dealing, investment track records, investment recommendations, investment performance, performance records of any individual investment position, performance records of any Company fund, [and] performance records of Employee…" *Id.*

On July 31, 2023, Fishback resigned from Greenlight, effective August 15, 2023. *See* Injunction Order ¶ 7. On August 14, 2023, Greenlight, through its Chief Operating Officer, Daniel Roitman, sent Fishback an email reminding him of his confidentiality obligations under the

Employment Agreement. *Id.* The next day, on August 15, 2023, Fishback forwarded an email attaching Greenlight's entire portfolio of investments (the "Port Sheet Email") to his personal email address. *Id.* ¶¶ 5, 8. That same day, Greenlight emailed Fishback informing him that he lacked authorization to transmit the Port Sheet Email to his personal email address and that such transmittal was a violation of Fishback's obligations under the Employment Agreement, and demanded that he delete the Port Sheet Email. *Id.* ¶ 8. In response, Fishback emailed Mr. Roitman telling him that Fishback had deleted the Port Sheet Email, a representation he repeated in his answer (*see* "Answer," ECF No. 28 ¶¶ 6, 75) that proved to be false. *See* Injunction Order ¶ 8.

Notwithstanding Greenlight's emails on August 14 and 15, 2023, and unbeknownst to Greenlight, Fishback remained in possession of Greenlight's Confidential Information following the termination of his employment at Greenlight, and through the date this action was filed. Injunction Order ¶ 9. Through discovery here, Plaintiffs discovered numerous instances during Fishback's employment with Greenlight in which he: (i) electronically accessed and transmitted Confidential Information between Greenlight's systems and his own personal email addresses; and (ii) sent electronic communications to third parties containing Confidential Information, each without seeking or obtaining authorization from personnel at Greenlight, and in clear violation of the Confidentiality Provision and Greenlight's policies. *Id.* ¶ 24. This misconduct continued after the termination of Fishback's employment with Greenlight, in aid of Fishback's efforts to secretly form and promote Azoria Partners, LLC ("Azoria"). For example, on multiple occasions, Fishback disclosed his purported track record at Greenlight in emails soliciting investors for Azoria. *Id.* ¶ 20. Fishback neither sought nor obtained authorization from Greenlight to do so, resulting in clear violation of the Confidentiality Provision. *Id.* ¶ 22.

**B.      The Instant Action**

On June 25, 2024, Plaintiffs commenced this action by filing a complaint (the "First Complaint") seeking, *inter alia*, entry of a permanent injunction ordering Fishback to refrain from breaching the terms of his Employment Agreement and judgment in Plaintiffs' favor on their breach of contract claim. *See* ECF No. 1. Plaintiffs commenced this suit after Fishback made public statements discussing and confirming that he was in possession of Greenlight's Confidential Information. *See id.* ¶ 157.

On August 26, 2024, Fishback filed a motion to dismiss, to strike, and to compel arbitration. *See* ECF No. 13. On September 23, 2024, Plaintiffs filed their amended complaint (the "Amended Complaint"), maintaining their breach of contract claim and reserving certain other claims for arbitration. *See* ECF No. 18. On October 9, 2024, Fishback filed another motion to strike. *See* ECF No. 20. On December 19, 2024, the Court denied Fishback's motion to strike in substantial part, but struck five paragraphs in whole and limited portions of three other paragraphs in the Amended Complaint. *See* ECF No. 24. On January 5, 2024, Fishback filed his Answer.

Pursuant to the Court's first scheduling order, *see* ECF No. 30, the parties exchanged interrogatories and requests for the production of documents on February 14, 2025, and exchanged objections to each other's discovery requests on March 17, 2025. *See* Baldini Decl. ¶ 25 n.2; Exs. 3-10.

On April 2, 2025, Fishback filed an offer of judgment with the Court. *See* ECF No. 33. On April 16, 2025, Plaintiffs filed a motion to strike the offer from the docket. *See* ECF No. 35. On April 23, 2025, the Court granted Plaintiffs' motion to strike. *See* ECF No. 38.

The deadline for the close of fact discovery was July 18, 2025 pursuant to the final scheduling order entered by the Court. *See* ECF No. 45. During discovery, Plaintiffs collected

and reviewed more than 16,000 documents in response to Fishback's requests for production, and produced more than 2,600 documents to Fishback in seven rolling productions. *See* Baldini Decl. ¶ 25. Plaintiffs also conducted the depositions of Fishback on June 5, 2025, and two third-party witnesses—Jeffrey Rehm on July 10, 2025, and Jason Hathaway on July 17, 2025, and reviewed more than 11,000 incoming documents from Fishback and subpoenaed third parties. *Id.* From June to August 2025, Plaintiffs sent several rounds of letters to Fishback detailing deficiencies in his production, many of which were not ameliorated until after the close of the discovery deadline in this case. *Id.* ¶ 26.

On August 8, 2025, Plaintiffs submitted a pre-motion letter in advance of a proposed motion for summary judgment. *See* ECF No. 54. On September 3, 2025, Plaintiffs submitted a letter to the Court requesting a pre-motion discovery conference in anticipation of a potential motion to compel. *See* ECF No. 57. On September 4, 2025, the Court held a post-discovery case management conference and pre-motion conference. *See* ECF No. 59. On September 5, 2025, the Court entered an order which set a briefing schedule regarding plaintiffs' proposed summary judgment motion and deadlines for submissions on Plaintiffs' motion to compel. *See* ECF No. 60. On September 8, 2025, Fishback submitted a letter in opposition to Plaintiff's motion to compel. *See* ECF No. 61. On September 10, 2025, Plaintiffs submitted a letter reply in support of their motion to compel. *See* ECF No. 64. On September 15, 2025, the Court granted Plaintiffs' motion in part and denied it in part. *See* ECF No. 66.

On September 24, 2025, the parties submitted a joint letter transmitting the proposed Injunction Order resolving the issues of Fishback's liability and injunctive relief, which was so-ordered by the Court that same day. *See* ECF Nos. 69, 70.

## ARGUMENT

**I.    PLAINTIFFS ARE CONTRACTUALLY ENTITLED TO AN AWARD OF ATTORNEYS' FEES AND COSTS**

Fishback contractually agreed to pay all damages resulting from any breach of the Employment Agreement, including without limitation, reasonable attorneys' fees.  *See* Employment Agreement § 11.  In the Injunction Order, the Court concluded that Fishback breached the Confidentiality Provision of the Employment Agreement on more than sixty occasions.  *See* ECF No. 70.  The Court affirmed that "Plaintiffs were and are 'entitled to enforce [their] rights under this [Employment] Agreement . . . to recover damages (including, without limitation, reasonable fees and expenses of counsel) . . .'"  *Id.* (quoting Employment Agreement § 11).

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008); *accord Metro Found. Contractors, Inc. v. Arch Ins. Co.*, 551 F. App'x 607, 610 (2d Cir. 2014).  Courts in this district have consistently found that provisions like Section 11 of the Employment Agreement are sufficiently clear to provide attorneys' fees.  *See, e.g.*, *Elevation Health, LLC v. Sun Grp. Partners, LLC*, 2025 WL 763983, at *5 (S.D.N.Y. Jan. 31, 2025) ("Federal courts will enforce contractual provisions requiring one party to pay another's legal fees and costs in the event of a breach so long as they are reasonable.") (citations omitted), *adopted as modified*, 2025 WL 586681 (S.D.N.Y. Feb. 24, 2025); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 2015 WL 4154112, at *10-11 (S.D.N.Y. July 10, 2015) (permitting recovery of attorneys' fees as damages for breach of contract claim where the contract explicitly provided that the non-breaching party would be entitled to attorneys' fees and costs in the event of a breach).  As such, Plaintiffs are entitled to reimbursement of their legal fees and costs related to the entirety of this litigation.

7

## II.    PLAINTIFFS' REQUEST FOR FEES IS REASONABLE AND APPROPRIATE

In the Second Circuit, the "starting point" for calculating an attorneys' fee award is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Imbeault v. Rick's Cabaret Int'l Inc.*, 2009 WL 2482134, at \*1 (S.D.N.Y. Aug. 13, 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The resulting figure is the "presumptively reasonable fee."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008).  The "presumptively reasonable fee," in effect, is "the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Montefiore Med. Ctr. v. Local 272 Welfare Fund*, 2019 WL 4565099, at \*5 (S.D.N.Y. Sept. 19, 2019).  When reviewing fee applications, a court "relies on its own familiarity with the case, as well as on its experience with the parties' evidentiary submissions and arguments." *Ruiz v. Maidenbaum & Assocs. P.L.L.C.*, 2013 WL 3957742, at \*4 (S.D.N.Y. Aug. 1, 2013).

### A.    The Hourly Rates Charged and Paid by Plaintiffs are Reasonable

In setting a reasonable hourly rate, a district court should "bear in mind all of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorneys' fees" to determine "what rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190.  The Second Circuit recognizes that the relevant factors, commonly referred to as the "*Johnson* factors," may include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

8

*Arbor Hill*, 522 F.3d at 186 n.3 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

Here, all applicable factors support the reasonableness of Akin's hourly rate. The rates charged by Akin have been *below* Akin's customary rates and paid by Plaintiffs, which is the clearest evidence of the rate a paying client would be willing to pay. *See Anderson v. YARP Rest., Inc.*, 1997 WL 47785, at *2 (S.D.N.Y. Feb. 6, 1997). The other relevant circumstances here—including the complexity of the matter and the results obtained—support the reasonableness of Akin's fees when considering Akin's experience and relationship with Plaintiffs and this matter.

1.    Akin Charged Below its Customary Rate, and Plaintiffs Have Paid the Fees Billed at Those Rates

The rates charged by Akin in this case are discounted from Akin's customary rates, which is a strong indicator of their reasonableness. *Anderson*, 1997 WL 47785, at *2 ("The best evidence of a reasonable fee rate is the amount actually charged by counsel[.]") (citations omitted).

Akin's customary hourly rates for the attorneys who worked on this matter ranged from $925 to $1,975 per hour as of 2024 and $995 to $2,175 per hour as of 2025.[2] For the work performed on this matter in 2024 and 2025, Akin billed at these amounts and then discounted the fees billed to Plaintiffs by 10%. Baldini Decl. ¶ 16. In sum, all of the rates charged to Plaintiffs on this matter were considerably lower than Akin's customary rates.

The reasonableness of Akin's rates is further supported by the fact that these rates have not

---

[2] The hourly rates charged by Plaintiffs' counsel were for attorneys: (1) Stephen M. Baldini ($1,975-$2,175); (2) Daniel Slemmer ($1,090-$1,310); (3) Hannah Reichelscheimer ($925-$1,095), and (4) Maria Hershey ($995). Baldini Decl. ¶ 15; Ex. 2. The ranges for attorneys Baldini, Slemmer, and Reichelscheimer represent their rates billed from 2024 to 2025; attorney Hershey did not bill any time to this matter in 2024, so only her 2025 rate is included. *See id.*

simply been billed to Plaintiffs, but have been paid by Plaintiffs in the normal course.  *Id.* ¶ 10.[3]

As the Second Circuit noted, "[t]he reasonable hourly rate is the rate a paying client would be

willing to pay," *Arbor Hill*, 522 F.3d at 191, and the fact that Plaintiffs' counsel charged, and was

paid, the requested rates is the best evidence that the rates are more than reasonable.  *Andrews v.*

*City of New York*, 118 F. Supp. 3d 630, 639 (S.D.N.Y. Aug. 3, 2015) ("Certainly, the amount

actually paid to an attorney by paying clients is strong evidence of a reasonable market rate.");

*Reiter v. Metro. Transp. Auth. of New York*, 2004 WL 2072369, at *5 (S.D.N.Y. Sept. 10, 2004)

("[A]s a logical matter, the amount actually paid to counsel by paying clients is compelling

evidence of a reasonable market rate.").

> 2.    The Requested Rates are Consistent with Rates Awarded in the Southern
>        District of New York

In assessing a reasonable hourly rate, the Court takes into consideration the market rate

"prevailing in the community for similar services by lawyers of reasonably comparable skill,

experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  The relevant

"'community' for purposes of this calculation is the district where the district court sits."  *Arbor*

*Hill*, 522 F.3d at 190.  This has been coined by the Second Circuit as the "forum rule."  *See*

*Bergerson v. New York State Off. of Mental Health*, 652 F.3d 277, 290 (2d Cir. 2011) ("This

Circuit's 'forum rule' generally requires use of the hourly rates employed in the district in which

the reviewing court sits in calculating the presumptively reasonable fee.") (citation omitted).

The rates sought herein have been awarded by courts in this district to attorneys of similar

experience.  Attorney Baldini's net rates of $1,777.50 per hour for 2024 and $1957.50 per hour for

2025 are comfortably within the range of rates which have been found to be reasonable for

---

[3] Plaintiffs have paid invoices for all legal services rendered by Akin through June 30, 2025.  *Id.*  That the amounts for the invoices for the months of July 2025 through September 2025 are outstanding is attributable to normal course delay in issuing bills and between billing and actual payment.  *Id.*

attorneys with his level of experience in complex litigation in the Southern District of New York. *See, e.g.*, *An v. Despins*, 2024 WL 1157281, at \*2-4 (S.D.N.Y. March 18, 2024) (finding hourly rate of $1,990 charged by partner with 20 years of litigation experience reasonable); *see also ATX Debt Fund 1, LLC v. Paul*, 2024 WL 2093387, at \*5 (S.D.N.Y. May 9, 2024) (finding hourly rate of $1,975 for partner was reasonable after imposing 10% reduction). Likewise, the net rates for attorneys Slemmer, Reichelscheimer, and/or Hershey ranged from $832.50 to $981 per hour in 2024, and $895.50 to $1,179 per hour in 2025, and are comparable to rates that have been found reasonable for associate attorneys with their level of experience. *See An*, 2024 WL 1157281 at \*2-4; *ATX Debt Fund 1, LLC*, 2024 WL 2093387 at \*5.

Akin's customary rates have also been found reasonable in recent cases in this district where attorneys' fees are routinely disclosed and approved, even without a 10% discount. *See In re SVB Fin. Grp.*, No. 23-10367 (Bankr. S.D.N.Y.), ECF Nos. 1363 and 1513 (approving fees ranging from $1,775 to $2,195 per hour for partners, and $840 to $995 per hour for associates); *see also In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y.), ECF Nos. 4273 and 7776 (approving fees ranging from $1,224 to $1,795.50 per hour for partners, and $661.50 to $1,012.50 per hour for associates).

### 3. Counsel's Experience Warrants the Requested Rates

Akin is an AmLaw 100 leading international law firm with more than 900 lawyers in offices throughout the United States, Europe, Asia, and the Middle East. Baldini Decl. ¶ 11. One of its primary focuses is in the area of complex commercial litigation, a group that currently has over 130 lawyers. *Id.* Plaintiffs' attorneys are highly qualified advocates, with extensive experience in litigating commercial litigation matters similar to this case. *Id.* They have ample ability, training, education, experience, and professional standing to justify the hourly rates Plaintiffs request. *Id.*

11

Attorney Baldini served as lead counsel from the outset of the litigation, advising Plaintiffs on various strategic decisions and supervising the work of others. *Id.* ¶ 12. He has more than 30 years of experience resolving high-stakes disputes involving hedge funds, and has represented companies, investors, and boards of directors in state, federal, and cross-border litigation and arbitration worth billions of dollars. *Id.* Attorney Slemmer served as the "day-to-day" associate on this litigation, taking primary responsibility for pleadings, discovery, and motion practice. *Id.* ¶ 14. He represents both domestic and international clients in a variety of complex litigation matters, and he received his J.D. from Brooklyn Law School in 2020. *Id.* Attorney Reichelscheimer is an associate at Akin specializing in labor and employment matters, and she received her J.D. from the Benjamin N. Cardozo School of Law, Yeshiva University in 2022. *Id.* Attorney Reichelscheimer participated in drafting pleadings, motion papers, and discovery requests. Attorney Hershey is an associate at Akin who joined this matter and began assisting with day-to-day tasks in May 2025, shortly before the parties began producing documents and Plaintiffs prepared to begin taking depositions. *Id.* She received her J.D. from the Columbus School of Law, Catholic University of America in 2023. *Id.*

4.    The Nature of Akin and Plaintiffs' Relationship Warranted Akin's Retention in this Matter

Akin's rates are also reasonable in light of "the nature and length of the professional relationship with the client." *Arbor Hill*, 522 F.3d at 186 n.3 (citing *Johnson*, 488 F.2d at 717-19). Greenlight is a longtime client of Akin's, and Akin has worked on a host of matters for Greenlight in a relationship that has spanned more than 25 years. *See* Baldini Decl. ¶ 22.

Further, in assessing the nature of a client's relationship with its attorneys under this factor, courts in this district have considered it relevant that the attorneys in the action where fees are sought also represent the client in related disputes in other fora. *See Phyto Tech Corp. v. Givaudan*

12

*SA*, 2023 WL 1437714, at \*8 (S.D.N.Y. Jan. 31, 2023) (finding that "the [plaintiffs'] attorneys' average rates appropriately reflect the range of skills and services needed to litigate on behalf of these plaintiffs across multiple venues and actions," where plaintiffs' attorneys represented plaintiffs and their affiliates in multiple other state and federal proceedings against the same adversary). And here, this action is just one of multiple disputes between Fishback and Plaintiffs, and Akin has represented Plaintiffs in all of their matters involving Fishback since Fishback left the company, as summarized below:

- After Fishback's employment with Greenlight terminated, Akin drafted and transmitted demand letters to Fishback which demanded repayment of outstanding loan amounts due under promissory notes executed by Fishback in favor of Greenlight, and made other demands with respect to Fishback's theft of Confidential Information and tortious misrepresentations regarding his role and work with Greenlight.

- Fishback sued Greenlight in New York State Supreme Court for defamation in October 2023 (the "NYS Defamation Action"). *See Fishback v. Greenlight Capital, Inc.*, Index No. 160289/2023, (N.Y. Sup. Ct., N.Y. County). Baldini Decl., Ex. 12. Akin represented Greenlight in that action, which Fishback voluntarily discontinued in favor of arbitration in January 2024.

- Fishback also filed a complaint against Greenlight with the New York State Division of Human Rights in October 2023. Akin also represented Greenlight in that action, which Fishback voluntarily discontinued in favor of arbitration in January 2024.

- In March 2024, Greenlight filed suit against Fishback in this district, seeking recovery of amounts due pursuant to one of the promissory notes discussed above (the "Note Action"). *See Greenlight Capital, Inc. v. Fishback*, No. 24-2299 (S.D.N.Y.). Greenlight was awarded summary judgment in its favor in that action and its motion for attorneys' fees remains pending. Akin represents Greenlight in that action.

- In September 2024, Fishback commenced an arbitration against Plaintiffs (the "Arbitration"). That arbitration remains pending, and Akin represents Plaintiffs in that action.

- Akin has represented Greenlight in all other miscellaneous matters pertaining to Fishback, which have involved drafting and transmitting letters to Fishback

13

demanding that he refrain from interfering with Greenlight events, and drafting and transmitting letters to third parties to correct Fishback's public misrepresentations.

*See* Baldini Decl. ¶ 23.

Akin became involved with Plaintiffs' disputes with Fishback more than seven months before this matter officially began, and has continued its involvement in all Fishback-related disputes since. *Id.* ¶ 24. As such, Plaintiffs' retention of Akin for this specific case was reasonably necessary to ensure that it was litigated efficiently and successfully.

### 5. The Results Obtained Warrant the Requested Rates

As the Second Circuit noted in *Arbor Hill*, courts should consider all of the *Johnson* factors in assessing fees, one such factor being the extent of results obtained. *Arbor Hill*, 522 F.3d at 186 n.3. Here, Plaintiffs achieved a total victory and all relief sought through the Court's entry of the Injunction Order, which concluded that Fishback breached the Employment Agreement by violating the Confidentiality Provision on more than sixty occasions. Injunction Order ¶¶ 24-27. The order further granted Plaintiffs a permanent injunction against Fishback, prohibiting him from, *inter alia*, possessing, documenting, using, transferring or disclosing any Greenlight Confidential Information to any person or entity. *Id.* at 13-14.

### 6. This Was a Complex Case

Courts consider the complexity of a case relevant to the reasonableness of hourly rates because "the reasonable hourly rate for an experienced attorney working on a 'simple, garden-variety' case may be lower than the rate the same attorney might command in a more complex matter." *Robles v. City of New York*, 2021 WL 1034773, at *5 (S.D.N.Y. Feb. 26, 2021) (quoting *Lilly v. City of New York*, 934 F.3d 222, 231-32 (2d Cir. 2019)).

This litigation was relatively complex. When Plaintiffs brought this action in June 2024, they were aware of only a fraction of Fishback's Confidentiality Provision violations, mainly those

14

involving his transmittal of information from his Greenlight email address to his personal email addresses. Uncovering the full extent of Fishback's violations required a dynamic and ongoing assessment of Fishback's various purposes for misusing Confidential Information, and mapping out Fishback's other email, text, and social media communications with third parties involved in that conduct. Furthermore, Akin was required to develop a honed understanding of the relevant investments and performance metrics at issue here, as many of Fishback's violations involved selective or piecemeal disclosure of Confidential Information in communications.

In addition to the complexity of the subject matter here, this case was also procedurally and logistically complex. Counsel conducted significant discovery from Fishback and third parties. As discussed in further detail in Section II.B.2 below, Plaintiffs' efforts in discovery were necessitated solely by Fishback's insistence on continued litigation of this case without having any colorable defenses, and other discovery issues that were of his own making.

**B.      The Hours Expended were Necessary and Appropriate for this Litigation**

1.      Akin Performed Tasks Requiring Significant Effort

The hours billed by Akin were reasonable in light of the procedural history and issues raised in this action. Akin became involved in this matter more than 17 months ago, in May 2024, before this litigation was commenced. Baldini Decl. ¶ 5. In that 17-month period, Akin attorneys have billed a total of only 1,411.2 hours to this matter, or less than 85 hours per month on average. *Id.* ¶ 19. Akin's work has included significant tasks such as (but not limited to) the following:

- Researching substantive and procedural issues related to the assertion of Plaintiffs' claim, and coordinating with Plaintiffs to develop an accounting of Confidential Information taken and/or retained by Fishback.

- Drafting and filing the First Complaint; analyzing Fishback's motion to dismiss, to strike, and to compel arbitration; and responding to the same.

15

- Drafting and filing the Amended Complaint; analyzing Fishback's second motion to strike; and responding to the same.

- Analyzing Fishback's Answer.

- Preparing the Initial Joint Letter and Proposed Case Management Order, and coordinating with Fishback's counsel with respect to schedular concerns (e.g., extensions, subsequent requests to the Court, etc.).

- Analyzing Fishback's Offer of Judgment that was inappropriately filed with the Court and drafting Plaintiffs' motion to strike the same.

- Drafting interrogatories and requests for production and responding to Fishback's 11 interrogatories and 76 requests for production.

- Collecting and reviewing more than 16,000 documents from Plaintiffs in response to Fishback's requests for production, and producing more than 2,600 documents to Fishback in seven rolling productions.

- Reviewing more than 10,900 documents produced by Fishback.

- Preparing and serving subpoenas on four third-parties, and reviewing nearly 500 documents produced by three of those third parties.

- Preparing for and conducting the depositions of: (1) Fishback on June 5, 2025; (2) third-party witness, Mr. Jeffrey Rehm on July 10, 2025; and (3) third-party witness, Mr. Jason Hathaway on July 17, 2025.

- Assessing settlement offers from Fishback and engaging in settlement discussions with Fishback's counsel at various points in the case.

- Drafting the August 8 Pre-Motion Letter and analyzing Fishback's response to the same.

- Drafting the September 3 Pre-Motion Letter, preparing for the September 4 Pre-Motion Conference, and drafting the September 10 Letter Reply in support of Plaintiffs' Motion to Compel.

- Preparing and negotiating the Proposed Stipulated Injunction Order.

*See* Baldini Decl. ¶ 25.

This total number of hours is reasonable and commensurate with the significant amount of work done by Akin over the course of litigating this case and resolving the issues of liability and injunctive relief.

2.      Akin's Efforts were Necessitated by Fishback's Own Wrongdoing and
        Litigation Conduct

A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (citation omitted); *see also Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) ("the hours required to litigate even a simple matter can expand enormously" when an attorney is forced to react to frivolous conduct by an adversary). Here, all of Akin's work—the vast majority of which was in discovery—was necessary to uncover the full extent of Fishback's wrongdoing. For his part, Fishback caused various issues during discovery, and worse yet, he never even had any colorable defenses to Plaintiffs' claim, despite ultimately admitting his liability. His refusal to acknowledge that reality earlier in this case resulted in needless litigation, which is unfortunately part of Fishback's broader playbook against Plaintiffs. As a result, Fishback should not be heard to complain about the hours that Akin rightfully expended in litigating this case.

a.      *Fishback's Conduct Drove Discovery*

The discovery Plaintiffs conducted here was extremely fruitful, and was necessitated by the wide scope of Fishback's misconduct in the first instance. In the Injunction Order, Fishback acknowledged that he violated the Confidentiality Provision on more than sixty occasions. Plaintiffs originally brought this suit in June 2024 after Fishback began making public statements confirming that he was in physical possession of Confidential Information, and at that point in time, were only aware of a handful of violations that are now detailed in the Injunction Order. Plaintiffs were also under the impression that Fishback no longer had any Confidential Information in his possession based on representations that he made to Greenlight, which he reasserted in his pleadings here. *See* Answer ¶ 78.

17

As reflected in the Injunction Order, however, Fishback did in fact possess and misuse Confidential Information after leaving Greenlight and during the pendency of this case.[4]  And discovery from Fishback and third parties in this case was not just necessary to confirm that Fishback still possessed Confidential Information he took directly via his Greenlight email address, but to uncover the vast majority of the violations now contained in the Injunction Order that were completely unknown to Plaintiffs and conducted through his personal accounts and devices.  This discovery revealed new schemes for misusing Confidential Information that were inconceivable to Plaintiffs at the outset of this case, and provided a much stronger basis for injunctive relief.  For instance, Plaintiffs discovered that Fishback had an undisclosed trading account in which he had been making investments that matched Greenlight's investments, *see* Injunction Order ¶ 10, used Greenlight's Confidential Information in efforts to secretly form an investment manager even before starting Azoria, *see id.* ¶¶ 14-16, and frequently transmitted a purported Greenlight track record to third parties he identified as potential Azoria investors, *see id.* ¶ 20.

Furthermore, conducting discovery in this case was a time intensive process due in large part to Fishback's own discovery issues.  Plaintiffs took Fishback's deposition on June 5, 2025. Following that deposition, it was clear to Plaintiffs that Fishback had not produced all requested responsive documents, and Plaintiffs were forced to press Fishback for additional discovery through several rounds of discovery letters from June through August 2025.  Baldini Decl. ¶ 26. A few notable examples of discovery issues include:

- Fishback failed to produce any text messages before his deposition, and testified in his deposition that he did not text often.  After a third-party witness produced numerous relevant text messages with Fishback, Plaintiffs pressed Fishback to search for texts following his deposition, and he ultimately produced nearly four

---

[4] For example, as detailed in the Injunction Order, Fishback retained and produced Greenlight's entire portfolio of investments, which was a document that Greenlight explicitly identified and asked him to delete, and that he previously (and as it turns out falsely) confirmed that he had deleted.  *See* Injunction Order ¶ 8.

hundred text messages after the close of fact discovery, which evidenced more than half of the sixty violations detailed in the Injunction Order. Baldini Decl. ¶ 26.

- One of Fishback's most blatant violations was his theft of Greenlight's portfolio of investments by forwarding the file to himself on his last day with Greenlight, which featured prominently in Plaintiffs' complaint. *See* Amended Complaint ¶¶ 3, 74-75. Prior to his deposition, Fishback produced the cover email for this violation, but failed to produce the attachment file containing Greenlight's portfolio of investments. Plaintiffs were forced to press Fishback for the attachment, which he only produced after the close of discovery. Baldini Decl. ¶ 26. Counsel explained in a letter that the original non-production was due to the file being password-protected, despite Fishback testifying in his deposition that the password for the attachment was in the cover email. *Id.*

- Another notable violation included in Plaintiffs' complaint was Fishback's retention and public discussion of an "internal trading ledger," his retention and disclosure of which is now included as a violation in the Injunction Order, where it is referred to as the IRR Sheet. *See* Amended Complaint ¶ 102; Injunction Order ¶¶ 6, 21. Fishback admitted that he disposed of the hardcopy of the IRR Sheet in late summer 2024, *see* Injunction Order ¶ 21, months after Plaintiffs commenced this case against him and put him on explicit notice that this document was at issue in this case in its original complaint. *See* First Complaint ¶ 157. As detailed in the Injunction Order, Fishback also originally failed to produce documents showing him sharing the IRR Sheet with third parties, and only produced it (again, after the close of discovery) after Plaintiffs informed him that they had subpoenaed a third party with whom he had shared the IRR Sheet and obtained a version of their communications showing the IRR Sheet from that third party. Injunction Order ¶ 21; Baldini Decl. ¶ 26.

        b.     *Fishback Never Had Any Colorable Defenses*

Fishback forced Plaintiffs' hand into conducting discovery knowing full well that he had no colorable defenses to any of his violations, needlessly dragging out the resolution of this case.

This case was ultimately resolved through the entry of the Injunction Order, in which Fishback himself admitted to violating the Confidentiality Provision on more than sixty occasions. In retrospect, this result should not be surprising, because it appears that Fishback never had any colorable defenses to Plaintiffs' claim, which left him no choice but admit his violations.

Indeed, more than two weeks before the parties submitted the Proposed Injunction Order, Fishback completely conceded to a finding of breach, as well as entry of injunctive relief and

19

Plaintiffs' entitlement to reasonable attorneys' fees. *See* ECF 61 at 1. Prior to that point in time, Fishback's sole defense against a finding of breach in his pre-summary judgment motion letter was that none of his breaches were material. *See* ECF 55 at 2. That defense was never colorable because "materiality" is simply not an element for a breach of contract claim. This is evident from each of the cases that Fishback cited in his letter, which all assessed materiality as part of the inquiry into whether the non-breaching party in each case was excused from their own obligations under the agreement—not whether a breach had occurred in the first instance.[5] Plaintiffs have never sought to be excused from their own obligations under the Employment Agreement, and such issues of "materiality" are inapposite here.

Simply put, Fishback concluded this case by acknowledging that he committed dozens of contractual breaches, he had clear knowledge of his own actions that constituted those breaches since the beginning of this case, and he has never been able to articulate any ostensible defense for those breaches. But instead of acknowledging this state of play early in the case, Fishback capitulated only after forcing Plaintiffs to discover the full extent of his breaches for themselves.

Fishback's attempt at a settlement "offer" pursuant to Federal Rule of Civil Procedure 68 (ECF No. 33, the "Rule 68 Offer,") at the outset of discovery is emblematic of the problem, as he used Rule 68 to create the appearance that he was making a reasonable, good faith offer, when in reality, it was improperly filed, substantively defective, and failed to acknowledge his inevitable liability.

---

[5] *See Orlander v. Staples, Inc.*, 802 F.3d 289, 293, 298 (2d Cir. 2015) (finding that plaintiff was not required to allege a material breach, as he did "not ask to be excused from performing his side of the contract, as he claims to have already performed in full"); *Korpak, Ltd. v. Williams Lea Inc.*, 2022 WL 375543, at *5 (S.D.N.Y. Feb. 7, 2022) ("[T]he materiality *vel non* of a breach of contract goes only to the question of the type of remedy that may be allowed, not to the issue of liability."); *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014) ("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.") (citation omitted).

20

First, as reflected in the Court's order striking the Rule 68 Offer, *see* ECF No. 38, the offer was filed on the docket, improperly drawing the Court into settlement negotiations. Second, in the Rule 68 Offer, Fishback did nothing more than offer to be enjoined from taking actions that would violate the Confidentiality Provision while **disclaiming liability and Plaintiffs' damages**. But Fishback was already prohibited from violating the Confidentiality Provision as part of his Employment Agreement, and this disclaimer left open the issue of how Plaintiffs were to recover their damages for bringing this action, which are explicitly provided for by the Employment Agreement.[6] This was in addition to the other validity issues raised by Plaintiffs in support of their Motion to Strike the Rule 68 Offer, which deprived Plaintiffs of the ability make a reasonable decision with respect to the "offer." *See* ECF No. 35.

Quite clearly, Plaintiffs obtained a more favorable result by continuing to litigate this case, as they not only secured injunctive relief, but a strong record of Fishback's breaches and liability that have paved the way for Plaintiffs to recover fees. With respect to Fishback's own litigation conduct, however, his handling of the Rule 68 Offer demonstrates that when presented with an opportunity for efficient resolution, he refused to reckon with his lack of defenses to breach and instead lobbed a defective Rule 68 Offer at the Plaintiffs that did nothing but stir up motion practice and create uncertainty and additional expense for both sides.

                    c.       *Fishback's Intent Was to Make This Case Difficult*

In retrospect, Fishback's choice to drag out this case was undoubtedly deliberate. This is just one of multiple cases that have been actively litigated between the parties, and Fishback has a demonstrated history of using the threat and burdens of litigation as a point of leverage with

---

[6] It is also unclear as to how Fishback supposes that there would have been a reasonable basis for the issuance of an injunction without the acknowledgment of any underlying contractual violations. Federal Rule of Civil Procedure Rule 65(d) provides that "[e]very order granting an injunction and every restraining order must . . . state the reasons why it issued [and] state its terms specifically . . . ." Fed. R. Civ. P. 65(d)(1).

Plaintiffs, irrespective of the legal merits of his claims or defenses. His conduct here is just another piece of that broader litigation strategy.

Fishback's motives can all be traced back to the desperate situation that he put himself in before leaving Greenlight. Specifically, when Fishback resigned: (1) he triggered an obligation to immediately repay hundreds of thousands of dollars he owed to Greenlight (*see* Note Action Compl., ECF No. 1 ¶ 25); and (2) in his final two weeks at the company, he inadvertently tipped off Greenlight as to his plans to misappropriate its Confidential Information and misrepresent his work with the company to support his launch of his own investment vehicle, Azoria.

Discovery in this action revealed that Fishback immediately resorted to manufacturing false pretenses for a lawsuit against Greenlight seeking millions of dollars. His goal was to use the suit as leverage to deter Greenlight from stopping any of his wrongful conduct or seeking repayment of his loan. The scheme to manufacture his false claim proceeded in two parts: (1) convincing a third party investment firm to send a reference check email (written by Fishback himself) to Greenlight inquiring about Fishback and a false title that he invented for himself ("Head of Macro"); and (2) suing Greenlight for defamation after it replied to correct the misstatement of Fishback's title, and falsely alleging in a sworn affidavit that the inquiring investment firm was likely to invest $5 million with Azoria, but did not pursue the investment due to Greenlight's response. Baldini Decl. ¶¶ 27-44; Exs. 12-21.

Discovery here showed that Fishback's statements in his affidavit—and the entire premise for his suit against Greenlight—were not just knowingly false, but were based on a course of conduct and events manufactured by Fishback for the purpose of conducting a fraud on the New York State Supreme Court. To start, the investment firm that sent the reference check was never considering investing in Azoria, as testified to at length in this case by both the sender of the

22

reference check email and the investment firm's Chief Investment Officer.[7]  Baldini Decl. ¶¶ 42-43; Exs. 19-20.  The sender of the email testified that he simply sent the email to Greenlight as a favor and at the request of his colleague at the time, Asaf Abramovich—Fishback's childhood friend and co-founder of Azoria.  Baldini Decl. ¶ 42; Ex. 19 at 34:9-36:11, 37:21-38:8.  Fishback himself had drafted the body of the reference check email, sent it to Mr. Abramovich, and conspired with Mr. Abramovich to arrange for one of his colleagues to send it to Greenlight to create the false impression of an interested investor.  *See* Baldini Decl. ¶¶ 34, 37-41; Exs. 14, 16-18; *see also* Ex. 20 at 22:22-23:15, 56:18-59:10.  If this scheme were not transparent enough, on the same day that Fishback sent Mr. Abramovich the draft email, he texted the draft to his father as well, spelling out his intentions in four subsequent text messages:  "We can have Asaf's assistant send this," "We need them to DEFAME us," "Which THEY WILL," and "That's another $1 MM right there."  Baldini Decl. ¶¶ 35-36; Ex. 15.

After Greenlight moved to compel arbitration of Fishback's defamation claims in the NYS Defamation Action, Fishback agreed to dismiss the claims in favor of arbitration, and reasserted them in the Arbitration in September 2024.  Baldini Decl. ¶ 45.[8]  He ultimately withdrew those claims in August 2025, however, after discovery in this action revealed that his claims were clearly fraudulent and frivolous.  *Id.*

In coordination with his frivolous offensive litigation against Greenlight, Fishback has been sure to drag out litigation where he is on the defensive, too.  For example, in Greenlight's Note Action against Fishback, Greenlight filed a pre-discovery summary judgment motion after

---

[7] Baldini Decl. ¶¶ 42-43; Ex. 19 at 34:6-8, 36:15-38:13, 39:21-40:17, 46:11-49:24; Ex. 20 at 44:14-46:24, 48:21-49:5, 55:16-23, 56:18-59:10, 61:6-64:6.

[8]  Discovery in this action also yielded documents showing that, before reasserting his defamation claims in the Arbitration, Fishback convinced a second third party to impersonate a potential Azoria investor (even though they were never considering such an investment) and send Greenlight a reference check (that Fishback again drafted), to ostensibly create more support for those false defamation claims.  Baldini Decl. ¶¶ 46-71; Exs. 22-38.

23

observing that Fishback had admitted all material allegations in his answer. But Fishback insisted that the case proceed through discovery, in which he produced no documents, took no depositions, and never marshaled any evidence to oppose Greenlight's motion; as a result, the Court ultimately ruled that Fishback "proffer[ed] no evidence or legal arguments in support" of his various "irrelevant" boilerplate defenses, and treated Greenlight's summary judgment as unopposed. *See Greenlight Cap., Inc. v. Fishback*, 2025 WL 965597, at \*5-7 (S.D.N.Y. Mar. 31, 2025). And notwithstanding Greenlight's total win, it was still required to endure the time and expense of a discovery process that was utterly pointless, and that Fishback insisted on solely to force Greenlight to bear the time and expense of vindicating its rights, and maintain a point of leverage in the parties' overall dispute.

That is the same tack Fishback has taken here. His dishonest and obstructionist approach to litigation with Plaintiffs should be admonished, not rewarded with fee reductions.

### 3.    Akin Worked Efficiently

From the outset of its engagement, Akin has staffed this matter leanly and distributed work such that the fees would remain relatively low. *See* Baldini Decl. ¶ 19. Despite this litigation spanning more than 17 months, this motion seeks recovery only for the time spent by four attorneys. *See id.* ¶ 19; Ex. 2. Workstreams were generally delegated to junior attorneys at lower rates, with associates billing approximately 83% of the attorney time in this case, and the only partner, attorney Baldini, billing the remaining 17% of the time. *Id.* ¶ 20.

There was no duplication of litigation efforts amongst tasks. *Id.* ¶ 21. For the first 12 months of the case, almost all of the "day-to-day" tasks were performed by attorneys Slemmer and Reichelscheimer, with attorney Baldini overseeing and advising accordingly. *Id*. Attorney Hershey began working on the matter in May 2025 in order to help expeditiously conduct

significant discovery.  *Id.*  Each of the depositions and conferences in this case was attended only by attorneys Baldini and Slemmer.  *Id.*

### C.      Plaintiffs are Entitled to Costs and Legal Assistant Fees

Section 11 of the Employment Agreement provides that each party thereto is entitled "to recover damages (including, without limitation, reasonable fees and expenses of counsel) by reason of any breach of any provision of this Agreement."  Baldini Decl., Ex. 1 § 11.  Second Circuit law affirms that attorneys' fees awards include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989).  Plaintiffs' costs are included in contemporaneous billing records.  Baldini Decl. ¶ 7; Ex. 2.  These costs primarily consist of customary research fees, managed document review, e-discovery, and deposition expenditures.  *Id.*

Plaintiffs also seek the recovery of paralegal, electronic discovery specialist, research specialist, and trial services manager time, to whom appropriate tasks were delegated at lower rates.  *Id.* ¶¶ 17-18.  These timekeepers billed a total of 51.6 hours, or less than 4% of total hours billed to this matter, at significantly lower rates than the attorneys on the team.  *Id.*

### CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that their motion be granted, and that they be awarded attorneys' fees in the amount of $1,747,626.75 and costs in the amount of $120,176.51.

New York, New York
Dated: October 10, 2025

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _/s/ Stephen M. Baldini_
Stephen M. Baldini
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Telephone: 212-872-1000
Fax: 212-872-1002
sbaldini@akingump.com

*Counsel for Plaintiffs Greenlight Capital, Inc. and
DME Capital Management, LP*

26