# Exhibit 11

**In the Matter Of:**

*GREENLIGHT CAPITAL v*

*FISHBACK*

---

*JAMES FISHBACK*

*June 05, 2025*

---



18

```
 1              06.05.25 | JAMES T. FISHBACK
 2   deposition taken?
 3        A.    My mom, my dad, and my colleagues.
 4        Q.    Okay.  Did you speak to any of
 5   those folks about the substance of your
 6   deposition?
 7        A.    No.
 8        Q.    And in connection with this action,
 9   were you asked to search for documents to
10   produce?
11        A.    I was -- yes, I handed over those
12   accounts to Mr. Kelton.
13        Q.    Okay.  Can you tell me what you did
14   to locate documents for production?
15        A.    Mr. Kelton's firm --
16          ATTORNEY KELTON:  Wait.  Don't talk
17   about anything we did, but you can say what
18   you did, so you gave us access.
19          THE WITNESS:  Oh, what I did.
20        A.    Gave them access to the accounts
21   that they requested.
22        Q.    Okay.  What accounts are you
23   referring to?
24        A.    My Gmail account.
25        Q.    Okay.  Any other accounts?
```

Case 1:24-cv-04832-PAE  Document 74-11  Filed 10/10/25  Page 4 of 35
GREENLIGHT CAPITAL v                                        James Fishback
FISHBACK                        Confidential                June 05, 2025

19

|    |    |                                      |
|----|----|--------------------------------------|
| 1  |    | 06.05.25 \| JAMES T. FISHBACK        |
| 2  | A. | My Macrovoyant account.              |
| 3  | Q. | Anything else?                       |
| 4  | A. | Azoria account and Twitter account.  |
| 5  | Q. | How about did you search any of      |
| 6  | your text messages?                  |
| 7  | A. | I did not personally search my text  |
| 8  | messages, no.                        |
| 9  | Q. | Do you use -- do you text often?     |
| 10 | A. | No.                                  |
| 11 | Q. | Do you use WhatsApp?                 |
| 12 | A. | I don't.                             |
| 13 | Q. | Do you use Signal?                   |
| 14 | A. | I don't.                             |
| 15 | Q. | Any other texting --                 |
| 16 | A. | Not really.                          |
| 17 | Q. | Okay.  You said that your counsel    |
| 18 | reviewed these accounts.             |
| 19 |    | Do you maintain a computer, a        |
| 20 | personal computer?                   |
| 21 | A. | I do.                                |
| 22 | Q. | How many?                            |
| 23 | A. | One.                                 |
| 24 | Q. | Is that the one in front of you?     |
| 25 | A. | Correct.                             |

172

```
 1              06.05.25 | JAMES T. FISHBACK

 2                          -  -  -

 3              (Whereupon, document GL-DME0000583

 4    through 590, is received and marked as Exhibit

 5    36 for Identification.)

 6                          -  -  -

 7         CERTIFIED STENOGRAPHER:  Exhibit

 8    Number 36.

 9         ATTORNEY BALDINI:  Okay.

10    BY ATTORNEY BALDINI:

11         Q.    Mr. Fishback, the court reporter

12    has just handed you an exhibit numbered 36.

13    Excuse me.  It's an email from you at

14    Greenlight Capital to your Gmail address,

15    dated 8/15/2023, and it is forwarding an email

16    from Geriann Bruno.

17              Do you see that?

18         A.    Yes.

19         Q.    Do you recognize this email

20    exchange?

21         A.    I do.

22         Q.    Why were you forwarding -- I'm

23    sorry.  The subject says:  End of day package.

24    Why were you forwarding this information to

25    yourself at your Gmail address?
```

173

1                06.05.25 | JAMES T. FISHBACK

2        A.    To keep a record of what the macro

3   positions were.  It was an ongoing

4   conversation with Mr. Roitman about whether I

5   would continue -- whether I would revert back

6   to my macro consulting role that I'd had for

7   the two years prior from becoming a full-time

8   employee.

9        Q.    Had you resigned from Greenlight at

10  this point?

11       A.    Yes.

12       Q.    Okay.  So I'm trying to understand

13  your last question.  What do you mean when you

14  say "whether I would revert back"?

15       A.    Well, I was a consultant for

16  Greenlight for two years before becoming an

17  employee.

18       Q.    Okay.

19       A.    And in my resignation letter, I

20  told Mr. Einhorn that I'd be happy to work as

21  a consultant.

22             My conversation with Mr. Roitman on

23  the Friday before suggested that that was

24  still an open possibility, and so before I

25  lost access to my Greenlight email, I

174

```
 1            06.05.25 | JAMES T. FISHBACK

 2  forwarded myself a copy of the portfolio so I

 3  could remember what the positions were in the

 4  event that Greenlight wanted to reretain me as

 5  a consultant.

 6       Q.   Okay.  What did you mean when you

 7  said "fireworks"?

 8       A.   Fireworks would have been the

 9  password of this document.

10       Q.   So the document was sent with

11  restricted access and you had to type in

12  "fireworks" in order to get access to the

13  document?

14       A.   I believe so.

15       Q.   And when you say -- I'm sorry.  I

16  just said "the document."  You're talking

17  about the attachment to the email that is in

18  front of you?

19       A.   (Indicating.)

20       Q.   So now this is on August 15, 2022.

21  This is a day after Mr. Roitman sent you his

22  email --

23       A.   Yes.

24       Q.   -- and the previous exhibit.

25            Did you ask permission from anybody
```

175

```
 1              06.05.25 | JAMES T. FISHBACK

 2   at Greenlight to send this information to your

 3   Gmail account?

 4        A.    I don't believe that I did.

 5        Q.    Is there a reason you didn't?

 6        A.    Not particularly.

 7        Q.    Okay.  What did you do -- excuse

 8   me.

 9              What did you do with the

10   information after you forwarded it to your

11   Gmail address?

12        A.    I don't remember.

13        Q.    You still have it today?

14        A.    I don't believe so.

15        Q.    Did you destroy the information?

16        A.    I believe that I did.

17        Q.    Did you send it to anybody else?

18        A.    I did not.

19        Q.    Okay.

20           ATTORNEY BALDINI:  Can I see 23?

21           CERTIFIED STENOGRAPHER:  Exhibit

22   Number 37.

23                        -   -   -

24              (Whereupon, document GL-DME0000604

25   through 607, is received and marked as Exhibit
```

176

```
 1              06.05.25 | JAMES T. FISHBACK

 2   37 for Identification.)

 3                          -   -   -

 4        THE WITNESS:  Thank you.

 5   BY ATTORNEY BALDINI:

 6        Q.    Mr. Fishback, we're showing you a

 7   document labeled Exhibit 37.

 8              This is an email exchange between

 9   you and Mr. Roitman, dated 8/15/2023.

10              Do you see that?

11        A.    Yeah.

12        Q.    Okay.  If I could ask you to turn

13   to the second-to-last page of that exhibit.

14        A.    Yes.

15        Q.    There is an email from Mr. Roitman

16   to you that says:  Sadly I have to be the bad

17   guy.  You've forwarded yourself this morning a

18   copy of our port sheet.  That was completely

19   inappropriate and illegal.  What were you

20   thinking, James?  Please delete it and confirm

21   deletion to me immediately via reply to the

22   email.

23              Do you see that?

24        A.    Yes.

25        Q.    Do you know what specifically he
```

177

```
 1              06.05.25 | JAMES T. FISHBACK

 2    was referring to when he said "copy of our

 3    port sheet"?

 4         A.   He would have been referring to the

 5    attachment in the previous exhibit.

 6         Q.   Okay.  Is that something that you

 7    typically called a port sheet?

 8         A.   I wouldn't have called it that, but

 9    he did.

10         Q.   What would you have called it?

11         A.   Probably an end of day package.

12         Q.   Okay.  And if you go back to the

13    first page, there's an email from you to

14    Mr. Roitman that says:  Deleted.  Period.  I

15    thought I was the, quote, head of macro, close

16    quote.

17              What did you do to delete the

18    document that Mr. Roitman was requesting?

19         A.   I believe I just deleted the email.

20         Q.   From your computer?

21         A.   Well, from the Gmail.

22         Q.   From the Gmail account.

23              Had you printed it out beforehand?

24         A.   I don't believe so.

25         Q.   Okay.  So did you delete only that
```

178

1

2     email or did you delete any other information?

3          A.    Well, he asked me to delete that

4     email.  So I responded and said that I deleted

5     that email.

6          Q.    Okay.  So when you say "deleted"

7     here, you're not referring to anything else

8     other than that email?

9          A.    Correct.

10           ATTORNEY BALDINI:  Sorry.  Just give me

11    a second.  Okay.

12         Q.    If I can --

13           ATTORNEY BALDINI:  What exhibit are we

14    on?

15         Q.    If I can direct your attention back

16    to Exhibit 36.

17         A.    Uh-huh.

18         Q.    Is that the email that you deleted?

19         A.    I believe so.

20         Q.    Okay.  There is content in the

21    actual body of the email from Geriann Bruno.

22    Do you see where I'm talking about?

23         A.    Yes.

24         Q.    The daily returns in the attached

25    package do not include the P and L, etc.?

179

```
1              06.05.25 | JAMES T. FISHBACK

2       A.    (Indicating.)

3       Q.    What's your understanding of what

4   that information is?

5       A.    It looks like performance

6   information.

7       Q.    Performance information.  Okay.

8             And so when you deleted the email,

9   you deleted the email and the attachment?

10      A.    (Indicating.)

11      Q.    Okay.

12      A.    Yes.

13      Q.    Thank you.

14         ATTORNEY BALDINI:  Can I have 74?

15                       -  -  -

16         (Whereupon, document Fishback

17   029285 and 29286, is received and marked as

18   Exhibit 38 for Identification.)

19                       -  -  -

20      CERTIFIED STENOGRAPHER:  Exhibit

21   Number 38.

22         ATTORNEY BALDINI:  Okay.

23   BY ATTORNEY BALDINI:

24      Q.    The court reporter has handed you a

25   copy of a document marked Exhibit 38.  Do you
```

180

```
 1              06.05.25 | JAMES T. FISHBACK

 2    see the document he's handed you?

 3         A.   Yes.

 4         Q.   And it appears to be a replica of

 5    the email that we just looked at in

 6    Exhibit 36.

 7              Do you see that?

 8         A.   Yep.

 9         Q.   Does it look to be the same to you?

10         A.   Yeah.

11         Q.   Okay.  So you produced documents in

12    this matter, and there is a Bates stamp at the

13    end of this exhibit that says:  Fishback

14    029285?

15         A.   Yep.

16         Q.   Which is a document that you

17    produced.  If you deleted this, can you

18    explain to me why this was a document that you

19    produced pursuant to the discovery in this

20    case?

21         ATTORNEY KELTON:  Objection, but you

22    can answer.

23         A.   I don't know.

24         Q.   Did you do anything to confirm that

25    the documents that you claim you deleted were,
```

181

```
1              06.05.25 | JAMES T. FISHBACK

2   in fact, deleted?

3         A.    I don't remember.

4         Q.    Are you aware of any other

5   documents that you claim were deleted that

6   have not, in fact, been deleted?

7         A.    I don't believe so.

8         Q.    Do you know where this document is

9   today in your computer systems?

10        A.    It appears to just be in this

11  email.

12        Q.    Okay.  So when you say "in this

13  email," do you know --

14        A.    Well, it would be in the Gmail, the

15  server here.

16        Q.    Okay.  Okay.

17              So when you told Mr. Roitman that

18  this email had been deleted, as you sit here

19  today, do you understand that it had not

20  actually been deleted?

21        A.    Let's see.  I think, and again,

22  this is nearly two years ago, what I think I

23  might have been referring to was deleting it

24  from -- I don't remember.

25        Q.    You don't remember -- you don't
```

182

1

2  have an explanation as to why this email

3  wasn't deleted despite the fact that you told

4  Mr. Roitman it was deleted?

5      A.   Correct.  I don't have an

6  explanation.

7      Q.   What's the actual name of Azoria?

8  Is it Azoria Legacy?  I'm sorry.  Is it Azoria

9  Partners, Inc.?  LLC?  What's the full title?

10     A.   Azoria Partners.

11     Q.   Okay.  And is it a single entity or

12 is it a group of entities?

13     A.    I think legally there are others.

14 I just -- I don't know exactly which one is

15 which.

16     Q.   What's the operating entity?

17     A.   Azoria Partners.

18     Q.   Okay.  And are you still employed

19 by Azoria Partners?

20     A.   Yes.

21     Q.   Are you a principal?

22     A.   I am.

23     Q.   What's your title?

24     A.   CEO.

25     Q.   CEO.

210

```
 1              06.05.25 | JAMES T. FISHBACK

 2        A.    I don't.

 3        Q.    And as far as you know, this is the

 4   full and final copy of this agreement?

 5        A.    That's my understanding.

 6        Q.    All right.

 7                           -   -   -

 8              (Whereupon, document Fishback

 9   029963, is received and marked as Exhibit 43

10   for Identification.)

11                           -   -   -

12        CERTIFIED STENOGRAPHER:   Exhibit

13   Number 43.

14        ATTORNEY BALDINI:   Okay.

15   BY ATTORNEY BALDINI:

16        Q.    Mr. Fishback, the court reporter

17   has handed you Exhibit Number 43.   It's an

18   email from you --

19        A.    Yeah.

20        Q.    -- to Mr. Abramovich, dated

21   September 27, 2023.   The subject is Jason

22   email.

23        A.    Uh-huh.

24        Q.    What does Jason email refer to?

25        A.    I don't know.
```

211

```
 1                06.05.25 | JAMES T. FISHBACK
 2          Q.    Well, take a look at the body of
 3      the email and see if that refreshes your
 4      recollection?
 5          A.    I've looked at the body.  I know
 6      what the email is.  I don't know what Jason
 7      email specifically refers to.
 8          Q.    Did you draft this email?
 9          A.    Did I draft this email?
10          Q.    Yes.
11          A.    It looks like I sent it, yes.
12          Q.    You sent it.  Did you draft it?
13          A.    I -- I -- I don't know.  It looks
14      like I sent it though.
15          Q.    What was your purpose in sending
16      this email?
17          A.    My purpose was understanding what
18      my former employer was disclosing to third
19      parties about my time at Greenlight.
20          Q.    Tell me what you mean by that.
21          A.    Well, if a third-party asked my
22      former employer about my time at Greenlight,
23      what would they have reported to them.
24          Q.    Okay.  So you sent this to
25      Mr. Abramovich.  What did you discuss with
```

212

```
 1              06.05.25 | JAMES T. FISHBACK
 2    Mr. Abramovich about this email?
 3         A.    I believe I asked Mr. Abramovich to
 4    send this to Mr. Roitman.
 5         Q.    Okay.  And it says:  Jason email.
 6    Does that mean you wanted Mr. Hathaway to send
 7    it?
 8         A.    I don't know.
 9         Q.    Okay.  Did Mr. Abramovich push back
10    and tell you that he didn't think it was
11    appropriate for them to send it?
12         A.    I don't believe so.
13         Q.    Did Mr. Hathaway --
14         A.    I didn't speak to Mr. Hathaway
15    about it.
16         Q.    How about Mr. Rehm?
17         A.    I didn't speak to Mr. Rehm about
18    it.
19         Q.    You never spoke to Mr. Rehm about
20    it?
21         A.    About this particular email?
22         Q.    Yes.
23         A.    I don't believe so, no.
24         Q.    The email has Mr. Roitman's
25    Greenlight Capital email address.
```

213

1            06.05.25 | JAMES T. FISHBACK

2            Do you see that there?

3      A.    Yes.

4      Q.    So it was your intention to have

5  somebody at Legacy cut and paste this email

6  and send it to Mr. Roitman so that you could

7  find out what your former employer was saying

8  about you?

9      A.    Correct.

10     Q.    And that's the extent of the

11  discussions that you had with Mr. Abramovich

12  about this email?

13     A.    I believe so.

14     Q.    And you didn't have any discussions

15  with Mr. Hathaway?

16     A.    No.

17     Q.    Or Mr. Rehm?

18     A.    I don't believe so.

19     Q.    Okay.  Now, at some point Mr. Rehm

20  did, in fact, cut and paste this and send it

21  to Mr. Roitman; correct?

22     A.    That's my understanding, because

23  Mr. Roitman had emailed it to me.

24     Q.    But he didn't -- Mr. Rehm didn't

25  tell you that before he sent it?

214

                    06.05.25 | JAMES T. FISHBACK

1

2        A.    I don't believe so.

3        Q.    Okay.  Did you draft any other

4   emails for people to send to Mr. Roitman?

5        A.    I don't immediately recall doing

6   that.

7        Q.    Did you draft one for Mr. Levitt?

8        A.    I don't remember.

9        Q.    And it's your understanding that

10  Mr. Rehm sent this email as drafted to

11  Mr. Roitman?

12       A.    That's my understanding.

13       Q.    And then forwarded Mr. Roitman's

14  response to you?

15       A.    That is my understanding.

16                       -  -  -

17            (Whereupon, document Fishback

18  034802 through 034804, is received and marked

19  as Exhibit 44 for Identification.)

20                       -  -  -

21       CERTIFIED STENOGRAPHER:  Exhibit

22  Number 44.

23            THE WITNESS:  Thank you.

24  BY ATTORNEY BALDINI:

25       Q.    The court reporter is showing you a

215

1              06.05.25 | JAMES T. FISHBACK

2    document marked 44.

3              Do you recognize this document?

4         A.    Yeah.

5         Q.    What is it?

6         A.    It appears to be a reference check

7    from Mr. Levitt.

8         Q.    The beginning of the email chain,

9    if you go to the back two pages, is an email

10   from Mr. Levitt to John Andrew and Daniel.

11             Do you know who John Andrew and

12   Daniel are?

13        A.    I believe that refers to John

14   Charecky, Andrew Simon, and one Dan Roitman.

15        Q.    Okay.  And did you draft this email

16   from Mr. Levitt as well?

17        A.    No.

18        Q.    What was your discussion with

19   Mr. Levitt about this email?

20        A.    I -- I did not draft this email.

21        Q.    That's not what I asked.  I asked

22   you what your discussion with Mr. Levitt was

23   about this email?

24        A.    I don't remember.

25        Q.    You don't remember?

216

```
 1                06.05.25 | JAMES T. FISHBACK
 2        A.    I don't remember.
 3        Q.    This email is fairly detailed and
 4   you don't have any recollection of what you
 5   discussed with Mr. Levitt about the terms of
 6   this email?  You just asked him to draft
 7   something?
 8        A.    I didn't -- well, I didn't ask him
 9   to draft anything.  I don't remember this
10   particular email, no.
11        Q.    I'm sorry, you didn't ask him to
12   draft anything?
13        A.    Did I ask -- sorry, did I draft
14   this email from Scott Levitt to Greenlight?
15   No.
16        Q.    Did you ask him to draft something?
17        A.    I don't recall if I asked him to
18   draft anything.
19        Q.    Now, you had known Mr. Levitt for,
20   I think you testified, 10 years roughly at
21   this point?
22        A.    Yup.
23        Q.    Why would -- and Mr. Levitt
24   invested in your prior fund; correct?
25        A.    Correct.
```

217

```
 1                06.05.25 | JAMES T. FISHBACK

 2        Q.    Why would Mr. Levitt need a

 3   reference check for you?

 4        A.    Trust, but verify.

 5        Q.    Explain to me what you mean by

 6   that?

 7        A.    Well, I trust that James Fishback

 8   is a good investor.  I trust he contributed in

 9   a positive way to his two years and seven

10   months at Greenlight, but allow me to verify

11   that.

12        Q.    Is that what Mr. Levitt told you

13   about this?

14        A.    No, you're asking me why.  I'm

15   speculating.

16        Q.    So you're speculating.

17              Why did Mr. Levitt send this email

18   to you?

19        A.    I -- it -- it appears that he was

20   sharing information about what Greenlight was

21   disclosing to him.

22        Q.    Okay.  And you discussed with

23   Mr. Levitt your dispute with Greenlight;

24   correct?

25        A.    I did.
```

218

```
 1              06.05.25 | JAMES T. FISHBACK
 2        Q.   Tell me what you discussed about
 3   your dispute with Greenlight.
 4        A.   I generally discussed what had been
 5   going on and so on.
 6        Q.   And what was his reaction?
 7        A.   I don't really remember his
 8   reaction.
 9        Q.   And how many times did you talk to
10   him about it?
11        A.   Maybe two or three.
12        Q.   During around the time of this
13   email?
14        A.   Yeah.
15        Q.   Okay.  When you said you generally
16   discussed what was going on, what did you tell
17   Mr. Levitt?
18        A.   That I had left Greenlight, that I
19   was starting a new firm, etc., etc.
20        Q.   And, but you said your dispute with
21   Greenlight.  What did you discuss about your
22   dispute with Greenlight?
23        A.   I don't remember what I discussed,
24   but, I mean, I think the dispute is
25   well-documented at this point.  So I would
```

219

```
 1              06.05.25 | JAMES T. FISHBACK
 2    manage the general public facts about the
 3    dispute.
 4         Q.    The pled facts that are on the
 5    public docket?
 6         A.    That's my understanding.
 7         Q.    Okay.  And did Mr. Levitt give you
 8    any advice with respect to the dispute?
 9         A.    I don't remember.
10         Q.    Did you tell Mr. Levitt anything
11    that you were intending to do with respect to
12    the strategy in the dispute?
13         A.    I don't believe so.
14         Q.    So was Mr. Levitt contemplating an
15    investment in Azoria at this point?
16         A.    It appears that he was, yes.
17           ATTORNEY KELTON:  Objection.
18         Q.    Did Mr. Levitt ever invest in
19    Azoria?
20         A.    He did not.
21         Q.    So when you were discussing the
22    dispute with Greenlight, were you doing so on
23    a personal level or on an investor
24    questionnaire level?
25         A.    On a personal level.
```

220

```
 1             06.05.25 | JAMES T. FISHBACK

 2        Q.    And after Mr. Levitt sent you

 3    Mr. Roitman's response, did you have any

 4    further discussions with him about the dispute

 5    with Greenlight?

 6        A.    I don't remember.

 7        Q.    When is the last time you spoke to

 8    Mr. Levitt?

 9        A.    Like two months ago.

10        Q.    What about?

11        A.    DOGE dividend.

12        Q.    Anything about Greenlight?

13        A.    No.

14        Q.    Any Greenlight personnel?

15        A.    No.

16        Q.    Anything about your disputes with

17    Greenlight?

18        A.    No.  And as you know, Mr. Baldini,

19    I've kept quiet about that for the better part

20    of seven months now.  I'd like to think I've

21    moved on from it.

22        Q.    Anything with respect to any other

23    legal actions?

24        A.    No.

25            ATTORNEY BALDINI:  Can I have 45?
```

221

```
 1              06.05.25 | JAMES T. FISHBACK

 2                       -  -  -

 3              (Whereupon, document GL-DME0005759

 4    through 5762, affidavit of James Fishback, is

 5    received and marked as Exhibit 45 for

 6    Identification.)

 7                       -  -  -

 8        CERTIFIED STENOGRAPHER:  Exhibit

 9    Number 45.

10        ATTORNEY BALDINI:  Okay.

11    BY ATTORNEY BALDINI:

12        Q.    Mr. Fishback, the court reporter

13    has just handed you an exhibit marked 45.

14              It's an affidavit that you gave in

15    a case pending in New York Supreme Court.

16              Do you recognize this?

17        A.    Yes.

18        Q.    In Paragraph 3, it says:  Soon

19    after starting Azoria Partners, I spoke with

20    Legacy Wealth Advisors, Legacy, which was

21    considering a substantial investment with

22    Azoria Partners?

23        A.    Correct.

24        Q.    What was the size of the investment

25    that Legacy was considering?
```

222

```
 1              06.05.25 | JAMES T. FISHBACK
 2       A.    I don't recall.
 3       Q.    We haven't seen any documentation
 4  that Legacy was considering an investment with
 5  Azoria.  Were these discussions oral or were
 6  they written?
 7       A.     They were largely early on with
 8  Mr. Abramovich and I.
 9       Q.    And did Mr. Abramovich have the
10  ability to make a commitment on behalf of
11  Legacy Wealth?
12       A.    He did not, but he would have had a
13  seat at the table.
14       Q.    What do you mean by that?
15       A.    He would have had a say.
16       Q.    And does Legacy Wealth, to your
17  knowledge, have an investment committee?
18       A.    In Azoria?
19       Q.    No.  No.  Does Legacy Wealth?  You
20  said he would have a say --
21       A.    Yeah, I believe there is an
22  investment committee, and he's on it.
23       Q.    Okay.
24             Was Mr. Abramovich associated with
25  Azoria at this point?
```

223

```
1              06.05.25 | JAMES T. FISHBACK

2       A.    He was not.

3       Q.    I believe in your last deposition

4  you said that you were partners with

5  Mr. Abramovich.  Did he leave Legacy at some

6  point and join Azoria full-time?

7       A.    No, he never left Legacy to join

8  Azoria.  This would have been in the fall

9  of -- late summer/fall of '24 he would have

10 joined Azoria, but never formally did.

11      Q.    Okay.  And then you say:  Upon

12 information and belief based upon my knowledge

13 of Legacy's -- of Azoria's business and of

14 such investment generally, the investment that

15 Legacy was considering would likely have been

16 in the amount of 5 million or more.

17            What are you basing that on?

18      A.    Well, that it was a seed

19 investment.  That was the discussion, that it

20 would have been a seed investment, so a Day 1

21 investment in the fund as opposed to a normal

22 investment.

23      Q.    And that was a discussion between

24 you and Mr. Abramovich?

25      A.    That's correct.
```

224

1          06.05.25 | JAMES T. FISHBACK

2      Q.    Anybody else at Legacy?

3      A.    No.

4      Q.    Did you ever exchange writings of

5  any kind with Legacy about the potential for

6  investing?

7      A.    I don't believe so.

8      Q.    Did you ever have a discussion

9  about it with anybody else other than

10  Mr. Abramovich?

11      A.    No, I discussed it with him in his

12  capacity as the investment committee of

13  Legacy.

14      Q.    But you didn't meet with anybody

15  else other than Mr. Abramovich with respect to

16  an investment in Azoria?

17      A.    I think I met with people, but I

18  don't know that I discussed beyond one meeting

19  beyond that.

20      Q.    Okay.  When was that?

21      A.    That would have been the early fall

22  of '23.

23      Q.    And who did you meet with?

24      A.    I think I went to the Legacy

25  offices and I think I met with Mr. Rehm and

225

| 1 | 06.05.25 | JAMES T. FISHBACK |

Mr. Abramovich.

    Q.    You met in a conference room at

Legacy's office?

    A.    Yes.

    Q.    And how long did that meeting last?

    A.    Half an hour or so.

    Q.    What did you discuss?

    A.    Generally catching up, at which

point I brought up the launch of Azoria.

    Q.    Okay.  And what did they say?

    A.    They expressed interest in it.

    Q.    And -- but there was no writing of

any kind that memorialized this meeting?

    A.    Not that I'm aware of.

    Q.    Okay.  Your next paragraph,

Paragraph 4, says:  Since Jeffrey Rehm, paren,

Mr. Rehm is responsible for due diligence on

behalf of Legacy, he contacted Daniel Roitman,

Chief Operating Officer of Greenlight, to

confirm certain details, including that my

position was the head of macro prior to the

end of my employment with Greenlight.

    A.    Uh-huh.

    Q.    Are you referring there to the

Case 1:24-cv-04832-PAE   Document 74-11   Filed 10/10/25   Page 32 of 35
GREENLIGHT CAPITAL v                                              James Fishback
FISHBACK                          Confidential                    June 05, 2025

226

```
 1              06.05.25 | JAMES T. FISHBACK
 2     email that you drafted and sent to
 3     Mr. Abramovich?
 4          A.    Yes.
 5          Q.    And so when you say Mr. Rehm
 6     contacted Mr. Roitman, he did so at your
 7     behest; right?
 8          A.    Not at my behest, but using the
 9     draft language that I had sent Mr. Abramovich.
10          Q.    Not at your behest?  He did it on
11     his own?
12          A.    Well, I mean, I didn't hold a gun
13     to his head.
14          Q.    Yeah, I understand, but was it his
15     idea?
16          A.    To confirm that I was the head of
17     macro to confirm my contributions?  I drafted
18     the language.  I don't know that it was not
19     his idea.  He sent it at the end of the day.
20          Q.    Do you know if Mr. Rehm knows that
21     you drafted that email?
22          A.    I think so.
23          Q.    What leads you to think so?
24          A.    I don't know.  I shouldn't say one
25     way or the other.  I just don't know.
```

227

```
 1              06.05.25 | JAMES T. FISHBACK

 2        Q.    And you didn't discuss it with him

 3   at all?

 4        A.    Mr. Rehm?

 5        Q.    Yeah.

 6        A.    Prior to him sending it?

 7        Q.    Yeah.

 8        A.    No.

 9        Q.    Okay.  In Paragraph 7, you say:  As

10   a direct result of Roitman's statement that I

11   was not head of macro at Greenlight, Legacy

12   decided to not proceed with its investment in

13   Azoria Partners.

14              What are you basing that on?

15        A.    Conversations after with

16   Mr. Abramovich.

17        Q.    And what did he say?

18        A.    That because it was not

19   confirmed -- or because Mr. Roitman did not

20   confirm the details of my employment, that

21   Legacy would not be proceeding.  It hurt my

22   credibility in their eyes.

23        Q.    Okay.  And Mr. Abramovich told you

24   this when?

25        A.    After this email, I believe after
```

228

```
 1              06.05.25 | JAMES T. FISHBACK
 2   Mr. Roitman responded to the email from
 3   Mr. Rehm.
 4        Q.   And so Mr. Abramovich said that it
 5   hurt your credibility with Legacy.
 6             Who at Legacy was he referring to?
 7        A.   Probably Mr. Rehm.
 8        Q.   But you didn't discuss this with
 9   Mr. Rehm at all?
10        A.   Afterward, no.
11        Q.   Okay.  You say "as a direct result
12   of Roitman's statement."
13             That is based exclusively on what
14   Mr. Abramovich told you?
15        A.   Yes, and the causal inference that
16   after Mr. Roitman responded to this email,
17   there was no moving forward with the Legacy
18   investment.
19        Q.   Okay.  So if I understand
20   correctly, for, in your words, a year plus,
21   while you were at Greenlight, you were
22   communicating with folks at Legacy about a
23   potential investment in Greenlight?
24        A.   Correct.
25        Q.   And your year plus didn't surprise
```

Case 1:24-cv-04832-PAE   Document 74-11   Filed 10/10/25   Page 35 of 35
GREENLIGHT CAPITAL v                                        James Fishback
FISHBACK                          Confidential              June 05, 2025

229

```
 1              06.05.25 | JAMES T. FISHBACK
 2    you because you assumed that these family
 3    offices move relatively slowly?
 4         A.    Yes.
 5         Q.    But the fact that they stopped
 6    pursuing an investment after one meeting led
 7    you to believe that their potential to invest
 8    in Legacy was dead?
 9         A.    No, I wouldn't say dead, but it was
10    severely hampered.
11         Q.    Okay.  I meant their potential to
12    invest in Azoria?
13         A.    Yeah, that's my understanding.
14         Q.    Okay.  And your understanding comes
15    exclusively from Mr. Abramovich's -- what he
16    said to you?
17         A.    Correct.
18         Q.    There is no writing to reflect
19    this?
20         A.    Correct.
21          ATTORNEY BALDINI:  Let's go to 56.  Do
22    you know what?  Give me A and B too.
23          I'm sorry, just A.
24          ATTORNEY SLEMMER:  Just A?
25          ATTORNEY BALDINI:  Yeah.
```