# Exhibit 19

**In the Matter Of:**

*Greenlight Capital, Inc. vs*

*Fishback*

---

*JEFFREY REHM*

*July 10, 2025*

---



```
                                                              33
1              THE COURT REPORTER:  Yes.
2              (Rehm Exhibit 4 was marked for identification.)
3   BY MR. BALDINI:
4       Q.   Okay.  Mr. Rehm, we just pulled up a document
5   that's been marked as Rehm Exhibit 4.  It's an e-mail
6   chain.  The chain at the bottom is an e-mail from
7   Mr. Fishback to Mr. Abramovich dated September 27, 2023.
8              Do you recognize that e-mail?
9       A.   Yes.
10      Q.   Okay.  Did you discuss this e-mail with
11  Mr. Fishback?
12      A.   No.
13      Q.   What's your understanding of what this e-mail
14  was?
15      A.   Asaf had approached me if I could do him a favor.
16  He had mentioned that he felt -- or Asaf relayed that
17  James felt that Greenlight was being dishonest or
18  disingenuous about his tenure and his work
19  responsibilities at Greenlight, and he asked me to send
20  the e-mail to -- just to verify his employment and what he
21  was actually doing at Greenlight.
22      Q.   And is this -- is an e-mail verifying employment
23  something that you would typically do as part of your due
24  diligence?
25      A.   On occasion, yes.
```

34

1    Q.    On occasion.

2          But in this case, I think you said you were not

3    looking at Greenlight as a potential for -- as potentially

4    investing in Greenlight; correct?

5    A.    That's correct.

6    Q.    And in this case were you looking at Azoria as a

7    possibility for Legacy investing in Azoria?

8    A.    No.  We were not actively looking at Azoria.

9    Q.    Okay.  And so I think you said this was a favor.

10         Mr. Abramovich asked you, as a favor, to send

11   this to Mr. Roitman at Greenlight?

12   A.    That's correct.

13   Q.    And if I'm understanding correctly, there was no

14   business purpose in sending this other than as a favor?

15   A.    Correct.  I trusted Asaf.  He was an employee,

16   and, you know, we'd communicate every day.  And he took

17   advantage of that friendship and trust.

18   Q.    Okay.  Can you -- can you expand on that?  Can

19   you tell me what you mean when you say "he took advantage

20   of that friendship and trust"?

21   A.    Well, he asked me to send this e-mail, and I did.

22   Q.    And when you say he asked you to send this

23   e-mail, that's -- that's the top part of this exhibit;

24   right?  That's him sending the e-mail to you for you to

25   send on to Mr. Roitman; correct?

35

1      A.    Correct.

2      Q.    Is there a reason that Mr. Abramovich didn't send

3 the e-mail himself?

4      A.    At the time I wasn't aware of any reason.

5      Q.    Was -- was it because this was part of your

6 responsibilities with Legacy and not Mr. Abramovich's?

7      A.    I would assume so.  I mean, for him -- perhaps

8 coming from me would have been more impactful than from

9 him.

10     Q.    Understood.

11           Did Mr. Abramovich advise you that Mr. Fishback

12 intended to use this e-mail in litigation with Greenlight?

13     A.    He did not.

14     Q.    And do you recall whether you discussed this with

15 Mr. Abramovich in person?

16     A.    Yeah.  He approached me in person about this.

17     Q.    Okay.  Is there anything else you recall about

18 your discussion with Mr. Abramovich regarding this e-mail?

19     A.    No.  Nothing material.  He asked me to do it, and

20 I did it.

21           MR. BALDINI:  Okay.  And then can we pull up

22 tab 8, please.

23           Can we mark this Rehm Exhibit 5, please.

24           THE COURT REPORTER:  Yes.

25           (Rehm Exhibit 5 was marked for identification.)

36

1    BY MR. BALDINI:

2        Q.    Okay.   Mr. Rehm, we just pulled up a document

3    marked Rehm Exhibit 5.

4            In your last answer you said, he asked me to do

5    it, and I did it.

6            Is this the e-mail where you forwarded the

7    previous e-mail we marked to Mr. Roitman?

8        A.    Yes.   It appears to be so.

9        Q.    Do you recall whether you made any revisions to

10   this -- to the e-mail that Mr. Abramovich had sent you?

11       A.    I don't recall any revisions.

12       Q.    Do you recall knowing who drafted the e-mail

13   originally?

14       A.    I do not.

15       Q.    Okay.   If I can direct your attention to the

16   line -- the first substantive line after, Hi, Daniel.   It

17   says, I hope this finds you well.   My firm is looking at

18   James Fishback's new hedge fund (Azoria Partners).

19            Do you see that?

20       A.    I do.

21       Q.    Did you mean anything by that?

22       A.    No, not me personally.

23       Q.    I understand.

24            Was Legacy, at that time, considering an

25   investment in Azoria Partners?

37

```
 1      A.   Not that I'm aware of.

 2      Q.   Okay.  So if you recall, Exhibit 4 -- I'm

 3 sorry -- Exhibit 3 was an e-mail from August of 2023 where

 4 Mr. Fishback told you he was resigning from Greenlight.

 5           This is now September of '23.  You know, call it

 6 almost two months later.

 7           Between the time you found out that Mr. Fishback

 8 resigned from Greenlight and the time you sent this

 9 e-mail, had Legacy done anything to look into a potential

10 investment in Azoria?

11      A.   Not that I'm aware of.

12      Q.   Had they received any written information about

13 Azoria?

14      A.   Not that I'm aware of.

15      Q.   Did you have any discussions with Mr. Fishback

16 about Azoria?

17      A.   Not in any detail, no.  I don't believe so.

18      Q.   Did you have any discussions with Mr. Abramovich

19 about Azoria?

20      A.   I don't recall.

21      Q.   So is it fair to say that other than

22 Mr. Abramovich's request for you to send this e-mail to

23 Mr. Roitman, that this e-mail was the only action taken by

24 Legacy with respect to Azoria?

25      A.   I believe so.
```

38

1      Q.   And -- and I hope this isn't redundant, but is it

2   also fair to say that the only reason you were sending

3   this e-mail was because you were asked to by

4   Mr. Abramovich?

5      A.   Correct.  I -- I was -- I was guided by somebody

6   who I trusted and --

7      Q.   Yeah.

8      A.   -- and didn't -- correct, so...

9      Q.   Okay.  And just to confirm, was Legacy likely to

10  make an investment in Azoria if there was a positive

11  outcome from this reference check e-mail?

12     A.   At that point in time, no.  We hadn't done any

13  work on Azoria.

14     Q.   Okay.

15          MR. BALDINI:  Can we pull up tab 12, please.

16          Okay.  Can we mark that Rehm Exhibit 6, please.

17          THE COURT REPORTER:  Yes.

18          (Rehm Exhibit 6 was marked for identification.)

19  BY MR. BALDINI:

20     Q.   Okay.  Mr. Rehm, we've pulled up a document here

21  that we've marked Rehm Exhibit 6, and it's a two-page

22  document.  We're just going to focus on the first.

23          So the top e-mail is an e-mail from you to

24  Mr. Abramovich dated September 29th, 2023.

25          Do you see that?

39

1     A.   I do.

2     Q.   Can you tell me what this e-mail exchange is.

3     A.   It's Mr. Roitman's reply to my initial e-mail

4  confirming or clarifying James' employment and

5  responsibilities at Greenlight.

6     Q.   And you were forwarding the exchange between you

7  and Mr. Roitman; correct?

8     A.   Yes.  Sorry.  And forwarding the response to

9  Asaf.

10     Q.   Do you send this e-mail exchange to anybody other

11  than Asaf?

12     A.   No.

13     Q.   Did you send it to Mr. Fishback?

14     A.   I did not.

15     Q.   Did you send it to anybody else at Legacy?

16     A.   I did not.

17     Q.   Did you discuss the e-mail exchange with

18  Mr. Abramovich?

19     A.   Not in any material way.  I just forwarded it to

20  him.

21     Q.   Okay.  Is it safe to say that this e-mail

22  exchange did not affect your impression of Azoria Partners

23  in any way?

24     A.   Affect my impression?  I'm not --

25     Q.   Yeah.  You -- I'm sorry.  That was a...

40

1           You sent a reference check to Mr. Roitman?

2      A.    Yes.

3      Q.    Mr. Roitman responded?

4      A.    Um-hum.

5      Q.    And then you forwarded that e-mail chain on to

6  Mr. Abramovich.

7           Was there anything in there that -- that affected

8  your willingness to invest in Azoria?

9      A.    No, not particularly.

10     Q.    Anything in there that impacted your willingness

11 to invest with Mr. Fishback in any way?

12     A.    No.  I didn't take it as positive or negative.

13 It was just data points about his employment.

14     Q.    Okay.  And other than just passing it along to

15 Mr. Abramovich, did you take any actions with respect to

16 the reference check?

17     A.    No.

18     Q.    Did you follow up with Mr. Roitman at all?

19     A.    I did not.

20     Q.    All right.

21          MR. BALDINI:  Can we pull up tab 13, please.

22          Okay.  We can mark this as Rehm Exhibit 6,

23 please.

24          THE COURT REPORTER:  Is it 7?

25          MR. BALDINI:  Yeah.  I'm -- I'd defer to you.  I

Confidential                    Jeffrey Rehm - July 10, 2025

41

1   guess so.  That's probably right.

2          I'm sorry.  You're right.  You're right, yes.

3          (Rehm Exhibit 7 was marked for identification.)

4   BY MR. BALDINI:

5      Q.   Okay.  Mr. Rehm, we're showing you a document

6   that's been marked Rehm Exhibit 7.

7          Do you see the document we're referring to?

8      A.   I do.

9      Q.   Am I correct that this is a screenshot of a text

10  exchange between yourself and Mr. Abramovich?

11     A.   It is.

12     Q.   Am I also correct that the blue noted bubbles in

13  here are you?

14     A.   Yes, they are.

15     Q.   Okay.  If you'll look in the middle of the page,

16  there's a blue bubble that says, You see Fishback email?

17  You want me to reply with anything?

18          Do you see that?

19     A.   I do.

20     Q.   And what is your recollection of why you sent

21  this?

22     A.   To make sure he saw the e-mail.  I don't recall

23  Asaf replying to me, so I just wanted to make sure he got

24  it.

25     Q.   Okay.

42

1      A.    I didn't mean anything with it.

2      Q.    Just above that Mr. Abramovich says -- he has a

3  text that finishes with, so I think the move is complete.

4          Do you know what he was referring to there?

5      A.    I don't recall.  I think he was buying a house or

6  just moving into a house he was renovating.  You know,

7  that's the only thing that I can think of at that point in

8  time.

9      Q.    Okay.  So that's unrelated to the e-mail exchange

10  that you had with Mr. Roitman?

11      A.    Correct.  All of this is unrelated except for

12  the -- my text and his reply.

13      Q.    Okay.  You mentioned below -- I'm sorry.  Below

14  that Mr. Abramovich says, No I send Fish the e-mail.  All

15  good.

16          Do you see that?

17      A.    I do.

18      Q.    And did you discuss that further with

19  Mr. Abramovich?

20      A.    No.

21      Q.    So from your perspective, once you had passed the

22  e-mail exchange to Mr. Abramovich on -- I mean, to

23  Mr. Roitman on to Mr. Abramovich, there was nothing

24  further to do with respect to this matter; is that

25  correct?

43

1      A.    That's correct.

2      Q.    And nobody asked you to follow up with

3  Mr. Roitman?

4      A.    No.

5      Q.    No one asked you to follow up with Mr. Fishback?

6      A.    No.

7      Q.    No one asked you -- or you didn't have any

8  further discussions with anybody at Legacy about the

9  e-mail exchange?

10     A.    Correct.

11     Q.    There was no internal call or e-mails on the

12  subject?

13     A.    Correct.

14     Q.    And is it -- is it safe to say that

15  Mr. Abramovich went silent on the idea of looking at

16  Azoria after this e-mail?

17     A.    I'm not sure about going silent.  We were never

18  really looking at it.  But I guess the answer would be

19  yes.

20     Q.    Okay.

21         MR. BALDINI:  Okay.  Can we pull up Exhibit 9,

22  please.

23         THE COURT REPORTER:  Tab 9?

24         MR. BALDINI:  I'm sorry.  Yes, tab 9.

25         Okay.  And could we mark this Rehm Exhibit 8,

44

1   please.

2           THE COURT REPORTER:  Yes.

3           (Rehm Exhibit 8 was marked for identification.)

4   BY MR. BALDINI:

5       Q.   Mr. Rehm, I'm showing you a document that's been

6   marked Rehm Exhibit 8.  It is an affidavit of

7   James Fishback that was sworn to and filed in a case in

8   the Supreme Court of the State of New York entitled

9   James Fishback against Greenlight Capital, Inc.

10          Do you see the document I'm referring to?

11      A.   I do.

12      Q.   Do you -- have you seen this document before?

13      A.   I've seen pieces of it.

14      Q.   Okay.  Other than in preparation for your

15  deposition today, have you seen the document?

16      A.   I got a -- just a -- I guess just a little

17  snippet of it where it mentioned my name.

18      Q.   And when did you see that?

19      A.   Couple days after they had an event at

20  Mar-a-Lago.

21      Q.   Can you be more specific?  Was there a time

22  frame?  Year?  Date?

23      A.   It was -- what was the year?  I think it was late

24  2023, I believe.  I believe the event was in December, so

25  it would have been maybe early 2024.

45

1      Q.    Who sent you the document?

2      A.    Eugene Frenkel.

3      Q.    So when you say you saw a snippet of it, that was

4    Mr. Frenkel sending you a copy of the portion of the

5    affidavit that had your name in it?

6      A.    Correct.

7      Q.    So did you -- did you discuss this with

8    Mr. Fishback?

9      A.    I did not.

10     Q.    Did you discuss it with Mr. Abramovich?

11     A.    I don't recall.

12     Q.    Did you have any -- were you aware that the

13   affidavit was being filed in the litigation before it was

14   filed?

15     A.    I was not aware.

16     Q.    Okay.  You said something to the effect of after

17   an event at Mar-a-Lago.

18          Can you tell me what you meant by that.

19     A.    I believe Asaf and James were at an event at

20   Mar-a-Lago, and shortly thereafter is when Eugene sent me

21   a snippet with my name in it -- in the affidavit.

22     Q.    Do you understand that anything about the event

23   led Mr. Frenkel to send the affidavit to you, or was it

24   just coincidental?

25     A.    Coincidental is -- I'm not sure.  I'd probably

46

1   assume that Asaf seemed to be more involved with Azoria

2   and James, and we were just -- Eugene took additional

3   steps to understand Azoria and James better, and this came

4   up through the research.

5       Q.   Okay.  And I -- if I'm correct, you said that

6   this was in -- your best guess was in early 2024?

7       A.   I believe so.

8           MR. BALDINI:  Okay.  So if we could scroll down

9   to the bottom of that first page, please.

10  BY MR. BALDINI:

11      Q.   Okay.  I'm going to direct your attention to

12  paragraph 3 there.

13          Do you see where I am, Mr. Rehm?

14      A.   Yes.

15      Q.   Okay.  The first sentence of paragraph 3 says,

16  Soon after starting Azoria Partners, I spoke with Legacy

17  Wealth Advisors, which was considering a substantial

18  investment in Azoria Partners.

19          Is that a true statement?

20      A.   Not for me it's not.

21      Q.   Okay.  And to your knowledge, was anybody at

22  Legacy considering a substantial investment in Azoria

23  Partners at that time?

24      A.   Not that I was aware of.

25      Q.   Okay.  Next sentence, I'm going to read it,

47

1  because it goes onto the next page, and we're going to

2  turn, so just so it's -- we avoid the awkwardness and we

3  have the full record.

4          It says, Upon information and belief, based upon

5  my knowledge of Legacy, of Azoria's business, and of such

6  investments generally, the investments that Legacy -- the

7  investment that Legacy was considering would likely have

8  been in an amount of $5 million or more.

9          Do you see that?

10      A.    I do.

11      Q.    Do you have any understanding that Legacy was

12  ever considering an investment in Azoria?

13      A.    Not that I'm aware of.

14      Q.    Do you have any understanding that Legacy had

15  ever considered an investment of $5 million or more in

16  Azoria?

17      A.    Not that I'm aware of.

18      Q.    Did you ever discuss with Mr. Fishback the

19  potential that Legacy would invest in Azoria?

20      A.    Not that I'm aware of.

21      Q.    And did you ever discuss the notion of a

22  $5 million or more investment with Mr. Fishback?

23      A.    No.

24      Q.    Okay.  Paragraph 4 refers to you, and it says,

25  Since Jeffrey Rehm (Mr. Rehm) is responsible for due

48

1   diligence on behalf of Legacy, he contacted Daniel

2   Roitman, Chief Operator Officer of Greenlight, to confirm

3   certain details, including that my position was as the

4   Head of Macro prior to the end of my employment with

5   Greenlight.

6           Do you see that?

7       A.   I do.

8       Q.   Is that the snippet you were referring to that

9   somebody had showed you in early 2024?

10      A.   I believe that was part of it, yes.

11      Q.   Okay.  Is this paragraph 4 of this affidavit

12  correct?

13      A.   It's -- it's functionally correct.  I -- I am

14  director of investments, but I did -- I contacted Daniel

15  Roitman at the request of Asaf.

16      Q.   And you did not contact him to confirm certain

17  details; correct?

18      A.   Correct.  I just forwarded -- I'm sorry.

19          So what details?  The --

20      Q.   Well, it says, confirm certain details, including

21  that my position was the Head of Macro prior to the end of

22  my employment with Greenlight.

23      A.   Right.  That was just part of the e-mail that was

24  sent to me to forward along.

25      Q.   Right.

49

1          That wasn't your motivation in sending the

2     e-mail?

3          A.    Correct.

4               MR. BALDINI:   Okay.  Let's, if we can, scroll

5     down to paragraph 7, please.  Thank you.

6     BY MR. BALDINI:

7          Q.    Okay.  Paragraph 7 states, As a direct result of

8     Roitman's statement that I was "not Head of Macro" at

9     Greenlight, Legacy decided to not proceed with its

10    investment in Azoria Partners, dealing a major blow to my

11    new hedge fund's ability to get off the ground.

12               See that?

13         A.    I do.

14         Q.    Is that a true statement?

15         A.    Not from -- no.  Well, we -- we were never really

16    considering an investment in Azoria, so I...

17         Q.    So is it true that as a direct result of

18    Mr. Roitman's statement that Mr. Fishback was not head of

19    macro, that Legacy decided not to proceed with an

20    investment in Azoria?

21         A.    That's not true.

22         Q.    And to your knowledge, would anybody at Legacy

23    have a different response to that question?

24         A.    I don't think so.

25         Q.    Okay.  So, Mr. Rehm, we discussed a little bit

50

1  earlier and you testified that at the time that you sent

2  out the reference check to Mr. Roitman, you were not aware

3  that Mr. Abramovich had a direct interest in Azoria.

4         Am I saying that correctly?

5  A.    That's correct.

6  Q.    Okay.  To your knowledge, were you or anybody at

7  Legacy aware that Mr. Abramovich was consulting with

8  Azoria?

9  A.    I knew he had spoken to James quite a bit and he

10 was helping him with some -- you know, as a friendly

11 conversation as friends, I know he was talking to James,

12 but not aware he was consulting specifically with some

13 equity ownership or partnership with Azoria.

14 Q.    Okay.  Did there come a time where you became

15 aware of that, that Mr. Abramovich had other interests in

16 Azoria?

17 A.    Just recently.

18 Q.    Can you give me a rough time frame when you say

19 "just recently"?

20 A.    Within the last year.

21 Q.    Within the last year.  Okay.

22        Was that as a result of the lawsuit that

23 you're -- between Greenlight and Mr. Fishback?

24 A.    Yes.

25 Q.    Was Mr. -- did Mr. Abramovich ever disclose his

51

1  interest in Azoria to you?

2      A.   Not that I'm aware of.

3      Q.   So Mr. Abramovich never disclosed any potential

4  interest in Azoria as part of a pitch that Legacy invest

5  in Azoria?

6      A.   I'm sure he wanted one of us to help his friend

7  out with an investment, but other than that, I don't

8  recall anything that specific.

9      Q.   Okay.

10         MR. BALDINI:   Mr. Rehm, we've been going for an

11  hour.  What I would like to do, if possible, is just put

12  it on mute for five or ten minutes.  I'm probably going to

13  have a few more questions for you, but I just want to try

14  to go back through the material and make it as efficient

15  as possible and cross out what we've talked about so that

16  we can try to keep this as concise as possible.

17         So is it okay with you if we take a five-,

18  ten-minute break?

19         THE WITNESS:   Sounds good.

20         MR. BALDINI:   Great.  I'll put it on a mute and

21  turn the video off.

22         Let's -- it's 12:05.  Let's come back on at

23  12:15, and I hope I can finish at least my questions

24  quickly after that.  Okay?

25         THE WITNESS:   Thank you.

52

1          (A recess was taken from 12:05 p.m. until

2      12:14 p.m.)

3          MR. ADAMS:  Okay.  Jeff's just going to clarify

4      one point on some of the chronology that we were just

5      walking through.

6          THE WITNESS:  Yeah.  The document I was looking

7      at where you put up the court case, I thought it was the

8      reference to the Greenlight suit against Mr. Fishback,

9      which I became aware of in December of '24.  I was not

10     aware of James' litigation with Greenback (sic) prior to

11     that.

12     BY MR. BALDINI:

13         Q.  Okay.  Understood.  And thank you for that

14     clarification.

15             But can I confirm that other than that you were

16     not aware of the document, it doesn't change the

17     substantive answers you gave with respect to the questions

18     we asked you about the document?

19         A.  Yes.  I believe that's fair.

20         Q.  Okay.  And there's nothing you need to correct in

21     any of your answers about the paragraphs that we asked you

22     about?

23         A.  No.  No.  Just to clarify, the December '24

24     knowledge when I became aware of the lawsuit was post the

25     Mar-a-Lago event, just prior to that.